IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MILTON OTIS LEWIS,

   Petitioner,      CIV-S-02-0013 FCD GGH DP

 vs.          **DEATH PENALTY CASE**

JEANNE WOODFORD, Warden,   ORDER and

   Respondent.     FINDINGS & RECOMMENDATIONS

            /

TABLE OF CONTENTS

*Introduction and Summary* ................................................... 5

*AEDPA Standards* ............................................................. 8

*Facts In a Capital Case Motion for Summary Judgment* ..................... 13

Petitioner's Claim for Automatic Discovery and Evidentiary Hearing ............. 14

Factual Background ............................................................ 15

Merits Discussion .............................................................20

 Claim 8 – Excessive Publicity ...........................................20

 Claim 33 – Lack of Speedy Trial .........................................23

 Claims 34 and 35 (Failure to Swear Jurors Prior to Filling out the
  Questionnaires (34) and Misrepresentation on the Questionnaire That
  the Jurors Had Been Sworn  ........................................ 24

Excusal of Jurors Grose (Claim 36), Trotter (Claim 37) and Burkhardt (Claim
      38) for Cause; Claim 39 – the Erroneous Excuals of These Three
      Jurors Requires Reversal; Claim 42 – Jurors Should Not Be Excused
      Because of Their Opinions Regarding the Likely Facts to be Presented .....24

Claims 40, 41 and 43 – Failure of the Trial Court to Excuse Juror Martin (40)
      and Horn (41) was Constitutional Error ....................................................29

Claim 44 – African-Americans Were Under Represented On the Jury Venire.......30

Claim 45 – Cumulative Error in Jury Selection .......................................................31

Insufficiency of the Evidence – Claim 46 (Hadix Testimony Demonstrated a
      Lack of Intent for Robbery or Burglary); Claim 47 (Baker Testimony
      Demonstrated a Lack of Intent for Robbery or Burglary); Claim 48
      (Rice Testimony Demonstrated a Lack of Intent for Robbery or Burglary);
      Claim 49 (Petititioner's Testimony Demonstrated a Lack of Intent for
      Robbery or Burglary); Claim 40 (Petitioner's Intoxication Prevented Him
      From Forming the Intent to Rob or Commit Burglary); Claim 57
      (Summation Claim of Why the Evidence Was Insufficient for Felony
      Murder and Only Established Only a Manslaughter) .................................32

Evidentiary Error – Claim 51 (Admission of Photos and Videotape); Claims
      52 and 53 (Practicing with a Buck Knife as Inadmissible Character
      Evidence); Claim 54 (Evidence of Prior Misconduct, i.e., Southard
      Fight and Uncharged Robbery); Claim 56 (Failure to Give Limiting
      Instruction re Southard Misconduct) .......................................................37

      *Claim 51 (Admission of Photos and Videotape)* .........................................37

      *Claims 52 and 53 (Practicing With a Buck Knife and Inadmissible,
            Irrelevant Character Evidence)* ......................................................41

      *Claims 54 (Evidence of Prior Misconduct, i.e., Southard Fight and
            Uncharged Robbery)*......................................................................45

      *Claim 56 (Failure to Give a Pin Point Instruction)* ..................................47

Claim 55 – Petitioner Was Entitled to a Separate Jury for the Penalty Phase ........48

Guilt Phase Instruction Error (Claims 59-68, 82 and 84) .......................................48

      *Claim 59 (Court Erred By Refusing the Manslaughter Instruction)* ..........48

      *Claim 61 (Failure to Give a Sua Sponte Instruction on Imperfect Self-
            Defense)* ........................................................................................58

      *Claim 68 (Ineffective Assistance of Counsel for Failure to Ask For an
            Imperfect Self-Defense Instruction)* ...............................................58*

\\\\\

*Claim 60 (Refusal to Give a Proffered Explanatory Instruction on the Temporal Relationship of Petitioner's Intent to Steal and Mr. Rumsey's Death; Claim 65 (The Jury Was Not Properly Instructed about the Temporal Relationship)* ...............................58

*Claim 62 (Failure to Give an Instruction Defining Voluntary Intoxication And Failure to Give That Part of the Intoxication Instruction Defining Specific Intent Necessary for Burglary and Robbery; Claim 66 (Ineffective Assistance of Counsel for Failing to Ask For Definition of Voluntary Intoxication)* ......................................61

*Claim 63 (Reasonable Doubt Instruction is Defective Because it Improperly Defines Presumption of Innocence; Claim 65 (The Reasonable Doubt Instruction Is Defective Because it Uses The Terms "Moral Evidence" and "Moral Certainty")* ................66

*Claim 67 (Ineffective Assistance of Counsel in Failing to Request CALJIC 8.83.1 – Sufficiency of Circumstantial Evidence to Prove Specific Intent); Claim 84 (Trial Court's Failure to Sua Sponte Give CALJIC 8.83.1)* .........................................68

*Claim 82 (Failure to Instruct the Jury That It Must Unanimously Agree On the Theory of Felony Murder Adopted, i.e., Robbery or Burglary)* ...........................................................69

Claim 71 – The Verdicts Were Inconsistent; Claim 72 – Inconsistencies in the Special Verdict; Claim 73 – Inconsistencies "Prove" That the Jury Did Not Understand How to Apply the Facts to the Law; Claim 74 – Failure to Object to the Inconsistent Verdicts Did Not Waive the Claim .............70

Claim 75 (Penalty Phase) Use of Preliminary Transcript to Prove the use of a Gun in the Horiuchi Robbery (Double Jeopardy) ......................................73

Hearsay (Prior Conviction) Was Admitted during the Penalty Phase (Claim 77); Admission of Prior Convictions Violates Due Process (Claim 78) .......... 78

Admission of Toombs Testimony/Lewis Denial (Claim 79); Ineffective Assistance of Counsel for Failing to Object (Claim 90) ...........................79

Miscellaneous Penalty Phase Asserted Instructional Errors:

Claim 80 – Failure to Instruct that the 1980 Horiuchi Robbery Must Be Found True Beyond a Reasonable Doubt;
Claim 81 – Failure to Instruct that the Greene Incident Must be proved Beyond a Reasonable Doubt;
Claim 85 – Failure to Instruct as to the Elements of Unadjudicated Criminal Activity;
Claim 86 – Petitioner Did not Waive his Right to Have the Jury Instructed as to Unadjudicated Criminal Activity;
Claim 88 – Use of the Terms "Circumstances," "Special Circumstances," "Aggravating Circumstances," and "Mitigating Circumstances" Are

3

Confusing;
Claim 89 – Failure of Counsel to Request that the Jury Be Instructed as to the
    Elements of Unadjudicated Criminal Activity Constituted Ineffectiveness;
Claim 95 – Ineffective Assistance of Counsel in Failing to Request Burden of
    Proof Instructions About the Greene Incident .............................................81

Prosecutorial Misconduct in the Penalty Phase; Claim 91 – Aguing that
    Petitioner Failed to Present Mitigating Evidence; Claim 92 – Arguing
    Fact Which Did Not Relate to Statutory Aggravating Factors; Claim
    93 – Arguing that Petitioner Lacked Remorse ...........................................86

Ineffective Assistance of Counsel for Failure to Object to Officer Smith's
    Testimony – Claim 94 ............................................................................ 89

The Checklist Claims:

    *Claims 25 and 101 – The Death Sentence was Disproportionate in*
        *Violation of the Eighth Amendment Because No Inter-Case*
        *Comparison is Required* ............................................. 90

    *Claim 29 – The Prosecutor Has Unbounded Discretion in Deciding*
        *To Bring a Death Penalty Case* ...................................90

    *Claim 76 – Use of Unadjudicated Violent Act Offenses in the Penalty*
        *Phase* ........................................................................92

    *Claim 83 – Failure to Instruct the Jury That it Must Find the Penalty*
        *Beyond a Reasonable Doubt* ........................................94

    *Claim 87 – Triple Counting of Evidence Regarding Petitioner's Intent*
        *To Steal Improperly Resulted in the Death Penalty* ...................96

    *Claim 96 – Ineffective Assistance in Failing to Object to the*
        *Constitutionality of California's Death Penalty Statute* ..............96

    *Claim 97 – The Death Sentence Fails Intra-Case Proportionality* .........97

    *Claim 98 – Failure to Require Written Findings by the Jury* ................. 97

    *Claim 99 – California Death Penalty Statute Fails to Narrow the*
        *Population of Death Penalty Eligible Defendants, Especially*
        *Felony Murder Defendants* ...........................................97

    *Claim 100 – California Death Penalty Statute is Unconstitutional*
        *Because it is Vague and Uses Otherwise Improper*
        *Aggravating Circumstances* .........................................98

    *Claim 101 – California's Death Penalty Statute is Unconstitutional*
        *Because it Fails to Require Inter-Case Review* ........................... 98

\\\\\

*Introduction and Summary*

Respondent has brought a motion for summary judgment on selected claims; petitioner has opposed and brought his own motion for summary judgment on selected claims. This is the second such motion brought in the case, and brings to an end law and motion on the merits prior to an evidentiary hearing. In order to understand what has been ruled upon, what is pending ruling, and what remains to be ruled upon at evidentiary hearing, the undersigned sets forth the following chart of the 103-claim First Amended Petition:

Claims Ruled Upon By Findings and Recommendations of July 12, 2005, Order of October 14, 2005 (summary judgment awarded to respondent):

1, 2, 3, and 7.

Claims pending ruling in this motion: ("R" = respondent's motion; "P" = petitioner's cross-motion):

8–R

25-R

29-R

33- R & P

34-R

35-R

36-R & P

37-R & P

38-R & P

39-R & P

40-R & P

41-R & P

42-R & P

43-R & P

1    44-R

2    45-R

3    46-R & P

4    47-R & P

5    48 -R & P

6    49 -R & P

7    50 -R & P

8    51 -R & P

9    52 -R & P

10   53 -R & P

11   54 -R & P

12   55 -R & P

13   56 -R & P

14   57 -R & P

15   58 -R & P

16   59 -R & P

17   60 -R & P

18   61 -R & P

19   62 -R & P

20   63 -R & P

21   64 -R & P

22   65 -R & P

23   66 -R

24   67 -R & P

25   68 -R

26   71 -R & P

1    72 -R & P

2    73 -R & P

3    74 -R & P

4    75 -R & P

5    76 -R & P

6    77 -R & P

7    78 -R & P

8    79 -R & P

9    80 -R & P

10   81 -R & P

11   82 -R & P

12   83 -R & P

13   84 -R & P

14   85 -R & P

15   86 -R

16   87 -R & P

17   88 -R & P

18   89 -R

19   90- R

20   91 -R & P

21   92 -R & P

22   93 -R & P

23   94- R

24   95 -R

25   96 -R

26   97 -R

1   98 -R & P

2   99 -R & P

3   100 -R

4   101 -R & P

5          For the reasons set forth below, no claims adjudicated in these motions need be

6   resolved at evidentiary hearing.  The remaining claims, i.e., those not adjudicated previously or in

7   these motions, will go to evidentiary hearing except for those claims which are procedurally

8   deficient under AEDPA, or shall otherwise be finally resolved after evidentiary hearing.[1]

9   Respondent will be permitted to oppose an evidentiary hearing on grounds that AEDPA

10  precludes such, but will not be permitted to make another motion for summary judgment on the

11  merits of these outstanding claims.  Accordingly, Claims 4 (petitioner's "helper" counsel

12  disbarred), 5, 6, 9, 10, 11, 12, 13, 14, 15,16, 17, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, 31, 32,

13  69, 70, 102, 103 (probably inadequately stated) are claims not discussed above that will go to

14  evidentiary hearing barring an AEDPA "diligence" flaw, or will be decided as a matter of law at

15  that time; petitioner will be allowed to seek *necessary* discovery on all fact-bound claims set

16  forth in this paragraph.

17  *AEDPA Standards*

18          The AEDPA applies to this petition for habeas corpus which was filed after the

19  AEDPA became effective.  The AEDPA "worked substantial changes to the law of habeas

20  corpus," establishing more deferential standards of review to be used by a federal habeas court in

21  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

22

23          [1]  As discussed at status conference, this motion for summary judgment was supposed to
    be omnibus, i.e., every claim susceptible to summary judgment was to be noticed.  Moreover, to
24  the extent respondent has "reserved the right" to bring further motions on the above listed claims
    for adjudication, based upon a different theory such as procedural default, the court recognizes no
25  such reservation of rights.  It is one thing to allow motion practice on various claims at different
    times as the court has already permitted; it is quite another to piecemeal motions on a particular
26  claim.

1   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

2          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

3   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

4   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

5   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

6   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

7   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

8   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

9   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

10          "Unreasonable application" of established law, on the other hand, applies to

11   mixed questions of law and fact, that is, the application of law to fact where there are no factually

12   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

13   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

14   AEDPA standard of review which directs deference to be paid to state court decisions.  While the

15   deference is not blindly automatic, "the most important point is that an *unreasonable* application

16   of federal law is different from an incorrect application of law....[A] federal habeas court may not

17   issue the writ simply because that court concludes in its independent judgment that the relevant

18   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

19   that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

20   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

21   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

22   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

23          The state courts need not have cited to federal authority, or even have indicated

24   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

25   Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

26   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

9

1   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

2   occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003). Moreover,

3   the established Supreme Court authority reviewed must be a pronouncement on constitutional

4   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

5   binding only on federal courts. Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

6          However, where the state courts have not addressed the constitutional issue in

7   dispute in any reasoned opinion, the federal court will independently review the record in

8   adjudication of that issue. "Independent review of the record is not de novo review of the

9   constitutional issue, but rather, the only method by which we can determine whether a silent state

10  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

11  2003).

12         One issue concerning the standard of review is especially important here –that is,

13  what level of specificity of Supreme Court rulings is required for the "unreasonable application

14  of established Supreme Court authority." For example, beyond any doubt, a defendant is entitled

15  by virtue of Supreme Court authority to due process in the conduct of criminal proceedings. But,

16  such an absurd level of generality would make AEDPA a dead letter. On the other hand, one

17  need not obtain completely on-point factual similarity before Supreme Court decisions can be

18  applied. Of course, the difficult part is correctly drawing the specificity line. The authority

19  below assists in drawing that line and will be applied herein.

20             [A]n affirmative answer to the first section 2254(d)(1) inquiry –
              whether the Supreme Court has prescribed a rule that governs the
21            petitioner's claim – requires something more than a recognition
              that the Supreme Court has articulated a general standard that
22            covers the claim. To obtain relief at this stage, a habeas petitioner
              must show that Supreme Court precedent requires an outcome
23            contrary to that reached by the relevant state court.

24             We caution that this criterion should not be applied in too rigid a
              manner. A petitioner need not point a habeas court to a factually
25            identical precedent. Oftentimes, Supreme Court holdings are
              "general" in the sense that they erect a framework specifically
26            intended for application to variant factual situations. These rules

1                        sufficiently shape the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision

2                        under section 2254(d)(1)'s "contrary to" prong.

3   Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 885, 886 (3rd Cir. 1999).

4              The precisely similar inquiry in qualified immunity cases aids the discussion here

5  as well:

6                        The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to

7                        be identified.  For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a

8                        sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a

9                        clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of "clearly

10                     established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness"

11                     that is the touchstone of Harlow.  Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly

12                     establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.  Harlow would be

13                     transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our

14                     cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance

15                     of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for

16                     damages."  Davis, 640 supra, 468 U.S., at 195, 104 S.Ct., at 3019. [FN2] It should not be surprising, therefore, that our cases establish

17                     that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more

18                     relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

19                     violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question

20                     has previously been held unlawful, see Mitchell, supra, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; but it is to say that in the light

21                     of pre-existing law the unlawfulness must be apparent.  See, e.g., Malley, supra, 475 U.S., at 344-345, 106 S.Ct., at 1097-1098;

22                     Mitchell, supra, 472 U.S., at 528, 105 S.Ct., at 2816; Davis, supra, 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019.

23

24  Anderson v. Creighton, 483 U.S. 635, 639-640, 107 S. Ct. 3034, 3038-3039 (1987) (qualified

25  immunity).

26  \\\\\

An instructive application of the above law appears in the "due process" biased juror issue of <u>Sims v. Rowland</u>, 414 F.3d 1148, 1153 (9th Cir. 2005):

> More importantly, no Supreme Court precedent holds that a failure to investigate potential juror bias presents structural error, and even if we were to read <u>Dyer</u> to address potential juror bias, it would be insufficient authority under AEDPA.  See <u>Hernandez</u>, 282 F.3d at 1140.  Although the Supreme Court recognized in <u>Tumey v. Ohio</u> that a trial before a biased judge presents structural error, it has not applied this principle to trials by biased jurors, much less in cases where there is only potential bias.  273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

> Accordingly, it remains for us to decide whether the state court's failure to hold an evidentiary hearing sua sponte when presented with evidence of juror bias is contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  We hold that it is not.  The reason is simple:  the Supreme Court has not yet decided whether due process requires a trial court to hold a hearing sua sponte whenever evidence of juror bias comes to light.

Another recent illustrative example derives from the case of <u>Carey v. Musladin</u>, __U.S.__, 127 S. Ct. 649 (2006), involving an audience wearing "victim" buttons.  Although some parallels existed between the issue of "audience misconduct" and prosecutorial misconduct, as both should be resolved by the trial judge, the Supreme Court held that its prosecutorial misconduct authority was not related enough to the audience victim buttons issue to be applied.  Accordingly, unless the Supreme Court precedent more or less directs the outcome in the sense that the parallels between the situations are reasonably unavoidable, AEDPA will not permit a finding that state courts violated clearly established Supreme Court law.  The court now turns to a discussion of the case background and the merits.

Finally, although circuit cases may be of some assistance in determining the breadth of Supreme Court pronouncements for AEDPA purposes, circuit authority cannot establish the clearly established law itself.  See <u>Alberni v. McDaniel</u>, 458 F.3d 860, 864 (9th Cir. 2006).

\\\\\

*Facts In a Capital Case Motion for Summary Judgment*

Although motions for summary judgment are appropriate in habeas corpus proceedings, Blackledge v. Allison, 431 U.S. 63, 97 S. Ct. 1621 (1977), the facts for such motions are presented in a decidedly different manner than in ordinary civil actions. This is so because habeas corpus law, both statutory and case-made, preempt the normal rules for factual presentation. Firstly, except for claims made outside the record, the facts are those contained within the record as a whole. Neither petitioner nor respondent may elevate his stated record facts to a status of "undisputed" by picking and choosing facts from that record. The record is what it is and cannot be excised in part.

Closely related to the above principle is that factual determinations made by the finder of fact at the trial level, including the jury, are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). This would include necessary inferences from the jury's verdict itself. See e.g., McCullough v. Bennett, 413 F.3d 244, 249 (2nd Cir. 2005). Moreover, to the extent that the appellate courts make findings of fact, such fact finding is also entitled to the presumption of correctness. Sumner v. Mata, 449 U.S. 539, 101 S. Ct. 764 (1981).

Thus, for example, if the jury here rejected a claim that petitioner was intoxicated, or such was a necessary inference from the verdict, petitioner has the burden of showing the error of such, i.e., by clear and convincing evidence from the record that petitioner was sufficiently intoxicated. Sufficiency of the evidence issues are by definition decided upon the record.

For the most part, claims outside the record are those which closely dovetail with ordinary summary judgment procedures. It is these claims which will not have a state court record, unless factual findings were made in the state court habeas proceedings. The court will refer to the record, and not a party's statement of undisputed facts, unless the claims appropriately involve facts outside the record. Of course, facts outside the record presented for purposes of demonstrating issues of fact, i.e., the need for a full factual hearing, must be presented in an admissible fashion.

13

_Petitioner's Claim for Automatic Discovery and Evidentiary Hearing_

Petitioner does not challenge a summary judgment procedure insofar as such claims may be entirely legal in nature.  However, petitioner is mistaken that he is automatically entitled to discovery on claims having any factual context simply because he requests discovery. He is doubly mistaken that he is entitled to an evidentiary hearing on any claim in which he simply concludes that there _may_ be facts which he _might_ find through discovery, and _might_ present at evidentiary hearing.

First, the Ninth Circuit has endorsed summary judgment in the capital case context as a procedure which can be utilized to ferret out factually baseless claims.  Rich v. Calderon, 187 F.3d 1064, 1067 (9th Cir. 1999):  "In fact, the Magistrate Judge established an entirely reasonable process to deal with the claims for which Rich sought discovery and a hearing."[2]  This is so whether or not petitioner has generally pled a conclusion of violation of his rights.  As seen from the previous section, the Supreme Court has expressly permitted the allegations of a habeas petition to be tested by summary judgment procedures.  Blackledge v. Allison, supra.  Therefore, even if a petition has set forth facts with some specificity and, as such, a petitioner would normally be entitled to an evidentiary hearing, Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998), nothing in AEDPA or the case law precludes the court from requiring petitioner to come forward earlier at summary judgment and present the court with _some bona fide factual basis_ for claims whose facts lay outside the record through an evidentiary showing before moving to the evidentiary hearing itself.  Indeed, the Supreme Court has required a petitioner to do so.

Moreover, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record."  Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998). \\\\\

---

[2]  The undersigned was that Magistrate Judge and summary judgment was the "entirely reasonable" procedure.

1    Finally, it is beyond dispute that even if petitioner alleges specific facts in good

2    faith, and can present an actual factual basis for the claim, no evidentiary hearing is necessary if

3    the facts as proven would not constitute a basis for granting the claim.  Correll, supra.  For

4    example, on a claim of ineffective assistance of counsel, if the facts concerning unreasonableness

5    of counsel's actions were to be accepted, but such would not demonstrate prejudice, there is no

6    need to hold a factual hearing on the reasonableness prong of ineffective assistance – the claim

7    would be denied in any event on the prejudice prong.

8    Moreover, a petitioner, even a capital case petitioner, has no automatic right to

9    discovery.  Every petitioner must show good cause for such discovery through a factual showing

10   developed in informal investigation which demonstrates the need for further, formal factual

11   development.  Bracy v. Gramley, 520 U.S. 899, 117 S. Ct. 1793 (1991).  As stated in Rich, 187

12   F.3d at 1067:  "Habeas is an important safeguard whose goal is to correct real and obvious

13   wrongs.  It was never meant to be a fishing expedition for habeas petitioners to 'explore their

14   case in search of its existence.'"

15   *None* of the claims referenced below in this adjudication require an evidentiary

16   hearing or discovery.

17   *Factual Background*

18   Because the factual background contained herein will be helpful to the reader to

19   place petitioner's claims in proper context, the court quotes the factual summary of the California

20   Supreme Court.

21   A jury convicted defendant Milton Otis Lewis of one count of first
     degree murder (Pen. Code, § 187), [FN1] and found true the

22   special circumstance allegations of robbery murder (§ 190.2,
     former subd. (a)(17)(i) [now subd. (a)(17)(A)]), and burglary

23   murder (§ 190.2, former subd. (a)(17)(vii) [now subd. (a)(17)(G)]).
     The jury also convicted defendant of two counts of robbery, one

24   count of burglary, and one count of attempted murder.  At the
     penalty phase, the jury returned a verdict of death for the first

25   degree murder with special circumstances.  After denying
     defendant's automatic motion to modify the death verdict (§ 190.4,

26   subd. (e)), the trial court sentenced defendant to death for the first

15

degree murder, and to a total determinate term of 21 years in state prison for the remaining counts.

FN1 All further statutory references are to the Penal Code unless otherwise stated.

Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We will affirm the judgment in its entirety.

I. Facts

A. The Prosecution's Guilt Phase Evidence

In December 1988, James and Helen Rumsey lived in a unit of the Shasta Pines Apartments in Redding. Marie Baker, a methamphetamine user, lived in another unit in the same building. Staying with Baker at that time was 15-year-old Amy Hadix, who also used methamphetamine regularly.

June Rice, another renter at the Shasta Pines Apartments, sold drugs from her apartment.  On December 21, 1988, defendant, who knew Rice and was a methamphetamine user, came to Rice's apartment with a man who wanted to sell some drugs.  Rice directed them to Baker's apartment.

On December 24, 1988, around 10:00 or 11:00 a.m., the Rumseys came to Baker's apartment to give her back some money they owed her.  In defendant's presence, James Rumsey pulled a wallet from his back pocket and removed $50, which he handed to Baker.  A short time later, also in defendant's presence, Baker's eight-year-old daughter commented on James Rumsey's money, saying, "Oh, Mom, he's got gobs."

Later that day, defendant went to June Rice's apartment and bought a half-gram of methamphetamine with money he had taken from a man after a fistfight in Baker's apartment.  After injecting the drugs, he told Rice they were "decent."  When he returned to Baker's apartment, however, he complained to Baker and Hadix that the drugs were no good.  They told him to return to Rice's apartment to get either more drugs or his money back.  When Hadix said she was going downstairs to visit another renter, defendant went with her.

As Hadix passed the Rumseys' first floor apartment, she noticed the door was ajar, and she greeted James, who was seated in an easy chair just inside the doorway.  Suddenly, defendant jumped on James and stuck a knife in his neck.  He then reached into James's back pocket, pulled out his wallet and opened it, but found no money in it.

\\\\\

When Helen Rumsey tried to come to her husband's aid, defendant kicked her hard in the groin area, causing her to fall. As she got up, defendant thrust the knife into her throat, and she fell to the floor. Defendant returned to James and tried to reach into the front pocket of his pants, but he was unsuccessful. He turned James's body over and retrieved a pocketknife from his back pocket. Defendant then picked up a gun belonging to James from a nearby table and held it to Helen's forehead as she struggled to her knees. Yelling obscenities at her, defendant threatened to shoot unless he got some money. He pulled the trigger, and Helen heard a click. She then crawled to where James was lying, opened the wallet defendant had looked in but discarded, and removed $250 in $50 bills that had been hidden in a secret compartment. After Helen handed defendant the money, he picked up James's pocketknife and gun, grabbed the knife he had brought with him, and walked out the door.

Meanwhile, Hadix had run to Tim Smith's apartment and told him that defendant was killing the Rumseys. A few minutes later, defendant appeared at Smith's door and told Hadix to come with him to June Rice's apartment. On arrival, defendant pulled James's gun from his pocket and pointed it at Rice, complaining about "bunk dope." Hadix ran to the bathroom in fright but came out a minute later after hearing a neighbor yell that Helen Rumsey had been stabbed. She ran to Baker's apartment, and defendant followed.

Once back inside Baker's apartment, defendant went to the kitchen to wash blood from his hands. He ordered Baker to hold the gun for him, but she refused. Defendant then handed Baker $250 in $50 bills and told her to hold the money for him. He told Hadix to come with him, and they left. Baker later found defendant's buck knife on her kitchen counter. She wrapped it and threw it away. As to the money defendant had left with her, she spent $50 on groceries and the rest on methamphetamine.

After leaving Baker's apartment, defendant, accompanied by Hadix, hid the gun in a shed behind the apartment complex. They then proceeded to a garbage bin belonging to a nearby church. Defendant opened the lid, threw Hadix inside, and then jumped in himself. They hid there for six or seven hours. During this time, Hadix asked defendant why he had killed James Rumsey. Defendant replied, "It had to be done." The next morning, defendant and Hadix returned to the shed to retrieve the gun, and, at Hadix's suggestion, they went to her parents' home, which was close by.

Shortly thereafter, the police arrived at the home of Hadix's parents. When Hadix's father opened the door for the officers, defendant fled into the bathroom. Defendant ignored the officers' orders to put his gun down and come out. Forty-five minutes later,

defendant emerged, leaving the gun in the bathroom.

An autopsy showed that James Rumsey died from hemorrhaging caused by a five-inch-deep knife wound to the front of the neck. Helen Rumsey sustained knife wounds to the side and back of her neck; one of these wounds was directly over the carotid artery.

Forensic testing showed that the gun retrieved from the bathroom of Hadix's parents' home was the gun taken from the Rumseys' apartment.  The gun held a full magazine, but there was no round in the chamber.

B. The Defense Guilt Phase Case

Testifying in his own defense, defendant said he had gone to Baker's apartment for the first time on December 21, 1988, accompanied by a friend who wanted to sell Baker some methamphetamine.  Defendant was homeless and had no money, so he stayed with Baker for the next three days.  During that time, there was drug use and constant activity in the apartment, and defendant neither slept nor ate.

On December 24, just after dark, defendant bought methamphetamine from June Rice and injected it while still in her apartment.  Five minutes later, he bought more methamphetamine from Rice's companion and, again, promptly injected it.  The drugs had an immediate and powerful effect.  When he went back to Baker's apartment, he told Baker he had bought drugs from Rice and the drugs were "decent."  Baker was angry with defendant for not sharing the drugs with her and suggested he get some more drugs from Rice by complaining that what he had bought was no good.  Feeling badgered and upset, defendant left the apartment with Hadix to see Rice.  Defendant carried a steak knife in his hand in case he encountered violence at Rice's apartment.  On the way, Hadix harangued him about getting more drugs.

When he and Hadix came to the Rumseys' apartment, defendant mistakenly believed it was Rice's apartment.  He became confused and could feel himself "ball up inside" because he was afraid he was going to be attacked by Rice's companion.  Suddenly, he heard a whirring sound and saw James Rumsey start to get out of his chair by the door.  Defendant became scared and stabbed him once, not knowing whom he was stabbing.  When Helen Rumsey rushed at him, he stabbed her also.

Defendant recalled removing James's wallet and not finding any money in it.  He admitted yelling at Helen, "Bitch, if you don't get me more money, I'll get you, too."  He also remembered that after Helen handed him the money from the wallet, he picked up James's gun from the table, but he denied pointing it at Helen's forehead and pulling the trigger.

18

Defendant remembered leaving the Rumseys' apartment and proceeding to Rice's residence. Once inside, he pulled out the gun and demanded more drugs. About a minute later, he was interrupted when a neighbor came to the door seeking help for the Rumseys.

When defendant returned to Baker's apartment, he dropped the knife in the sink full of dishwater. At Baker's direction, he put the knife in the garbage, which he and Hadix took and disposed of on their way out.

When called as a defense witness, the investigating officer, Sergeant Lebak, testified that Hadix had told him of entering the Rumseys' apartment with defendant.

C. The Penalty Phase

At the penalty phase of the trial, the prosecution presented evidence of six incidents of unadjudicated violent criminal activity, one robbery that resulted in a felony conviction, and a felony drug conviction.

In December 1971, a police officer saw defendant fighting with a woman on a street corner in Los Angeles. Defendant shook the woman, threw her to the sidewalk, struck her in the head with his fist, and knocked her against an apartment building, rendering her unconscious. Defendant resisted arrest, and the officer used a choke hold to subdue him.

In July 1980, around 10:00 p.m., defendant entered a liquor store in Southgate and approached the clerk, Kiro Horiuchi. Defendant said: "I have a gun; I don't want to shoot you." Defendant was holding one hand behind a straw hat. Defendant told Horiuchi to empty out the register, and Horiuchi complied. Defendant took around $250 to $300. Horiuchi's wife activated a silent alarm, and defendant was arrested nearby within minutes. He did not have a gun when arrested. For this incident, defendant was convicted of robbery (§ 211), a felony.

In February 1985, at a house in Weed, defendant was arguing with his mother when defendant's uncle, Leon Johnson, told defendant to stop. Defendant followed Johnson around the house and, when Johnson refused to fight, defendant stabbed him twice in the chest with a folding knife having a blade four and a half to five inches in length. Defendant left the house, but he returned a short time later, surrendered to the police, and signed a confession.

In January 1986, defendant was married to a woman named Willie B. Shumlai. During an argument, he hit her in the eye with his fist.

\\\\\

1
2
3
4

In August 1986, defendant and Debra Swango had been living together in defendant's house in Weed for around eight months, and she was three months pregnant.  Defendant wanted her to move out, and during an argument about that, he hit her with his fist, causing a black eye and a cut to her lip that left a scar.  He also dragged her out of the house.

5
6
7

In September 1986, defendant encountered George Toombs, the father of Willie B. Shumlai, at a supermarket parking lot in Weed.  Toombs, who was then 63 years old, was sitting in his pickup truck.  Defendant had a handgun, and he fired a shot that punctured one of the truck's tires.  When Toombs asked defendant why he did it, defendant said: "Next time you hear son of a bitch I'm going to be shooting your God damn guts out."

8
9
10
11
12
13

On an evening in November 1986, Andrew Greene encountered defendant outside a bar in Weed known as the Nightcap.  Greene warned defendant to stay away from one of Greene's sons.  Defendant told Greene to wait, and then defendant left.  More than an hour later, defendant entered the bar shouting for Greene and threatening his life.  Defendant was wearing a trench coat.  As John Rogers, the bar's owner, approached him, defendant reached into his coat.  Rogers pulled the coat down over defendant's shoulders, revealing a revolver in a holster.  Rogers took the gun from defendant.

14
15

In June 1987, defendant entered a plea of guilty to a charge of sale of methamphetamine (Health & Saf. Code, § 11379), a felony.

16
17

The defense presented no evidence in mitigation at the penalty phase.  Defense counsel's terse closing argument was a plea for mercy based on biblical references and lines from William Shakespeare's The Merchant of Venice.

18  People v. Lewis,  25 Cal. 4th 610, 623-628, 106 Cal. Rptr. 2d 629, 640-644 (2001).

19  *Merits Discussion*

20          Claim 8 – Excessive Publicity

21          Petitioner alleges that substantial pre-trial publicity in the locale where he was

22  tried (Redding, CA) prejudiced the jury such that his conviction should be vacated.  The

23  excessive publicity claim was not asserted as error before the trial court in either a change of

24  venue motion or in a request to excuse jurors for cause at voir dire.  Petitioner believes that if his

25  counsel had asked more, or the correct type of questions, counsel would have had a basis for the

26  potential venue motion or request.  Petitioner seeks unspecified discovery to prove the point

20

1  regarding excessive publicity, including any prejudice component and a de novo review of the

2  facts of excessive publicity at evidentiary hearing in this habeas action.

3         The prejudicial or excessive publicity claim was made in the first state habeas

4  corpus petition to the California Supreme Court which denied the claim on the merits but also for

5  failure to raise a timely objection in the trial court.  1SHC.ORD (filed October 24, 2001).[3] On the

6  latter point, the Supreme Court cited People v. Hillery, 10 Cal. 3d 897, 899-900 (1974) and

7  People v. Laster, 18 Cal. App. 3d 381, 387 (1971).  These cases stand for the proposition that one

8  must contest venue on account of excessive publicity in the trial court to not forfeit the issue.

9         The procedural ruling by the state supreme court that petitioner failed to raise the

10  venue issue in the trial court as required by state law precludes petitioner from raising the issue in

11  federal habeas corpus if the procedural ruling was well established in state law and consistently

12  applied.  King v. Lamarque, 464 F.3d 963 (9th Cir. 2006).  Shifting burdens of articulation and

13  production exist to determine whether the procedural bar should be honored.  Id.  Respondent

14  must raise the issue – which respondent did.  At the very least, petitioner must then contest the

15  bar in respect to its being well established and consistently applied by the specific articulation of

16  facts demonstrating a lack of "establishment" or "consistency."  If petitioner satisfactorily

17  contests the procedural bar, respondent must demonstrate that the state procedural bar is in fact

18  well established and consistently applied.

19         Respondent's ultimate burden never came into play because petitioner *in no way*

20  contests the viability of the "must object to venue" procedural bar – much less set forth an

21  articulation of specific facts as to why the bar is not viable.[4]  Petitioner only urges that he might

22

23         [3]  The undersigned will use respondent's reference system.  This reference is to the Order
    of the state supreme court for the first habeas corpus filing.

24

25         [4]  This is not a situation, as in King v. LaMarque, supra, where the federal courts had
    previously indicated that the procedural bar in question was not well established or consistently
    applied.  In such a situation, petitioner need only indicate that he is contesting the bar.  Id.  In a

26  situation where the bar has been honored previously, or where the federal courts have not spoken,

1  be able to demonstrate cause and prejudice as an exemption from the procedural bar.  Thus, the

2  only issue before the court is petitioner's assertion that he might be able to demonstrate cause

3  and prejudice.

4          Petitioner argues that had trial counsel questioned correctly, he would have

5  obtained more information about prejudicial publicity and "would have" objected.  Petitioner

6  understands that the claim has been defaulted, but views counsel's potential ineffectiveness as a

7  "cause" and seeks further discovery on the cause and prejudice aspect of procedural default.

8  Petitioner simply seeks to avoid a ruling now by speculating that something might exist if given

9  the chance to obtain discovery.  Petitioner posits merely a known quantity of publicity and

10  speculates that if counsel had asked more questions, the jurors surely would have remembered

11  more about their exposure.  This is not good cause for discovery.  See Sims v. Brown, 425 F.3d

12  560, 577 (9th Cir. 2005) ("Discovery is indicated where specific allegations give the court reason

13  to believe that a petitioner may be able to demonstrate that he is entitled to relief.  Bracy v.

14  Gramley, 520 U.S. 899, 908-09, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997).)")  Petitioner's

15  speculation will not defeat summary judgment.  And, discovery of jurors regarding any exposure

16  to pretrial publicity would not be permitted on such speculation.

17          Not only is petitioner's opposition to summary judgment based on pure

18  speculation, the speculation itself could not rise to "cause" sufficient to overcome the procedural

19  bar.

20          "[T]he mere fact that counsel failed to recognize the factual or
        legal basis for the claim, or failed to raise the claim despite
21          recognizing it, does not constitute cause for a procedural default."
        Murray, 477 U.S. at 486, 106 S.Ct. 2639.  Attorney ignorance or
22          inadvertence does not constitute "cause" unless it rises to the level
        of constitutionally ineffective assistance of counsel.  Coleman v.

23

24

_____

25  petitioner bears a burden of attacking the bar ruling by specific facts demonstrating a lack of the
    bar being established or consistently applied.  *In this case, petitioner did not contest the bar*, so
26  regardless of which situation applied, petitioner did not meet his burden.

22

1    Thompson, 501 U.S. 722, 753-54, 111 S.Ct. 2546, 115 L.Ed.2d
2    640 (1991).

3  Cockett v. Ray,  333 F.3d 938, 943-944 (9th Cir. 2003).

4          Moreover, petitioner's request for more time to demonstrate cause also falls upon

5  the rule that ineffective assistance of counsel claims must be separately exhausted in state court

6  before they can serve as "cause" for the procedural default of another claim.  Cockett v. Ray, 333

7  F.3d at 943.  Was this done?  No.  Although petitioner did raise the ineffective assistance of

8  counsel at voir dire, see Claim 26, this claim went only to failure to ferret out pre-determined

9  views caused by personal bias (not related to pretrial publicity) and matters of obvious potential

10 juror prejudice, e.g., Juror Hill played tennis with the prosecutor's wife.  No mention of failure to

11 properly assess the amount of pretrial publicity was asserted against trial counsel in the state

12 courts.

13         Because petitioner is precluded from establishing "cause" as part of the cause and

14 prejudice exemption from application of procedural bar, the court need not assess prejudice or

15 the need for an evidentiary hearing to establish such.  Petitioner is barred in this court from

16 raising the pretrial publicity issue.

17         Claim 33 – Lack of Speedy Trial

18         Petitioner confuses the federal constitutional right to a speedy trial with state

19 procedures involving stricter time limits for speedy trials.  In his opposition, p. 62, petitioner

20 recounts that he agreed to waive time on several occasions, none of which are under attack here.

21 Petitioner only focuses upon the last waiver, and the fact that petitioner's trial started two days

22 after the date on which he had agreed to waive time.  Petitioner claims this is a violation of his

23 Sixth Amendment right to a Speedy Trial.

24         Of course the two day hiatus, even if caused by the prosecutor, has nothing to do

25 with the overall speedy trial provision in the Sixth Amendment.  See Barker v. Wingo, 407 U.S.

26 514, 519, 92 S. Ct. 2182 (1972).  The federal courts will not constitutionalize every state

23

procedure designed to effectuate a state's own view of the necessity of speedy trials, and indeed, a ruling on the state law issues is out of bounds in this federal habeas.  See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475 (1991) (reemphasizing that federal habeas courts may not reexamine state-court determinations on state-law questions).  Petitioner's claim is not cognizable as a federal claim and, hence, should be denied.

Claims 34 and 35 (Failure to Swear Jurors Prior to Filling out the Questionnaires (34) and Misrepresentation on the Questionnaire That the Jurors Had Been Sworn

Nowhere does petitioner show that failure to swear a jury at any time violated any federal constitutional right under clearly established Supreme Court law.  Similarly, there is no established Supreme Court authority for the proposition that a mistake as to swearing potential jurors to a jury questionnaire form raises any federal issues whatsoever.  See Baldwin v. State of Kansas, 129 U.S. 52, 56, 9 S. Ct. 193 (1889) (finding no federal issue in the allegedly improper swearing of a state court jury).  This is especially true since the jury was sworn prior to trial.  Petitioner's claims should be denied.[5]

Excusal of Jurors Grose (Claim 36), Trotter (Claim 37) and Burkhardt (Claim 38) for Cause; Claim 39 – the Erroneous Excusals of These Three Jurors Requires Reversal; Claim 42 – Jurors Should Not Be Excused Because of Their Opinions Regarding the Likely Facts to Be Presented

Because in this AEDPA case the rulings of the state supreme court may not be overturned unless an unreasonable application of established Supreme Court authority, the undersigned starts with the findings of the state supreme court on all three jurors excused on request by the prosecution:

\\\\\

---

[5] This is not to say that the swearing of a jury has no significance.  Indeed, the swearing of a jury has much to do with the triggering of double jeopardy.  See Crist v. Bretz, 437 U.S. 28, 98 S. Ct. 2156 (1978).

a.  Prospective Juror Harold G.

At the outset of voir dire, Prospective Juror Harold G. said he had no personal convictions that would cause him to automatically decide which penalty to impose and he could follow the trial court's instructions and reach an appropriate verdict.  During the prosecution's examination, however, Harold G. confirmed he had answered "yes" to a questionnaire item asking, "Do you believe there is any reason why you might have any difficulty in objectively and impartially serving as a juror in this case?"  The prosecutor then asked him if he would still answer "no" to the question posed to him on the questionnaire as to whether he could set aside his personal feelings about the death penalty law and follow the law as explained by the court.  He replied that his answer would still be "no."

Although he made contradictory statements about his ability to set aside his own personal views and follow the law, Harold G. ended his examination with the declaration that he could not set aside his personal views.  Under these circumstances, the trial court did not abuse its discretion in excusing Harold G. for cause.  The record does not support defendant's complaint that the trial court failed to ask enough questions during voir dire to determine whether the challenge for cause was proper.

b. Prospective Juror Robert T.

When Prospective Juror Robert T. stated during voir dire he was "not completely sold on that death penalty," the trial court admonished him that his personal views were not to be taken into consideration and that he must follow the court's instructions.  Robert T. responded that he could set aside his personal feelings and apply the law as the court explained it.  But when the prosecutor asked him whether, in light of his convictions about the death penalty, he would be capable of deciding for himself to vote for the death penalty if that was what the evidence showed and the law indicated, Robert T. replied, "I'm not positive I could, you know." And when the prosecutor asked, "Wouldn't it be fair to say you just can't conceive of a situation where you'd vote for the death penalty?," he responded, "I really don't think so."

Given these responses to the prosecutor's questions, we are satisfied that the trial court did not abuse its discretion when it excused Robert T. for cause.  Defendant argues that Robert T.'s response of "I really don't think so" meant he found the prosecutor's assessment of his inability to apply the death penalty in any setting to be inaccurate.  This interpretation is untenable in light of Robert T.'s other comments.  Equally unpersuasive is defendant's contention that the trial court improperly relied on answers to the unsworn questionnaire to excuse Harold G. and Robert T.  As the record shows, these prospective jurors took the

25

1   required oath before being orally examined, and they confirmed
2   their questionnaire responses during that oral examination.

    c. Prospective Juror Leonard B.

3
4   On voir dire, Prospective Juror Leonard B. said he might have
    difficulty if he was asked to decide the penalty and such a decision
5   would weigh on his conscience.  He also said he had been opposed
    to the death penalty for a number of years.  On further questioning
6   by the prosecutor, Leonard B. said:  "I can conceive of situations,
    maybe where I had a personal emotional involvement, where I
7   would go along with it.  But, in general, it would be very disturbing
    to me to feel for the rest of my days that I voted in favor of the
8   death penalty."  He reiterated the point later when he stated, "It's
    conceivable to me that I would vote in favor of the death penalty
9   but I doubt it very much."  He ended by declaring, "I'm a flexible
    person but not that flexible, I think."  After considering defense
10  counsel's argument pointing out that the juror had stated there were
    circumstances under which he could vote for the death penalty, the
    trial court sustained the prosecutor's challenge for cause.

11

12  People v. Lewis,  25 Cal. 4th at 631-633, 106 Cal. Rptr. 2d 629, 647-648.

13         Petitioner relies strongly on Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770

14  (1968), for the proposition that a juror can be excused for scruples expressed towards capital

15  punishment only when it is "'unmistakably clear (1) that they [the challenged jurors] would

16  *automatically* vote against the imposition of capital punishment without regard to any evidence

17  that might be developed....or (2) that their attitude would prevent them from making an impartial

18  decision as to the defendant's *guilt.'"* Opposition at 57 quoting Witherspoon, 391 U.S. at 522, n.

19  21, 88 S. Ct. at 1777.  However, the Supreme Court has since expressly loosened this standard:

20         We therefore take this opportunity to clarify our decision in
           Witherspoon, and to reaffirm the above-quoted standard from
21         Adams as the proper standard for determining when a prospective
           juror may be excluded for cause because of his or her views on
22         capital punishment.  That standard is whether the juror's views
           would "prevent or substantially impair the performance of his
23         duties as a juror in accordance with his instructions and his oath."
           [FN5 omitted]  We note that, in addition to dispensing with
24         Witherspoon's reference to "automatic" decisionmaking, this
           standard likewise does not require that a juror's bias be proved
25         with "unmistakable clarity."  This is because determinations of
           juror bias cannot be reduced to question-and-answer sessions
26         which obtain results in the manner of a catechism.  What common

                                        26

1   sense should have realized experience has proved:  many
    veniremen simply cannot be asked enough questions to reach the
2   point where their bias has been made "unmistakably clear;" these
    veniremen may not know how they will react when faced with
3   imposing the death sentence, or may be unable to articulate, or may
    wish to hide their true feelings.  [FN6 omitted]  Despite this lack of
4   clarity in the printed record, however, there will be situations
    where the trial judge is left with the definite impression that a
5   prospective juror would be unable to faithfully and impartially
    apply the law.  For reasons that will be developed more fully, infra,
6   this is why deference must be paid to the trial judge who sees and
    hears the juror.

7

8   Wainwright v. Witt, 469 U.S. 412, 424-425, 105 S. Ct. 844, 852-853 (1985) (footnotes omitted).

9          Petitioner's avenue of attack here is to focus on a partial record, favorable to his

10  position, and ignore the unfavorable part.  Petitioner, in essence, posits a scenario where once a

11  juror at any time states that he could follow the law, further questions which show a substantial

12  erosion of the bona fides of the initial statement are simply not to be considered.  The court will

13  not repeat the unchallenged factual reporting of the *entire* pertinent voir dire by the state supreme

14  court.  Suffice it to say that a reasonable judge could have serious misgivings about the

15  challenged jurors' ability to follow the penalty phase jury instructions.

16         Care must be taken to apply the correct standard here.  The determination by the

17  trial court that all of the challenged jurors waffled too much, and that their attitudes precluded

18  them from following the law, is a fact which must be upheld by the federal courts unless

19  disproved by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  For example, "Court will

20  find that Mr. Trotter has personal convictions with respect to capital punishment which would

21  prevent him from – or substantially impair the performance of his duties as a juror..."  RT 1473.

22  The court thanked juror Trotter for his candor.  Id.  These are clearly findings of fact.  This has to

23  be the standard because the Supreme Court has stated that deference is due to the trial judge's

24  non-record credibility observations, i.e., manner and mode of answering the questions.  Petitioner

25  does not attempt to demonstrate that the state courts' factual decisions were clearly contrary to

26  \\\\\

1    the factual record, he merely asserts that the court should have wound up on the other side of the

2    issue.

3              Even if the standard is ultimately one of mixed law and fact, and based on the

4    record only, the undersigned cannot say that the California Supreme Court was unreasonable, i.e.,

5    much more than simply wrong, when it determined that the excused jurors' performance as jurors

6    applying the law were "substantially impaired" by their personal beliefs concerning capital

7    punishment.  When pressed, all stated very significant reluctance to impose the death penalty to

8    the point where it became obvious that their ability to follow the law as instructed was in much

9    doubt.[6]

10             Petitioner's reply cited case of Brown v. Lambert (see footnote 6) does not direct

11   any conclusion in petitioner's favor.  In that case, the Ninth Circuit read the record in such a

12   manner that it was clear that the excused juror had simply voiced doubts about overuse of the

13   death penalty, but clearly indicated that he would follow the law regarding it's imposition.  All

14   that can be said about that case is that the record in this case is much different.  The trial judge's

15   factual finding that all three jurors would not put aside their personal anti-death penalty

16   convictions has not been challenged herein and, if simply a record review is at issue, the state

17   supreme court's decision is far from "unreasonable" in the AEDPA sense.

18             Claim 39 is simply a consolidated repeat of the previous three claims except that

19   petitioner now correctly cites Wainwright.  However, for the reasons explicated above,

20   petitioner's claim must fail.  Similarly, Claim 42 ( Jurors Should Not Be Excluded Because of

21

22             [6]  The undersigned is puzzled by the standard utilized and finding enunciated in Brown v.
     Lambert, 431 F.3d 661 (9th Cir. 2005), cited by petitioner.  Other than a footnote expressing that
23   AEDPA applied, no discussion whatsoever was made about the correct standard in a juror
     excusal case.  Brown concluded on its record that the state supreme court finding was "directly
24   contrary to" Supreme Court precedent.  However, because Brown was not on all fours with any
     Supreme Court case, it is clear that the "unreasonable application" of precedent was the correct
25   standard.  Moreover, the analysis proceeded on the record only, and no deference was given the
     trial court's non-record ability to observe the challenged juror.  This potential error may have
26   been mitigated when the initial opinion was superseded, see 451 F.3d 946, 951 (9th Cir. 2006).

1  Their Opinions Regarding the Likely Facts to Be Presented) is simply a repetition of the previous

2  claims (despite the slight difference of wording in the title) and should be denied.

3     Claims 40, 41 and 43 – Failure of the Trial Court to Excuse Juror Martin (40) and Horn

4     (41) was Constitutional Error[7]

5       In Claim 40, petitioner contends that juror Martin should have been dismissed for

6  cause because she indicated inflexibility in her views that the death penalty should be imposed.

7  Claim 41 posits that juror Horn should have been dismissed because she was integrally

8  connected in another case being handled by defense counsel, and investigation with respect to

9  that case would unduly influence her verdict in the instant case.  Critical to the outcome of this

10  case is that neither juror ultimately sat on petitioner's jury.  Martin was excused with a

11  peremptory challenge, RT 3002, and juror Horn was never called to be on the jury at all.  RT

12  2995-3008.

13       The court need not assess the propriety of the refusals to excuse for cause because,

14  whether or not the refusal to dismiss for cause "wasted" a peremptory challenge, such a "waste"

15  does not state a federal claim.  The ultimate inquiry is whether the jurors who *did* sit on the jury

16  were biased.  The court also need not assess whether the claim was procedurally defaulted under

17  California law.

18       In United States v. Martinez-Salazar, 528 U.S. 304, 120 S. Ct. 774 (2000),

19  defense counsel unsuccessfully challenged for cause a certain juror who he later excused with a

20  peremptory challenge.  It so happened that defense counsel used all his peremptories.  Defendant

21  claimed on appeal that the forced use of a peremptory, which he might well have used on another

22  juror, unconstitutionally deprived him of the right to a peremptory.  The Supreme Court

23  unequivocally held, however, that the loss of a peremptory challenge, whether viewed by itself or

24

25     [7] Claim 43 is simply a legal argument that respondent's defense to Claims 40 and 41, i.e.,
that failure to utilize all peremptory challenges forfeits a challenge for cause claim, is not lawful.

26  As such, it is not actually a claim for relief.

1    in the context that by unnecessarily having to use a peremptory challenge one was not given the

2    entire complement of challenges allowed by law, does not state a constitutional claim.  Id. at 313-

3    315, 120 S. Ct. at 78-781.  The court reiterated that "peremptory challenges are not of federal

4    constitutional dimension."  Id. at 311, 120 S. Ct. at 779.

5            In this case, petitioner argues: "By not performing its proper function and

6    dismissing jurors Martin and Horn, the trial court changed the dynamics of voir dire and forced

7    counsel to be overly cautious in his use of challenges – instead of using peremptory challenges as

8    sound trial strategy dictated, counsel instead was forced to focus on retaining his ability to

9    prevent Ms. Martin and Ms. Horn from being placed on the final jury panel."  Opposition at 61.

10   This argument is not even a variation on the Martinez-Salazar theme.  It is simply not cognizable

11   as a constitutional claim.[8]  All three claims should be denied.

12          Claim 44 – African-Americans Were Under Represented On the Jury Venire

13          Petitioner posits the following facts, and only these facts/conclusions, to set forth

14   his claim of lack of representation:  (1) There were no African-Americans on petitioner's jury;[9]

15   (2) the failure to have African-Americans on the jury came about by way of systematic exclusion;

16   (3) the systematic exclusion resulted in (1) above – no African-Americans on the jury.  First

17   Amended Petition at 233, citing Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664 (1979).  This

18   speculative and conclusory statement of a claim does not even approach the requirements for

19   pleading habeas cases with specificity, nor could it possibly qualify for discovery.  No

20   _____

21          [8]  Even before the Supreme Court decided Martinez-Salazar, the Ninth Circuit had
     already concluded that no constitutional claim could be stated in a capital case for the "waste" of
22   a peremptory when defendant had not exhausted his complement of peremptories.  Such was the
     case here.  Petitioner herein failed to use a great many peremptory challenges (failed to use 21
23   peremptory challenges).  The Ninth Circuit in Martinez-Salazar distinguished Siripongs on the
     basis that all peremptories in Martinez-Salazar had been exhausted so that counsel had to utilize
24   a peremptory to excuse a juror who "should have been excused for cause," and which peremptory
     he could have used on another juror.  The Supreme Court in reversing the Ninth Circuit rejected
     even that "had-to-use-my-last-one" situation as a due process violation.

25
26          [9]  Respondent disputes the fact that no African-Americans were in the jury venire by
     pointing out that petitioner presents no record or extra-record evidence of this fact.

1  information whatsoever is imparted regarding why or how petitioner believes a systematic

2  exclusion occurred – just that it did.  The court assumes from the lack of information, lacking

3  even after placed at issue in a summary judgment motion, that petitioner has no such information.

4  Therefore, petitioner desires discovery simply to fish for any problems that might arise after an

5  expensive and time-consuming study of the juror selection process.  Bracy, supra does not permit

6  "good cause" to include such speculative ventures.

7          Moreover, even assuming petitioner's proffered fact of no African-Americans in

8  the jury venire, not having African-Americans in a jury venire would not be unusual given the

9  demographics of Shasta County.  In 1990, the year of petitioner's trial, African-Americans

10  constituted a mere .74% of the population in Shasta County.  In 2000, the percentage of African-

11  Americans had only increased to .8%.[10]  As a matter of law, petitioner has failed to plead even a

12  prima facie case.

13          A survey of the cases show that the exclusion of a group
              constituting 7.7% or less of the total population is, standing alone,
14          generally insufficient to establish a prima facie case of systematic
              exclusion.  See United States v. Cannady, 54 F.3d 544, 548 (9th
15          Cir. 1995); United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir.
              1982); United States v. Potter, 552 F.2d 901, 906 (9th Cir. 1977).

16

17  Rich v. Calderon, 187 F.3d at 1068.

18          This claim has no merit.

19          Claim 45 – Cumulative Error In Jury Selection

20          There being no *federal* constitutional error in jury selection, petitioner's claim of

21  cumulative prejudicial error must be denied.

22  \\\\\

23

        [10]  The 1990 census figures were derived from U.S.Census, American Fact Finder, Quick
24  Table, 1990 Summary Tape File 1; See http//factfinder.census.gov.  This table gave a total
    population for Shasta County in 1990 as 147,036; the number of African-Americans was only
25  1,081.  Rounded to the nearest tenth, the percentage figure is .74%.  The 2000 figure was derived
    from the U.S. Census Bureau website page: quickfacts.census.gov.qfd/states/06/06089.hmtl.  The
26  court takes judicial notice of these figures.

1  <u>Insufficiency of the Evidence – Claim 46 (Hadix Testimony Demonstrated a Lack of</u>

2  <u>Intent for Robbery or Burglary); Claim 47 (Baker Testimony Demonstrated a Lack of</u>

3  <u>Intent for Robbery or Burglary); Claim 48 (Rice Testimony Demonstrated a Lack of</u>

4  <u>Intent for Robbery or Burglary); Claim 49 (Petitioner's Testimony Demonstrated a Lack</u>

5  <u>of Intent for Robbery or Burglary); Claim 50 (Petitioner's Intoxication Prevented Him</u>

6  <u>From Forming the Intent to Rob or Commit Burglary); Claim 57 (Summation Claim of</u>

7  <u>Why the Evidence Was Insufficient for Felony Murder and Only Established Only a</u>

8  <u>Manslaughter)</u>

9          Petitioner focuses upon certain testimony (as opposed to the record as a whole), to

10  make his assertions of insufficient evidence.  After a plenary review of the pertinent transcripts in

11  this case, the court finds that the California Supreme Court's rejection of the insufficiency claims

12  was not AEDPA unreasonable.  Petitioner mistakes his burden here in that simply pointing to

13  evidence that supports his contentions, or evidence from which an inference could reasonably be

14  drawn in his favor, does not establish insufficiency of the evidence.

15          First, the burden on petitioner to demonstrate insufficiency of the evidence is

16  extraordinary in an AEDPA case.  When a challenge is brought alleging insufficient evidence,

17  federal habeas corpus relief is available if it is found that upon the record evidence adduced at

18  trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have

19  found "the essential elements of the crime" proven beyond a reasonable doubt.  <u>Jackson v.</u>

20  <u>Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  Under <u>Jackson</u>, the court reviews the

21  entire record when the sufficiency of the evidence is challenged on habeas.  <u>Adamson v. Ricketts</u>,

22  758 F.2d 441, 448, n. 11 (9th Cir. 1985), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 789 F.2d 722 (9th Cir. 1986)

23  (en banc), <u>rev'd</u>, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the

24  testimony, to weigh the evidence, and to draw reasonable inferences from basic facts."  <u>Jackson</u>,

25  443 U.S. at 319, 99 S. Ct. at 2789.  "The question is not whether we are personally convinced

26  beyond a reasonable doubt.  It is whether rational jurors could have reached the same conclusion

1    that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

2         If the trier of fact could draw conflicting inferences from the evidence, the court in

3    its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465,

4    469 (9th Cir. 1994). The fact that petitioner can construct from the evidence alternative scenarios

5    at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable

6    trier of fact could have found the conviction scenario beyond a reasonable doubt.

> In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

14    United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) (emphasis added).

15         Superimposed on these already stringent insufficiency standards is the AEDPA

16    requirement that even if a federal court were to initially find on its own that no reasonable jury

17    should have arrived at its conclusion, the federal court must also determine that the state

18    appellate court could not have affirmed the verdict under the Jackson standard in the absence of

19    an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

20         Petitioner (reasonably) argues that certain evidence favors his position, and the

21    court will summarize that evidence below. No claim is made that petitioner was not the person

22    who stabbed the Rumseys; rather, petitioner focuses upon his argument that he did not actually

23    have the intent to rob or burglarize at the time, or before, he stabbed Jim Rumsey to death.[11]

24

25       [11] The California Supreme Court in Lewis, 25 Cal.4th at 642, 106 Cal. Rptr. 2d at 655, reiterated the legal standards for felony robber/burglary murder:

26

1    Petitioner, however, (unreasonably) argues two inconsistent theories:  (a) at the time he left the

2    Baker apartment with Amy Hadix, petitioner had intended to confront June Rice, and perhaps

3    Roger Beard over being cheated on the quality of illegal drugs petitioner had ingested, and (2)

4    petitioner was so intoxicated by his drug use at the time of the murder that he could not actually

5    form the intent to rob or burglarize in connection with the Rumsey murder and assault.  The

6    theories are inconsistent because petitioner freely concedes that he actually formed the intent to

7    seek some type of recompense or retribution against bad quality drug pushers, but when it comes

8    to robbing the Rumseys, petitioner could not (did not) form the required intent because of his

9    intoxication.   Which is it? – did petitioner form intent to act despite his intoxication, or did he

10   not?  The required mental state to form the intent to "get even" and the intent to rob/burglarize is

11   not of any meaningful different degree.  The resort to blatant inconsistency reveals the paucity of

12   the insufficiency argument.

13           Credible evidence was presented from several witnesses which indicated that

14   petitioner's initial purpose when leaving the Baker apartment, that at least one of his motivations,

15   perhaps even his primary motivation, was to seek some type of recompense for the alleged bad

16   drugs he had received.  There was no direct evidence *at that time* that petitioner had indicated he

17   was also going to rob the Rumseys along the way.  However, the California Supreme Court

18   ───────────────────

19       Liability for first degree murder based on a felony-murder theory is proper when
         the defendant kills in the commission of robbery, burglary, or any of the other
         felonies listed in section 189.  For conviction, the prosecution must establish that
20       the defendant, either before or during the commission of the acts that caused the
         victim's death, had the specific intent to commit one of the listed felonies. (People
21       v. Anderson (1968) 70 Cal.2d 15, 34, 73 Cal.Rptr. 550, 447 P.2d 942; People v.
         Proctor (1992) 4 Cal.4th 499, 532, 15 Cal.Rptr.2d 340, 842 P.2d 1100.) Thus, to
22       find a defendant guilty of first degree murder based on a killing perpetrated during
         a robbery, the evidence must show the defendant intended to steal the victim's
23       property either before or during the fatal assault. (§ 211; People v. Sakarias (2000)
         22 Cal.4th 596, 619, 94 Cal.Rptr.2d 17, 995 P.2d 152; People v. Marshall, supra,
24       15 Cal.4th at p. 34, 61 Cal.Rptr.2d 84, 931 P.2d 262.)  Conviction of felony
         murder in the commission of burglary requires proof that the defendant entered
25       the residence with the intent to commit a felony or theft. (§ 459; People v. Frye
         (1998) 18 Cal.4th 894, 954, 77 Cal.Rptr.2d 25, 959 P.2d 183; People v. Proctor,
26       supra, at p. 533, 15 Cal.Rptr.2d 340, 842 P.2d 1100.)

found that a reasonable jury could *infer* that petitioner possessed the requisite state of mind

because:

> (1) in the month preceding the crime, defendant had neither money nor a place to live, and he was involved in drug activity; (2) on the day of the murder, defendant saw James Rumsey take $50 from his wallet and overheard Baker's eight-year-old daughter say that Rumsey had "gobs" of money; (3) several hours before the murder, defendant had fought with a man in Baker's apartment and had forcibly taken his money, which he used to buy methamphetamine; and (4) before leaving Baker's apartment and going to the Rumseys' apartment, defendant had armed himself with a knife. Also, Helen Rumsey and Amy Hadix testified that when defendant followed Hadix past the opened door to the Rumseys' apartment, he pushed her out of the way and entered the residence, then quickly slammed the door shut after jumping on James Rumsey and stabbing him in the neck. Helen Rumsey further testified that after defendant had stabbed James and kicked her away as she approached, he removed the wallet from James's back pocket and went through it. When defendant found no cash in the wallet, he stabbed Helen in the throat, then pointed a gun at her head, yelling obscenities and demanding money.

People v. Lewis, 25 Cal. 4th at 655, 106 Cal. Rptr. 2d at 655.

Petitioner could certainly argue that the jury would not be compelled to find that

he had robbery or burglary of the Rumseys on his mind when he left the Baker apartment;

petitioner could argue that arming himself with a knife was for the purpose of confronting Rice.

But the point is not whether petitioner has a valid take on the evidence, but rather whether a

rational jury could make the inferences which were made by the California Supreme Court. The

undersigned cannot find the state supreme court unreasonable in the AEDPA sense, even more

incorrect than clear error, in inferring the appropriate intent by use of the undisputed facts stated

above.

Moreover, this court is not ultimately limited to the rationale expressed by the

state supreme court, or even respondent,[12] on this issue of whether a rational jury could have

---

[12] While it is generally inappropriate for judicial officers to raise issues sua sponte, once an issue has been raised, the undersigned's duty is to decide it correctly, whether or not the parties have advanced the most appropriate theory.

found the appropriate intent.  It was not necessary for petitioner to have established his intent to rob and/or burgle the Rumseys at the time he left the Baker apartment.  If at any time prior to the Jim Rumsey murder, the evidence demonstrates that a rational jury could have found the required intent, the jury's verdict will be upheld.  In reviewing the transcript, the court finds nearly unequivocal evidence of petitioner's felonious state of mind prior to the Jim Rumsey murder.

Keeping in mind the facts emphasized by the California Supreme Court, i.e., that petitioner needed money and he knew the Rumseys had money, the testimony of Amy Hadix shows that petitioner had robbery/burglary on his mind at the time he entered the Rumsey apartment, and not that he was somehow mistaken, or so intoxicated that he did not know where he was.

It is not disputed that both petitioner and Amy Hadix knew where June Rice's apartment was located.  On their way to that apartment (even giving petitioner the benefit of the doubt that such was his true and only intent at the time of leaving the Baker apartment), they passed by the Rumsey apartment.

Q. And was Milton in front of you, behind you, where was he?

A. [Amy Hadix] He was like kind of beside me, behind me, kind of following me.

\*\*\*

Q. When you get in the vicinity of the Rumsey's apartment, do you see Jim?

A.  Well, as I was [walking] by *Milton says stop* and the door was open about two or three inches and you can see in just a little bit.  Jim's chair was right next to the door, so you could see him sitting there if you look through the door.  And I says hi–

\*\*\*

I said, "Hi, Jim how are you.  And he said , "Hi, how are you doing?"  *And that's when Milton pushed me out of the way and went in, jumped on Jim....*

RT 3178-3179 (emphasis added).

If this witness is to be believed, and petitioner does not attack her credibility, indeed, he relies on her, a jury could surely believe that petitioner knew precisely where he was,

36

1   ordered Hadix to stop, heard her identify the man petitioner knew had "gobs" of money, made a

2   decision to break into Jim Rumsey's apartment and jumped on him.  Petitioner had no other

3   motive apparent from the evidence besides robbery which would have caused him to initiate the

4   cutting of Rumsey's throat.  So much for petitioner hearing a "whirr," or being "surprised" by

5   Jim Rumsey, or "not knowing where he was" on account of intoxication.  According to Hadix,

6   petitioner was in control of the events.  Moreover, petitioner's actions then in threatening Helen

7   Rumsey if she did not get him money, and his taking the wallet of the now dead Jim Rumsey,

8   tend to confirm in a strong fashion precisely what petitioner had in his mind just before going

9   through the Rumsey door.  Petitioner himself testified that he remembered details about the

10   events such as taking Rumsey's wallet, and what he said to Helen Rumsey – hardly the man who

11   was acting like an automaton because of drug intoxication.  Petitioner later related to Hadix that

12   the murder "had to be done," RT 3189; not that he had been surprised or unknowing – just that in

13   a calculated manner, "it had to be done." Clearly, it appears that petitioner made a last minute

14   decision to pick up some "easy money" on the way to the Rice apartment.  And, last minute or

15   not, petitioner had sufficient time in which to form the requisite intent.  Any rational juror or jury

16   could have reached this conclusion based on the evidence.

17           All of the insufficient evidence claims should be denied.

18           Evidentiary Error – Claim 51 (Admission of Photos and Videotape); Claims 52

19           and 53 (Practicing with a Buck Knife as Inadmissible Character Evidence); Claim

20           54 (Evidence of Prior Misconduct, i.e., Southard Fight and Uncharged Robbery);

21           Claim 56 (Failure to Give Limiting Instruction re Southard Misconduct)

22               *Claim 51 (Admission of Photos and Videotape)*

23           In general, alleged evidence admission errors are difficult for a petitioner in

24   habeas corpus.  See Estelle v. McGuire, 502 U.S. 62 at 67-68, 112 S. Ct. 475 ("[I]t is not the

25   province of a federal habeas court to reexamine state-court determinations on state-law

26   questions."); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("[W]e do not review

1    questions of state evidence law.  On federal habeas we may only consider whether the

2    petitioner's conviction violated constitutional norms.")  The level of error must rise to that of

3    fundamental fairness, i.e., that the erroneously admitted evidence was so prejudicial that it

4    deprived petitioner of a fair trial.  Not only is the standard high, but even if this federal court

5    were to find that the level of error reached fundamental fairness, petitioner could not prevail

6    unless the state courts in reviewing the *federal* issue were not only wrong, not only made clear

7    error, but were *unreasonable* in their determination of the federal issue in light of clearly

8    established Supreme Court law.  See generally Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th

9    Cir. 2002) (habeas relief not warranted unless due process violation clearly established by the

10   Supreme Court).

11          Petitioner does not demonstrate how these pictures of corpses were any more

12   gruesome than any picture of a corpse would be whose previous embodied person was stabbed to

13   death.  Nor has petitioner even provided the pictures to the court.  This is a summary judgment

14   motion in which petitioner will ultimately bear the burden of proof and certainly has the burden

15   to raise a material issue of fact.  The court could never find as a matter of due process that

16   graphic pictures per se violated one's due process rights.  But more importantly, if the pictures

17   are relevant to an issue in the case, it is nearly impossible to find that admission of the pictures

18   violated due process. [13]

19          The opinion of the California Supreme Court is the one which must be found to be

20   unreasonable in the sense that fundamental due process was not violated.  The undersigned sets

21   forth the pertinent part of the opinion here:

22

23          [13] According to respondent, and not disputed by petitioner, Exhibit 16 depicted victim
      James Rumsey in the face down position in which he was found.  Exhibit 20 is a close-up
      photograph depicting Mr. Rumsey's stabbing neck wound.  Exhibit 21 shows his shoulder stab
24   wound.  Exhibit 22 shows Mrs. Rumsey in the hospital with an oxygen mask as well as her stab
      wound to the neck.  Exhibit 23 was a videotape of the Rumsey apartment focusing upon the
25   location of Mr. Rumsey's body and some of his belongings as well as the presence of blood in
      the bathroom.  The videotape corroborated Mrs. Rumsey's testimony as to how the murder
26   unfolded.

Defendant contends the admitted evidence was irrelevant because it had no bearing on the only contested issues, which concerned defendant's specific intent to commit the underlying felonies.  He argues, moreover, that any probative value the evidence might possess was far outweighed by its prejudicial impact, given the graphic and bloody images portrayed.

The admissibility of victim and crime scene photographs and videotapes is governed by the same rules of evidence used to determine the admissibility of evidence generally:  Only relevant evidence is admissible. (Evid. Code, § 350; see also *id*., § 210; People v. Mendoza (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150]; People v. Crittenden (1994) 9 Cal.4th 83, 132 [36 Cal.Rptr.2d 474, 885 P.2d 887].)  The trial court has broad discretion in deciding the relevancy of such evidence. (People v. Smithey (1999) 20 Cal.4th 936, 973 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; People v. Crittenden, supra, at p. 132.)

Although defendant contends the photographs were inadmissible because they had no bearing on the only disputed question at trial (his mental state), we have made clear that the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant. (People v. Smithey, supra, 20 Cal.4th at pp. 973-974; People v. Scheid (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748]; People v. Crittenden, supra, 9 Cal.4th at pp. 132-133.)  Here, the photographs of the victims' injuries and the videotape depicting the crime scene taken by investigating officers tended to corroborate Helen Rumsey's account of the incident and were therefore relevant to the prosecution's theory of robbery murder and burglary murder. (People v. Mendoza, supra, 24 Cal.4th at p. 171.)  For example, a photograph showing victim James Rumsey as he was found by officers, with his face against the chair seat and his knees on the floor, supported Helen's testimony that shortly after defendant stabbed her husband, he turned the body over to gain access to James's back pocket after having tried but failed to get his hand inside the front pocket of James's pants.  Two photographs depicting the deep stab wound in Helen Rumsey's neck not only corroborated her testimony but also showed the nature and placement of her wound; in this way, they tended to bolster the prosecution's theory that defendant entered the Rumseys' apartment with the intent to obtain money from them by force, and undermined defendant's testimony describing the stabbings as a startled, reflexive reaction to sudden movements by the victims. (People v. Crittenden, supra, 9 Cal.4th at p. 133.)

Defendant further asserts that because the bloody and graphic nature of the photographs and videotape must have inflamed the jury, the trial court erred in refusing to exclude the evidence as more prejudicial than probative under Evidence Code section 352.

1
2
3
4
5
6
7

> Having reviewed the challenged exhibits, we are satisfied their admission violated neither state evidentiary law nor defendant's federal constitutional rights to fundamental fairness and reliability of verdicts.  Although the blood-splattered surroundings and the images of the victims depicted in the photographs and crime scene videotape are disturbing to view, as such evidence always is (People v. Crittenden, supra, 9 Cal.4th at p. 134), none of these exhibits is unduly gruesome or inflammatory. (People v. Mendoza, supra, 24 Cal.4th at p. 171; People v. Smithey, supra, 20 Cal.4th at p. 974; People v. Crittenden, supra, at p. 134; People v. Pride (1992) 3 Cal.4th 195, 243-244 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

8  People v. Lewis, 25 Cal. 4th at 641-642, 106 Cal. Rptr. at 653-655.

9        The introduction of photographs in a capital case is a difficult issue, and the trial

10 judge is given great discretion in determining what is relevant.  Batchelor v. Cupp, 693 F.2d 859,

11 865 (9th Cir. 1982); United States v. Goseyun, 789 F.2d 1386, 1387 (9th Cir. 1986); see also,

12 Thompson v. Oklahoma, 487 U.S. 815, 878, 108 S. Ct. 2687, 2721 (1988) (Scalia, J.) (reaching

13 the issue in dissent with Chief Justice Rehnquist and Justice White that the majority did not

14 reach).  Especially given the fact that the evidence in the guilt phase was also evidence in the

15 penalty phase, it may be that demonstrative evidence legitimately separates this case from a

16 murder case where the facts were less egregious.  Capital case juries are asked to distinguish

17 between murders that deserve the death penalty and murders that do not; these juries cannot

18 perform that task well if material evidence is kept from them simply because the evidence is

19 itself repulsive to human sensibilities.  Murder is not pretty; it is not sterile.  And the jury should

20 not be led to believe otherwise.  On the other hand, our system does not want juries deciding life

21 and death matters, and ignoring mitigating evidence, simply because the juries are angered or

22 shocked out of their sensibilities.  The key in walking this extraordinarily fine line is the

23 determination of whether the evidence is relevant to a guilt or penalty phase issue.

24        Thus, in according the trial judge the deference he or she deserves, the vast

25 majority of capital cases involving gruesome photographs or other demonstrative evidence have

26 refused to overturn verdicts because of the introduction of gruesome photographs.  See, e.g.,

1   Jones v. Butler, 864 F.2d 348, 368 (5th Cir. 1988) (photographs showed buttocks areas with

2   blood trickling down from the genital area and of victim's legs spread apart showing genital

3   area); Schneider v. Delo, 890 F. Supp. 791, 841 (E.D.Mo. 1995), aff'd., 85 F.3d 335 (8th Cir.

4   1996) (gruesome aspect of photos is directly attributable to the crime itself, and counsel's desire

5   to stipulate to facts of death was irrelevant); Odle v. Calderon, 884 F. Supp. 1404, 1425 (N.D.

6   Cal. 1995); Murray v. Delo, 767 F. Supp. 975, 987 (E.D.Mo. 1991) (photographs aided the jury

7   in analyzing the oral testimony); Williams v. Chrans, 742 F. Supp. 472, 491 (N.D.Ill. 1990),

8   aff'd., 945 F.2d 926 (7th Cir. 1991) (use of photos justified, in part, for demonstrating nature of

9   force used on victim).

10         In sum, petitioner does not in any meaningful way contest the California Supreme

11   Court's relevancy finding, and petitioner's unsupported contention that the pictures were unduly

12   prejudicial fails in light of the AEDPA deference due the state courts.

13         *Claims 52 and 53 (Practicing With a Buck Knife and Inadmissible, Irrelevant*

14         *Character Evidence)*

15         During cross-examination, the prosecutor asked petitioner about a buck knife with

16   which he used to practice. There was no evidence at trial directly linking the buck knife with the

17   murder and attempted murder weapon although, despite petitioner's testimony, some inferential

18   evidence existed that the buck knife may have been used. See testimony of Marie Baker

19   commencing at RT 3129 et seq. Baker testified that petitioner left her apartment complaining

20   about the quality of drugs he had received from June Rice, and came back to the apartment with a

21   gun and a knife, and that the knife was confirmed as a "fold-up knife, like a Buck knife." RT

22   3153. The Rumseys were attacked during the time petitioner had left Baker's apartment.

23   However, no forensic evidence was produced linking this knife with the murder weapon, and it

24   could have been simply one petitioner carried with him.

25   \\\\\

26   \\\\\

41

1      The California Supreme Court determined as follows :

2      [D]efendant indicated he at one time had carried a buck knife and
       had told people he practiced with it.  He denied having this knife in
3      his possession during the events leading to the present charges,
       however.  In response to the prosecutor's question about how he
4      used to practice with the knife, defendant explained that he would
       grab the knife from his pocket and open it as fast as he could.
5      When defendant was then asked to describe this knife, defense
       counsel objected on relevancy grounds and the trial court sustained
6      the objection.

7      On further cross-examination, defendant said he took a knife with
       him when he went to see June Rice about getting more drugs. The
8      prosecutor asked defendant where he got this knife, and defendant
       replied that it came from Marie Baker's kitchen.  The following
9      exchange then took place:

10     Prosecutor: "Well, you have some familiarity with knives, didn't
       you?"
11
       Defendant: "Not a specialist, I'm not, different than a steak knife."
12
       Prosecutor: "Well, you used to practice with your buck knife?"
13
       Defendant: "Not competition that I was preparing for, if you
14     understand what I mean."

15     Defense counsel objected that this line of questioning was not
       relevant, but the trial court overruled the objection without
16     comment.  Defendant continued, "I wasn't practicing to kill
       somebody, if that's what you're trying to ask."  The prosecutor
17     then inquired, "What did the knife look like?"  Defendant replied
       with a detailed description of his buck knife, including the length
18     of the blade.  The trial court interrupted the cross-examination,
       however, to ask defendant if he was describing the knife he got
19     from Baker's kitchen.  When defendant indicated he thought the
       prosecutor was asking him to describe the buck knife he used to
20     carry, the trial court clarified that the prosecutor's question related
       to the knife taken from Baker's residence.  After the prosecutor
21     confirmed the trial court's understanding of the question, defendant
       described that knife as a regular kitchen-set knife with a black
22     handle.
                                    ***
23     As to the prosecutor's question about defendant's having formerly
       practiced with his buck knife, that was also proper.  Defendant
24     argues that evidence of his past practice was irrelevant because
       there was no evidence he used a buck knife to stab the victims.
25     Although there was no direct evidence the murder weapon was a
       buck knife, the testimony on this issue was inconclusive and
26     therefore did not foreclose that possibility.  For example, Marie

                                      42

1    Baker testified that the knife defendant left on the kitchen sink
     after the stabbings was one she had never seen before.  Moreover,
2    evidence of defendant's earlier efforts to perfect his ability to
     quickly retrieve and open a pocketknife tends to undermine
3    defendant's version of his attack on the victims as an unthinking
     response to being startled first by James Rumsey and then by Helen
4    Rumsey.

5    Nor did the trial court err by not prohibiting the line of questioning
     under Evidence Code section 352 as more prejudicial than
6    probative.  The inquiry was relevant under applicable standards, as
     previously discussed.  The trial court could reasonably conclude
7    that any danger of prejudice in portraying defendant as having a
     propensity for violence did not substantially outweigh this
8    probative value, and thus the trial court did not abuse its discretion
     in failing to exclude the evidence under Evidence Code section
9    352.

10   Lewis, 25 Cal. 4th at 638-640, 106 Cal. Rptr. 2d at 652-653.

11   Petitioner first runs afoul of AEDPA in that no clearly established Supreme Court

12   law forbids the introduction of propensity evidence.

13   The Supreme Court "has never expressly held that it violates due
     process to admit other crimes evidence for the purpose of showing
14   conduct in conformity therewith, or that it violates due process to
     admit other crimes evidence for other purposes without an
15   instruction limiting the jury's consideration of the evidence to such
     purposes."  Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir.
16   2001).  In fact, the Court has expressly declined to answer these
     questions.  See Estelle v. McGuire, 502 U.S. 62, 75, 112 S.Ct. 475,
17   116 L.Ed.2d 385, n. 5 (1992) ("Because we need not reach the
     issue, we express no opinion on whether a state law would violate
18   Due Process if it permitted the use of 'prior crimes' evidence to
     show propensity to commit a charged crime.").  Petitioner is
19   therefore precluded from federal habeas relief on his claim that the
     admission of evidence that he sold drugs violated his federal due
20   process rights.  See Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th
     Cir. 2001) (The question under § 2254(d) "is not whether [the
21   conviction] violates due process as that concept might be
     extrapolated from the decisions of the Supreme Court.  Rather, it is
22   whether [the conviction] violates due process under 'clearly
     established' federal law, as already determined by the Court.").

23

24   Chaidez v. Knowles,  258 F. Supp. 2d 1069, 1091 (N.D. Cal. 2003).

25   \\\\\

26   \\\\\

1    See also Bockting v. Bayer, 399 F.3d 1010, 1038-1039 (9th Cir. 2005)[14]

2            Thus, petitioner has not stated a cognizable federal claim.  However, even if the

3    AEDPA standard were to be reviewed on the general premise of whether the introduction of

4    propensity evidence could violate constitutional rights, see McKinney, supra, petitioner cannot

5    establish a deprivation of fundamental fairness as opposed to a wrong conclusion on a fairly

6    minor matter.

7            The rationale of the state supreme court – that years ago aimless "practice" tends

8    to show purposefulness years later – is somewhat of a stretch.  No matter how one pares it, the

9    once-upon-a-time "quick-draw" practicing with a buck knife reasonably says nothing about one's

10   state of mind years later.  If it did, every child who ever played quick-draw, a la Hopalong

11   Cassidy or Roy Rodgers, with a toy cap gun would do so at his own later peril in demonstrating

12   an intent to rob.  But the court need not decide whether this stretch violated some general

13   prohibition against the introduction of propensity evidence because it cannot possibly be said to

14   have violated fundamental fairness.

15           Although not formally stipulating to the prosecution's evidence that petitioner was

16   the person who committed the murder and assault, for all practical purposes this issue was

17   unopposed.  Just as in the previous section, one sees that petitioner's defense was state of mind –

18   not that petitioner was not around when the stabbings occurred.  After all, Mrs. Rumsey

19   identified petitioner as her attacker and the murderer of her husband.  No contrary evidence was

20   introduced.  When testifying on direct, *petitioner admitted the stabbings.*  RT 3411, 3412.

21   Petitioner testified on direct, *prior to the prosecutor's questioning*, that he had stabbed the

22   victims.  Therefore, it makes little difference what specific knife petitioner used and whether the

23   buck knife was linked to the murder.  Nor could the practice testimony have any conceivable,

24   significant effect on the jury's determination whether petitioner had the mental state requisite for

25
          [14]  McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993), upon which petitioner relies,
26   is not an AEDPA case.

44

burglary or robbery at the time the murder of Mr. Rumsey took place (despite the conclusion of the state supreme court that the evidence had some relevance).  Indeed, the prosecutor thought so little of this evidence that he never mentioned it in closing.

This claim should be denied.

*Claim 54 (Evidence of Prior Misconduct, i.e., Southard Fight and Uncharged Robbery)*

As stated in several places up to this point, a key issue in the case was whether petitioner harbored an intent to burgle/rob when he entered the Rumsey's apartment.  If he did not, petitioner could not be found guilty of felony murder, and hence the special circumstances and death penalty would drop out of the case.  At trial, one of the witnesses (Amy Hadix) began to describe an incident which took place just prior to the Rumsey murder/assault, i.e., on the same day.  After defense objection based on relevance, the trial judge permitted Hadix to testify that petitioner had acquired an unknown sum of money from a person named Southard who happened to be in Baker's apartment.  Later, when cross-examining petitioner, the prosecutor requested of the judge that he allow extended questioning into this matter based on the fact that when arrested, petitioner had Southard's license in his wallet and that petitioner had taken $52 from a person named Southard by beating him up.  The prosecutor argued that this evidence was probative of petitioner's state of mind vis-a-vis the Rumseys, i.e, petitioner continuously had money and drugs on his mind because petitioner immediately took the Southard money to go to June Rice to buy drugs so that was probably his intention when he robbed Rumsey.  Over continued objection, the prosecutor was permitted to ask petitioner about his behavior with Southard.  Petitioner admitted beating up Southard, and admitted taking the $52 from Southard when Southard's wallet "presented itself" during the struggle.  This evidence would be important, especially to rebut petitioner's "I did it without thinking" defense, and the prosecutor emphasized the Southard evidence (along with other evidence) in closing before the jury.  RT 3629, 3637, 3638, 3644, 3645, 3647, 3648, 3649, 3713 (rebuttal).

1        Again, however, petitioner's claim is barred by AEDPA because admission of

2   propensity evidence has not been determined to violate the due process clause.

3        But even assuming no AEDPA bar, the court does not find the admitted evidence

4   to be simply "propensity" evidence.  It was properly used to buttress the intent to rob the

5   Rumseys.  The state supreme court held [all internal citations to California case law omitted]:

> Evidence of prior criminal acts is admissible "when relevant to
> prove some fact (such as motive, opportunity, intent, preparation,
> plan, knowledge ...)," but not to prove the defendant carried out the
> charged crimes in conformity with a character trait.  (Evid.Code, §
> 1101.)  "To be relevant on the issue of identity, the uncharged
> crimes must be highly similar to the charged offenses.... [¶] ... [¶]
> A lesser degree of similarity is required to establish relevance on
> the issue of common design or plan.... [¶] The least degree of
> similarity is required to establish relevance on the issue of intent.
> [Citation.]  For this purpose, the uncharged crimes need only be
> sufficiently similar [to the charged offenses] to support the
> inference that the defendant" 'probably harbored the same intent in
> each instance.' [Citations.]" ' ' "....

> As we have observed, however, evidence of uncharged misconduct
> "'is so prejudicial that its admission requires extremely careful
> analysis'" and to be admissible, such evidence" 'must not
> contravene other policies limiting admission, such as those
> contained in Evidence Code section 352.'" ....Thus, "[t]he
> probative value of the uncharged offense evidence must be
> substantial and must not be largely outweighed by the probability
> that its admission would create a serious danger of undue
> prejudice, of confusing the issues, or of misleading the jury."....

> Applying these principles, we find no abuse of discretion and no
> federal constitutional violation in the admission of the uncharged
> crimes evidence.  In both the charged and uncharged crimes,
> defendant overcame the victim by force, then reached into the
> victim's back pocket to obtain his wallet.  Both times, after having
> taken the money, defendant proceeded to June Rice's apartment to
> buy methamphetamine.[15] Although the incidents themselves are
> not particularly distinctive, they are sufficiently similar to support
> an inference that defendant harbored the same intent in both
> instances, that is, to forcibly obtain cash from the victim.  Contrary
> to defendant's assertion, this is not a case in which the evidence
> relating directly to the charged crimes was so compelling on the
> question of defendant's intent as to render the uncharged crimes

---

15   Amy Hadix testified that right after the Rumsey stabbings, petitioner proceeded to June
Rice's apartment.  RT 3182.

1

2   evidence merely cumulative on the issue.... Furthermore, the trial
    court limited any prejudicial impact of the uncharged crimes
3   evidence by instructing the jury, in the language of CALJIC No.
    2.50, that such evidence could not be considered to prove
    defendant was a person of bad character or that he had a
    disposition to commit crime.

4

5   People v. Lewis, 25 Cal. 4th at 637, 106 Cal. Rptr. 2d at 651.

6           The law and application cogently stated by the California Supreme Court is

7   commonplace in criminal jurisprudence.  See Fed. R. Ev. 404(b).  Petitioner cannot be suggesting

8   that all such law violates the Constitution.  Petitioner does argue that he did not testify that

9   robbing Southard was his intent when the struggle broke out.  Rather, petitioner contends that

10  Southard had made some racial epithets towards him, and this precipitated the fight with the

11  taking of the wallet simply being an afterthought when the wallet "presented itself" during the

12  fight.  However, the state supreme court was not limited in judging the Southard circumstances

13  solely by reference to petitioner's testimony.  Contrary to petitioner's assertion of "no evidence"

14  to support the similarity, the two situations corroborated petitioner's common motive to

15  unlawfully acquire money to purchase drugs.  The prosecutor saw the connection, the trial judge

16  saw the connection, the state supreme court saw the connection, respondent sees the connection –

17  as does the undersigned.  That petitioner does not see this rather simple and similar, albeit not

18  identical, connection between the two incidents is insufficient to overturn his verdict.

19                  *Claim 56 – (The Failure to Give a Pin Point Instruction)*

20          Although a general limiting instruction was given to restrict the jury's use of

21  uncharged misconduct to a showing of intent and not propensity to commit crimes, petitioner

22  argues that a limiting instruction specifically mentioning the Southard incident should have been

23  given.  Petitioner cites no authority that the failure to give a cautionary pin point instruction

24  violates due process.  Certainly, the U.S. Supreme Court has not established law on this

25  particular subject.  And, as the California Supreme Court held, there was no other uncharged

26  misconduct of "other crimes" in the guilt phase to which the general pinpoint instruction was

                                            47

1   given which would have confused the jury into believing that the general instruction given did

2   not apply to the Southard evidence.  The claim should be denied.

3   Claim 55 – Petitioner Was Entitled to a Separate Jury for the Penalty Phase

4   This claim was never raised on appeal, and hence the California Supreme Court

5   denied it when first raised in the state habeas corpus proceedings.  Finding that the claim was

6   procedurally barred, the state supreme court went on to deny the claim on its merits as well.

7   California Penal Code 190.4 directs that capital cases shall have a unitary jury for

8   guilt and penalty phases unless good cause is shown.  See also People v. Lucas, 12 Cal. 4th 415,

9   483, 48 Cal. Rptr. 2d 525 (1995).  Federal capital case law requires the same unitary approach

10  with exceptions.  18 U.S.C. § 3593(b).  Indeed, it has been held that a defendant cannot waive the

11  requirement of a unitary jury.  United States v. Green, 407 F.3d 434, 443 (1st Cir. 2005).

12  Against this backdrop, petitioner cites no Supreme Court case which announces a

13  rule, or anything close to it, that a defendant is entitled to separate juries for guilt and penalty,

14  and that failure to provide such establishes constitutional error.  Because petitioner's argument

15  cannot advance further without such a citation, and the court's independent research has not

16  discovered such a citation, this claim must fail.

17  As the claim lacks merit, there is no reason to examine the issue of procedural

18  default.

19  Guilt Phase Instructional Error (Claims 59-68, 82 and 84)

20  *Claim 59 (Court Erred By Refusing the Manslaughter Instruction)*

21  Petitioner claims that he had a right to have the jury instructed on his theory of the

22  case (involuntary and voluntary manslaughter) because there was evidence to support his theory.

23  Petitioner further asserts that the error is reversible per se, i.e., no harmless error.

24  Petitioner's counsel is somewhat vague in explaining his precise theories for

25  manslaughter, but the court understands from the petition that counsel believes there was

26  sufficient evidence on petitioner's intoxication to warrant the giving of an involuntary

48

1  manslaughter instruction, and also an instruction based on imperfect self-defense which, if valid,

2  would have warranted a voluntary manslaughter instruction.[16]   In sum, petitioner presents three

3  theories:

4          (1) he was so intoxicated that he was acting like an automaton, hence negating the

5  actual capacity to form specific intent for burglary/robbery; hence the homicide resulting

6  therefrom was involuntary manslaughter;

7          (2)  he was sufficiently intoxicated that as a result petitioner formed a "good faith"

8  belief that his life was in imminent peril when he struck out at Mr. Rumsey, hence constituting

9  an imperfect self-defense situation which would have reduced any homicide to voluntary

10  manslaughter;

11          (3) regardless of intoxication, petitioner formed a good faith belief that his life

12  was in imminent peril when he struck out at Mr. Rumsey, hence constituting an imperfect self-

13  defense situation which would have reduced any homicide to voluntary manslaughter.

14          The undersigned will discuss each in turn.

15          Although there was plenty of evidence to suggest that petitioner was not

16  intoxicated enough to be legally unconscious, such is not the standard regarding giving an

17  instruction on the defense theory of the case.  As the state supreme court recognized, defendant

18  had a constitutional right to have the jury determine every material issue presented by the

19

---

20          [16]  As state supreme court held: "Involuntary manslaughter is defined to include a killing
that occurs "'in the commission of a lawful act which might produce death, in an unlawful
21  manner, or without due caution and circumspection.'"  Lewis, 25 Cal. 4th at 645, 106 Cal. Rptr.
2d at 657, citing Cal. Penal Code § 192.  The only possible theory for involuntary manslaughter
22  would depend on voluntary intoxication, see People v. Ochoa , 19 Cal. 4th 353, 79 Cal. Rptr. 2d
408 (1998).  A person  who kills because of a good faith, but unreasonable, belief he is in serious
23  harm's way is now guilty of voluntary manslaughter, i.e., there are now no imperfect self-defense
claims which will result in involuntary manslaughter.  People v. Blakely, 23 Cal. 4th 82, 88-89,
24  96 Cal. Rptr. 2d 451, 455 (2000).  (If remanded for a new trial, petitioner could only have current
law applied).  "When the defendant killed in the actual but unreasonable belief that he or she
25  was in imminent danger of death or great bodily injury, this is termed 'imperfect self- defense,'
and the killing is reduced from murder to voluntary manslaughter."  Lewis, 25 Cal. 4th at 645,
26  106 Cal. Rptr. 2d at 657-658.

1  evidence, and failure to instruct on a theory supported by some evidence constitutes a denial of

2  that right.  Lewis, 25 Cal. 4th at 645, 106 Cal. Rptr. 2d at 657; see also Beardslee v. Woodford,

3  358 F.3d 560, 577 (9th Cir. 2004).[17]  On first glance, this is petitioner's strongest guilt phase

4  claim, but after much legal and factual analysis, the undersigned cannot find AEDPA error.

5           In order to understand the significance of the claims made, it is necessary to

6  understand how the jury was instructed.  Petitioner's jury was instructed in first degree felony

7  murder and second degree implied malice murder.  In essence, petitioner could be guilty of first

8  degree murder if he possessed the specific intent to rob or burgle prior to the actual killing of Mr.

9  Rumsey, and guilty of second degree murder on an implied malice theory if the specific intent

10 described above was found wanting but petitioner had the following mental state:  one, the

11 killing resulted from an intentional act[;] [t]wo, the natural consequences of the act are dangerous

12 to human life[;] [a]nd, three, the act was deliberately performed with knowledge of the danger to

13 and with conscious disregard for human life. (CALJIC No. 8.11.)  At the time of petitioner's

14 trial, second degree implied malice murder was considered a crime of specific intent *in terms of*

15 *applying any intoxication instruction*.  People v. Whitfield, 7 Cal. 4th 437, 441, 450-451, 453

16 (1994).[18]

17           A voluntary intoxication instruction was given in petitioner's trial, RT 3737:

18           "[for crimes of robbery, burglary, and attempted murder]:  If the
             evidence shows that the defendant was intoxicated at the time of
19           the alleged crime from the use of alcohol, the use of drugs, or a
             combination of alcohol or drugs, you should consider that fact in
20           determining whether the defendant had such specific intent.  If
             from all the evidence you have a reasonable doubt whether the
21           defendant formed such specific intent, you must find that he did
             not have such specific intent."

22

23           [17]  Thus, for example, petitioner testified that he was too intoxicated to know what he was
     doing, and there was some other evidence of intoxication of whatever degree, petitioner would be
24   entitled to an instruction on his theory of the case despite overwhelming evidence that his degree
     of intoxication would not qualify for involuntary manslaughter.

25

26           [18]  The legislature abrogated Whitfield in part by amending the voluntary intoxication
     statute in 1995.  Cal. Penal Code § 22.

The intoxication jury instruction was erroneous in leaving out second degree murder, because of the absence of any manslaughter instruction; legally, the jury could find that petitioner was guilty of first degree murder (with or without special circumstances), second degree murder, or nothing at all in terms of the death of Mr. Rumsey.  That is, if the jury found intoxication, there was no other homicide charge available aside from murder.  The undersigned is confused by the trial judge's acceptance of the need to instruct on intoxication which, if believed, would negate the required intent for any murder charge, but his belief that no manslaughter crime was possible under the evidence.  As the discussion on prejudice shows below, intoxication which actually robbed a person of the intent required for murder of any degree is quintessential involuntary manslaughter.  In a sense, petitioner was in the somewhat analogous position of the defendant in Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382 (1980), where the law precluded consideration of lesser offenses than capital murder even if the evidence supported such.  (But the evidence must exist to support the lesser charge, see Hopper v. Evans, 456 U.S. 605, 102 S. Ct. 2049 (1982)).[19]

The undersigned finds that there was sufficient testimony from petitioner to warrant the giving of the involuntary manslaughter instruction based on intoxication.  There is no doubt that petitioner had heavily engaged in substance abuse prior to the Rumsey murder.  The undersigned will not repeat all of petitioner's testimony but, viewing his testimony in isolation, evidence existed that petitioner, impaired as he was by his drug and alcohol use, became confused as to where he was, thought he was entering the June Rice apartment, was surprised from behind by a "whirring" sound, and then saw a blur coming towards him.  At this point, petitioner struck out with the knife.  While such evidence of intoxication would barely warrant the giving of an involuntary manslaughter instruction, and would in all probability have failed,

_____

[19]  The undersigned says "somewhat analogous" because, as the jury was actually instructed, the jury's choice for homicide charges was capital murder, second degree murder and nothing.

the threshold of evidence to warrant the giving of an instruction is very low.[20]  Moreover, given

the fact that the trial judge found sufficient evidence of intoxication with which to instruct the

jury, the undersigned believes it to have been in error to refuse the manslaughter request based on

petitioner's testimony and that of others about intoxication.

Petitioner now asserts that having found the jury should have been instructed on

involuntary manslaughter, the lack of such instruction was reversible per se, i.e. "never

harmless."  Petitioner cites Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999); United States v.

Sarno, 73 F.3d 1470, 1485 (9th Cir. 1995); Duckett v. Godinez, 67 F.3d 734, 743 (9th Cir. 1995);

United States v. Zuniga, 6 F.3d 569, 571 (9th Cir. 1993), and the initial Ninth Circuit case that

stands for the proposition, United States v. Escobar de Bright, 742 F.2d 1196, 1202 (9th Cir.

1984).  With the exception of Conde, which murkily combines the error at issue with other errors

in its per se analysis, the cases do indeed stand for the "never harmless" proposition cited by

petitioner's counsel.  However, there is a dispositive problem – none of the cases are AEDPA

cases, none of the cases examined the Brecht harmless error application in habeas cases, and

most importantly, an AEDPA capital case examining the very same failure to give a defense

theory instruction issue held that the Brecht harmless error doctrine applied.  Beardslee v.

Woodford, 358 F.3d 560, 577-578 (9th Cir. 2004).

> Beardslee argues that any such error [failure to give defense theory
> instruction] is per se reversible, citing United States v. Escobar de
> Bright, 742 F.2d 1196, 1201-02 (9th Cir.1984).
> ***
> More importantly, Escobar involved a direct appeal from a district
> court conviction on federal drug charges.  Beardslee attacks his
> conviction collaterally, after the state supreme court held that no
> mistake of fact instruction was required under state law.
> Beardslee, 53 Cal.3d at 87-88, 279 Cal.Rptr. at 284-85, 806 P.2d at

---

[20]  There simply was no evidence of an unintentional (accidental) murder.  In order for
that scenario to have existed, petitioner would have to have been in the room unlawfully and, as
he was surprised, turned around and unintentionally (accidently) stabbed Rumsey.  Even
petitioner's testimony rules this out in that, at absolute best for petitioner, petitioner intended to
stab Rumsey, albeit as alleged now, because he had a good faith belief of serious imminent
bodily harm to himself.  There was nothing accidental about petitioner's stabbing action.

1319-20.  As we have indicated, "the fact that a jury instruction is
inadequate by Ninth Circuit direct appeal standards does not mean
a petitioner who relies on such an inadequacy will be entitled to
habeas relief from a state court conviction."  Duckett v. Godinez,
67 F.3d 734, 744 (9th Cir.1995).  *Beardslee must show that the
alleged error had a substantial or injurious effect on the verdict*.
Anderson v. Calderon, 232 F.3d 1053, 1090 (9th Cir. 2000).

Beardslee v. Woodford, 358 F.3d at 577-578 (emphasis added).[21]

In this AEDPA case, petitioner cannot establish that the claimed error is "never

harmless," i.e, structural error, unless he cites established Supreme Court authority for that

proposition, and this he has not done.  Nor could he.  No such cases have been cited, and the

undersigned cannot find any either.  Therefore, as on all but structural error situations, petitioner

bears the burden of demonstrating that the failure to give the manslaughter instruction had a

harmful and injurious impact on the verdict.

Although an involuntary manslaughter instruction based on intoxication should

have been given, the evidence was so weak that substantial and injurious harm caused by its

omission cannot be found.  Overindulgence in illegal drugs or alcohol does not *per se* warrant the

giving of an intoxication instruction.  One must present evidence that he is legally unconscious.

Under California law when a person renders himself unconscious through voluntary intoxication

and kills in that state, the killing is attributed to his negligence and is treated as involuntary

manslaughter.  People v. Ochoa, 19 Cal. 4th at p. 423, 79 Cal. Rptr. 2d 408.  Unconsciousness

for this purpose need not mean that the actor lies still and unresponsive.  Id. at 423-424, 79 Cal.

Rptr. 2d 408.  Instead, a person is deemed "unconscious" if he committed the act without being

conscious thereof.  Id.  See also CALJIC 8.47 "If you find that a defendant, *while unconscious*

*as a result of voluntary intoxication*...When a person voluntarily induces his own intoxication *to*

*the point of unconsciousness*..." (emphasis added).  Although unconsciousness does not require

---

[21]  The Brecht standard applies uniformly in all federal habeas corpus cases under § 2254
regardless of the error standard, if any, applied by the state court.  Bains v. Cambra, 204 F.3d
964, 976 (9th Cir.2000); see also Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir.2005).

1   the incapacity to move or act, the given definition is somewhat of a tautology; however, other

2   cases and authority define the level of lack of consciousness – and the level is very difficult to

3   reach.  One court has held that the level is that of an automaton.  <u>People v. Webber</u>, 228 Cal.

4   App. 3d 1146, 1163, 279 Cal. Rptr. 437 (1991).[22]  In other cases, courts found insufficient

5   evidence to support a sua sponte intoxication jury instruction when (1) the defendant had drunk

6   some beer and whiskey and was "'pretty well plastered'" <u>People v. Spencer</u> , 60 Cal. 2d 64, 88,

7   31 Cal. Rptr. 782 (1963); (2) the defendant had been drinking for several hours, but was "only

8   woozy and not completely 'blacked out'" <u>People v. Simpson</u>  192 Cal. App. 3d 1360, 1370, 237

9   Cal. Rptr. 910) (1987); (3) the defendant had been drinking before the crime; he appeared to be

10  "'a little high'" at the time of the crime, and he testified he was "'pretty drunk,'" (<u>People v. Cram</u>

11  (1970) 12 Cal. App. 3d 37, 42, 90 Cal. Rptr. 393 (1970)); and (4) the defendant had drunk a

12  dozen beers and some wine and thought he was drunk, but knew what he was doing, <u>People v.</u>

13  <u>Gonzales</u> (1970) 4 Cal. App. 3d 593, 607, 84 Cal. Rptr. 863 (1970).

14          The issue of how unconscious is unconscious is a critical one to the outcome here.

15  If it means simply that one's judgment has been "impaired" by alcohol or drugs, or even

16  "significantly impaired," nine out of ten murderers are not murderers, and petitioner is one of the

17  nine.  If, however, unconscious means that one has essentially lost the ability to think through

18  any act, <u>see</u> footnote 22 below, a much fewer number of life takers are absolved of murder.

19          The court finds that impairment in thinking per se does not satisfy the standards of

20  unconsciousness as that term is utilized in California law.  Based on the above law, any

21  impairment in thinking, or making judgments, or being able to intend an act, must be so severe as

22  to render a person in the circumstances at issue unable to exhibit any significant ability in those

23  areas.  An "unconscious" person might have the ability to simply respond, more or less

24

25          [22] "Automaton" is defined in this context as "a person or animal acting in an automatic or mechanical way."  *Webster's New World Dictionary*, Third College Edition at 93.  "Automatic" in its pertinent meaning is defined: "done without conscious thought or volition, as if

26  mechanically, or from force of habit."  <u>Id</u>.

1 automatically, to stimuli, but from a cognitive standpoint, he does not have the ability to

2 purposefully influence his own response.

3      While there is no doubt that petitioner was impaired by having used

4 methamphetamine and alcohol over a long period, petitioner points to no evidence in the record

5 that he was automaton-like in his actions, and the record certainly bespeaks otherwise.  No one

6 testified to this effect, rather, petitioner left the Baker apartment on that fatal trip with a stated

7 purpose in mind.  No one testified that petitioner was staggering or could not communicate in a

8 coherent fashion.  According to his escort, petitioner was the one giving orders to "stop" at the

9 Rumsey apartment.  While petitioner testified that he was confused as to his whereabouts, and

10 surprised by someone coming at him, such that he reacted more or less automatically to the

11 perceived threat, this evidence does satisfy the "legally unconscious" standard.  An allegedly

12 instinctive reaction is not an unconscious response.  Tellingly, petitioner's clearly recalled intent

13 to defend himself and his argued good faith belief is totally inconsistent with this argument that

14 he was so intoxicated he could not know or control what he was doing.  Moreover, petitioner's

15 purpose driven actions immediately after the murders, even as related by himself, are totally

16 inconsistent with someone who could be termed unconscious, i.e., the taking of Mr. Rumsey's

17 wallet, his directions to Mrs. Rumsey to give him more money, his later travel to the Rice

18 apartment, his attempts to conceal evidence and hide from the police, his ability to recall that the

19 murder "had to be done."

20      Therefore, a failure to instruct the jury on involuntary manslaughter occasioned by

21 intoxication did not have a substantial and injurious impact on the verdict.  If required, the

22 undersigned would make this finding beyond a reasonable doubt.  The court now turns to

23 imperfect self-defense.

24      First, the doctrine of imperfect self-defense is incompatible with involuntary

25 delusions or voluntarily induced delusions of reality occasioned by ingestion of drugs or alcohol;

26 the repudiated doctrine of diminished capacity cannot masquerade as imperfect self-defense.

1    <u>People v. Mejia-Lenares</u>, 135 Cal. App. 4th 1437, 38 Cal. Rptr. 3d 404 (2006).  Thus, petitioner

2    was either unconscious enough for an involuntary manslaughter finding, or he was not.

3    Defendants cannot claim easier prerequisites for imperfect self-defense because they were

4    intoxicated and judgment/perception was only impaired.  If the case were otherwise, defendants

5    who had killed would always be better off because of intoxication.  Thus, petitioner was not

6    prejudiced legally if petitioner's contention is that he is entitled to imperfect self-defense because

7    his intoxication made the whirring sound and surprise encounter more threatening than it might

8    have been to the sober individual.  *In other words, a delusion caused by mental defect or*

9    *intoxication impairment cannot give rise to a "good faith belief of imminent harm" as a matter*

10   *of law.*

11           Assuming that petitioner is separating claims of intoxication from his imperfect

12   self-defense theory, petitioner remains lacking in actionable prejudice.  The undersigned will not

13   repeat all of the testimony characterized thus far but will emphasize a few points.  Hearing a

14   whirring sound and being surprised by a person does not give rise, usually, to a good faith belief

15   that one's life or bodily integrity is imminently threatened.  Petitioner's testimony to this effect

16   would probably be viewed with great scepticism even if the testimony were the only evidence on

17   the issue.  But, it was not the only evidence on the issue.  As pointed out earlier, Amy Hadix

18   accompanied petitioner on the fateful trip, ostensibly to June Rice's apartment.  When proximate

19   to the Rumsey apartment, Hadix saw Mr. Rumsey through the door opening, identified him by a

20   greeting, and watched petitioner attack him – not vice versa.  The Hadix testimony is the

21   antithesis of imperfect self-defense.

22           The California Supreme Court also found petitioner not to be prejudiced, but for a

23   different reason.

24           Error in failing to instruct the jury on a lesser included offense is
            harmless when the jury necessarily decides the factual questions
25           posed by the omitted instructions adversely to defendant under
            other properly given instructions.  (<u>People v. Sedeno</u>, supra, 10
26           Cal.3d at p. 721, 112 Cal.Rptr. 1, 518 P.2d 913.)  Here, the trial

1    court instructed the jury on first degree felony murder and the
     crimes of robbery and burglary.  In addition, the court instructed
2    the jury on theft as a lesser included offense of robbery and
     burglary, an instruction emphasizing that if defendant formed the
3    intent to steal only after he had entered the Rumseys' apartment
     and assaulted them, he was guilty of the lesser crime of theft.  The
4    jury found defendant guilty of robbery and burglary, and it found
     true the special circumstance allegations that defendant killed
5    James Rumsey in the commission of robbery and burglary.  (§§
     211, 459, 190.2, former subd. (a)(17)(i), (vii) [see now subd.
6    (a)(17)(A), (G)].)  To render these verdicts, the jury had to find that
     defendant had already formed the intent to steal when he entered
7    the Rumseys' apartment and assaulted them, thus necessarily
     rejecting defendant's version of the events.

8

9    Lewis, 25 Cal. 4th at 646, 106 Cal. Rptr. 2d at 658.

10         The state supreme court was correct.  It was not just the fact that the jury found

11   petitioner guilty of the felony murder that matters.  If that were the case, a refusal to give

12   instructions to cover a defense theory could always be cured because the defendant was found

13   guilty of the greater offense anyway.  There is more than just a slight bootstrapish quality to such

14   a finding.  However, the key here is that the instruction relating to the lesser offense of theft was

15   given (which would have precluded robbery, and hence felony murder), and the jury did have a

16   choice.  If the jury believed petitioner's imperfect self-defense testimony, it would have also

17   found that he did not have the intent to rob at the time he entered the Rumsey apartment, and

18   hence would have found petitioner only guilty of theft – which crime had no requirement of an

19   intent to steal at the time of apartment entry.  Enough of the alternative instruction petitioner was

20   claiming was before the jury – the jury simply did not pick the offense which petitioner had

21   hoped for.[23]

22         For all of the reasons given above, the ruling of the California Supreme Court was

23   not an unreasonable application of established Supreme Court authority.  This claim should be

24   denied.

25

26   _____
     [23]  The state supreme court's rationale would apply to *any* of the alleged theories upon
     which petitioner could have sought an involuntary manslaughter instruction.

                                        57

1           *Claim 61 (Failure to Give a Sua Sponte Instruction on Imperfect Self-Defense*)

2           Imperfect self-defense is antagonistic with a finding of felony murder.  That is,

3 even unintentional, accidental murders committed during the course of a robbery or burglary are

4 first degree murders.  See footnote 6 of Lewis state supreme court opinion set forth in response to

5 Claim 60 below.  For the reasons expressed above, including that the jury rejected the theft

6 charge and expressly and necessarily found that petitioner did have the intent to burgle and/or

7 rob, no imperfect self-defense was possible.  Petitioner could not have been harmed by the failure

8 to instruct on imperfect self-defense.

9           *Claim 68 (Ineffective Assistance of Counsel for Failure to Ask For an Imperfect*

10           *Self-Defense Instruction*)

11           For the reasons expressed for Claims 59 and 61, petitioner did not suffer prejudice

12 as defined by Strickland [v. Washington], 466 U.S. 668, 104 S. Ct. 2052 (1984).  If substantial

13 and injurious injury did not result from any error in not giving an imperfect self-defense

14 instruction, it follows that one's confidence in the verdict is not undermined.

15           *Claim 60 (Refusal to Give a Proffered Explanatory Instruction on the Temporal*

16           *Relationship of Petitioner's Intent to Steal and Mr. Rumsey's Death); Claim 65*

17           *(The Jury Was Not Properly Instructed about the Temporal Relationship*)

18           Petitioner contends that the trial court erred when it rejected the proposed

19 explanatory instruction: "If you have a reasonable doubt whether the defendant had the intent to

20 steal at the time the unlawful killing took place, you must find him not guilty of first degree

21 murder."  Lewis, 25 Cal. 4th at 647, 106 Cal. Rptr. 2d at 659.  The California Supreme Court

22 answered:

23           Defendant contends the trial court committed reversible error in
          failing to give this requested instruction because the omission left

24           the jury with no guidance on the requirement of a "unified
          temporal relationship" between the perpetration of a felony and the

25           killing of a victim for purposes of establishing felony murder.  He
          asserts the refusal to so instruct the jury amounted to a failure to

26           instruct on the defense theory of the case in violation of the Sixth

Amendment, and denied him the rights to due process, fair trial, fundamental fairness and a reliable verdict. [FN5] [omitted]

To prove first degree murder based on a felony-murder theory, the prosecution must establish that the defendant intended to commit one of the felonies enumerated in section 189 "either prior to or during the commission of the acts which resulted in the victim's death." (People v. Anderson, supra, 70 Cal.2d at p. 34, 73 Cal.Rptr. 550, 447 P.2d 942.) Conversely, when the killer forms the intent to commit an independent felony only after delivering the fatal blow to the victim, the felony-murder doctrine does not apply. (People v. Jeter (1964) 60 Cal.2d 671, 676-677, 36 Cal.Rptr. 323, 388 P.2d 355; see also People v. Gonzales (1967) 66 Cal.2d 482, 486, 58 Cal.Rptr. 361, 426 P.2d 929 [jury properly instructed that intent to rob formed after infliction of mortal wounds is insufficient to support finding of first degree felony murder].)

Here, the relevant principles concerning the timing of the requisite intent to steal were adequately covered by the instructions given, CALJIC Nos. 8.21 and 9.40 (formerly No. 9.10), defining first degree felony murder and robbery, respectively. [FN6] (People v. Hayes (1990) 52 Cal.3d 577, 625-626, 276 Cal.Rptr. 874, 802 P.2d 376; People v. Hendricks (1988) 44 Cal.3d 635, 642-643, 244 Cal.Rptr. 181, 749 P.2d 836.)

FN6. As given in this case, CALJIC No. 8.21 provides: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of first degree robbery or first degree burglary is murder of the first degree when the perpetrator had the specific intent to commit the crime of first degree robbery or first degree burglary. [¶] The specific intent to commit first degree robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt. The specific intent to commit first degree burglary in the commission or attempted commission of such crime must be proved beyond a reasonable doubt. The specific intent required for first degree robbery and the specific intent required for first degree burglary are contained in the definitions of those offenses."

Former CALJIC No. 9.40, as given in this case, provided: "Defendant is accused in Count 2 and Count 4 of the crime of robbery. Every person who takes personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear, and with the specific intent permanently to deprive such person of property, is guilty of the crime of robbery. In order to prove such crime each of the following elements must be proved. [¶] One, a person had possession of property of some value, however slight. [¶] Two, such property was taken from such person or from the person's immediate presence. [¶] Three, such property

59

was taken against the will of such person. [¶] Four, the taking was accomplished either by force, violence, fear or intimidation. [¶] And five, such property was taken with the specific intent to permanently deprive such person of the property."

[text continued]

Defendant acknowledges that in People v. Hayes, supra, 52 Cal.3d 577, 276 Cal.Rptr. 874, 802 P.2d 376, we rejected an identical claim, finding no error in the trial courts refusal to give two jury instructions requested by the defense that related to the formation of intent to steal because the pattern instructions defining first degree felony murder and robbery that were given in the case, CALJIC Nos. 8.21 and former 9.10 (now No. 9.40), adequately covered the issue. (People v. Hayes, supra, at pp. 625-626, 276 Cal.Rptr. 874, 802 P.2d 376.) He asserts, however, that Hayes is not dispositive of his claim because the wording of CALJIC No. 8.21 as given here was fundamentally different from the version given in Hayes. He points out that while the Hayes jury was instructed that felony murder requires a finding the unlawful killing occurred "'*as a result of the* commission of the crimes of robbery and burglary'" (People v. Hayes, supra, at p. 626, fn. 9, 276 Cal.Rptr. 874, 802 P.2d 376, quoting CALJIC No. 8.21, italics added), the jury here was told that to convict of felony murder it must find the killing occurred "*during* the commission, or attempted commission of" robbery and burglary.

The differing language represents two options appearing in a bracketed portion of CALJIC No. 8.21, a standard instruction. Which one is given depends on whether the victim's death occurred close in time to the commission of the predicate felony or at a later period. (See Use Note to CALJIC No. 8.21 (6th ed.1996) p. 392.) Under both variations of the standard instruction, however, the jury is properly informed that first degree felony murder applies if it is proven beyond a reasonable doubt that the defendant formed the intent to steal before or contemporaneously with, rather than after, the killing. Here, as in People v. Hayes, supra, 52 Cal.3d 577, 276 Cal.Rptr. 874, 802 P.2d 376, the trial court did not err in refusing to give the requested instruction elaborating on CALJIC Nos. 8.21 and 9.40.

Lewis, 25 Cal. 4th at 647-648, 106 Cal. Rptr. 2d at 659-660.

Petitioner's federal claim is lacking. This is not a case where an element of a crime has been left out of the instructions, or even that an element has been misdescribed. At its essence, petitioner's claim is that California law, upon which there is no disagreement, was not explained enough. Petitioner now has two published state supreme court cases to contend with

1   (his and <u>People v. Hayes</u>) which hold that California law was accurately and sufficiently

2   described by the instructions given.  It is not up to this federal court to quibble with the state

3   supreme court on its own law.  <u>Estelle v. McGuire</u>, <u>supra</u>.  <u>Estelle's</u> proscription of adjudicating

4   alleged state law error is not to be avoided simply because the claim is wrapped with a due

5   process label.

6          Moreover, assuming that petitioner could cross the federal threshold with his

7   ambiguity claim, he is then faced with the AEDPA requirement that the state supreme court was

8   *unreasonable* in its express or implicit finding that due process was not violated by the

9   instructions.  Clearly, the explanation of the state supreme court is not unreasonable.

10          Claims 60 and 65 fail.

11          *Claim 62 (Failure to Give an Instruction Defining Voluntary Intoxication and*

12          *Failure to Give That Part of the Intoxication Instruction Defining Specific Intent*

13          *Necessary for Burglary and Robbery); Claim 66 (Ineffective Assistance of*

14          *Counsel for Failing to Ask for Definition of Voluntary Intoxication)*

15          Petitioner sought to have the jury find that because he was voluntarily intoxicated

16   with drugs, he lacked the specific intent to commit burglary and robbery, and hence, he could not

17   be liable for felony murder.  The jury was given a voluntary intoxication instruction.  As

18   discussed above, in California, a defendant may not argue that he lacked the capacity to commit a

19   crime because of intoxication, but is permitted to argue that he *actually* lacked the specific intent

20   required on account of voluntary intoxication.  (<u>People v. Williams</u>, 16 Cal. 4th 635, 677, 66 Cal.

21   Rptr. 2d 573 (1997)).  In order to be intoxicated to the point where one actually lacks the required

22   intent, one must be acting as if an automaton.  <u>See</u> discussion <u>supra</u> for Claim 59.

23          The ordinary instruction regarding intoxication and specific intent is as follows:

24          CALJIC 4.21. Voluntary Intoxication--When Relevant To Specific
            Intent
25
            In the crime[s] of _____, [_____,] [and _____,] of which
26          the defendant is accused in Count[s] _____, [or that of _____,

61

which [is a] [are] lesser crime[s] thereto,] [or in the allegation that
_____] a necessary element is the existence in the mind of the
defendant of the [specific intent to _____] [mental state[s] of
_____].

If the evidence shows that the defendant was intoxicated at the
time of the alleged crime, you should consider that fact in deciding
whether defendant had the required [specific intent] [mental state].

If from all the evidence you have a reasonable doubt whether the
defendant formed that [specific intent] [mental state[s]], you must
find that [he] [she] did not have such [specific intent] [mental state[s]].

The state supreme court held as follows:

With defense counsel's assent, the trial court used a modified
version of CALJIC No. 4.21 to instruct the jury on the relevance of
evidence of defendant's intoxication to the question whether he
formed the specific intents required to prove the charged crimes of
robbery, burglary, and attempted murder, and the necessarily
included offense of theft. [FN7] Defendant asserts the trial court
erred in omitting from the standard instruction the first paragraph,
which would have described for the jury the specific intent
necessary for robbery or burglary.  He argues the error was
compounded by the trial court's failure to instruct on the lesser
crime of manslaughter and on imperfect self-defense.

FN7.  The trial court read the following modified version of
CALJIC No. 4.21:  "In the crime of robbery, burglary and
attempted murder and the included or related crime of theft, a
necessary element is the existence in the mind of the defendant of a
certain specific intent, included in the definition of each crime.  If
the evidence shows that the defendant was intoxicated at the time
of the alleged crime from the use of alcohol and drugs, you should
consider that fact in determining whether the defendant had such
specific intent.  If from all the evidence you have a reasonable
doubt whether the defendant formed such specific intent, you must
find that he did not have such specific intent."

[text continued]

In assessing defendant's claim of error, we consider the entire
charge to the jury and not simply the asserted deficiencies in the
challenged instruction.  (People v. Burgener (1986) 41 Cal.3d 505,
538, 224 Cal.Rptr. 112, 714 P.2d 1251, overruled on another point
in People v. Reyes (1998) 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968
P.2d 445.)  A trial court is not obliged to condense the required
explanation of a legal rule or concept in a single instruction; a
charge is not erroneous or prejudicial simply because a required
explanation is given in two instructions rather than one.  (People v.
Burgener, supra, at pp. 538-539, 224 Cal.Rptr. 112, 714 P.2d

1251.)

The record shows that in instructing the jury how evidence of voluntary intoxication relates to the question of specific intent, the trial court did not expressly define the specific intents required to establish the various crimes at issue in the case but instead stated as follows:  "In the crime of robbery, burglary and attempted murder and the included or related crime of theft, a necessary element is the existence in the mind of the defendant of a certain specific intent, included in the definition of each crime."  The "definition of each crime" was given in other instructions such as CALJIC Nos. 9.40 and 14.50, which set forth the elements of robbery and burglary, respectively, including the specific intents necessary to establish those crimes.  The jury was also instructed under CALJIC No. 1.01 to consider the instructions "as a whole and in light of all the others."

In People v. Ochoa, supra, 19 Cal.4th 353, 79 Cal.Rptr.2d 408, 966 P.2d 442, we found no reasonable likelihood a jury that had been similarly instructed would be confused or misled about the relationship between evidence of the defendant's voluntary intoxication and the formation of the specific intent required for proving the felony-murder charges at issue in that case.  (Id. at p. 421, 79 Cal.Rptr.2d 408, 966 P.2d 442 [further citations omitted]) Defendant fails to point to anything in the record suggesting grounds for reaching a contrary conclusion here. (See People v. Welch (1999) 20 Cal.4th 701, 757, 85 Cal.Rptr.2d 203, 976 P.2d 754 [finding similar claim of error waived by counsel's failure to request additional or clarifying instruction].)

Defendant also contends the trial court should have further defined voluntary intoxication for the jury by giving CALJIC No. 4.22 on its own initiative.  He asserts the omission violated his federal constitutional rights to due process, fundamental fairness, confrontation of witnesses, and freedom from cruel and unusual punishment. That instruction states: "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when [he][she] willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion, injecting or taking by any means of any intoxicating liquor, drug or other substance." (Ibid.)

There was no error.  Because a trial court has no duty on its own initiative to give an instruction relating evidence of voluntary intoxication to the question of defendant's mental state generally (People v. Ervin (2000) 22 Cal.4th 48, 90-91, 91 Cal.Rptr.2d 623, 990 P.2d 506; People v. Saille (1991) 54 Cal.3d 1103, 1120, 2 Cal.Rptr.2d 364, 820 P.2d 588), the trial court here had no obligation to clarify or elaborate on the voluntary intoxication instructions it gave.  (People v. Clark, supra, 5 Cal.4th at pp.

1       1021-1022, 22 Cal.Rptr.2d 689, 857 P.2d 1099.)

2       Nor did the absence of an instruction further defining voluntary
        intoxication prejudice defendant. As previously noted, the
3       modified version of CALJIC No. 4.21 told the jury:  "[I]f the
        evidence shows that the defendant was intoxicated at the time of
4       the alleged crime from the use of alcohol and drugs, you should
        consider that fact in determining whether the defendant had such
5       specific intent."  In addition, defense counsel urged the jury to find
        defendant lacked the specific intent to steal when he entered the
6       Rumseys' apartment and attacked them, stressing the evidence of
        defendant's intoxication on methamphetamine and alcohol. (See
7       People v. Ervin, supra, 22 Cal.4th at p. 91, 91 Cal.Rptr.2d 623, 990
        P.2d 506.)  Because the absence of an instruction further defining
8       voluntary intoxication did not prejudice defendant, we also reject
        his contention that trial counsel's failure to request CALJIC No.
9       4.22 violated his constitutional right to the effective assistance of
        counsel.

10

11      In order to avoid the rigorous standard for generic jury instruction claims in a

12      federal habeas action, counsel for petitioner attempts to wrap the alleged error here under

13      "Winship" error, i.e., failure to require proof of facts of guilt beyond a reasonable doubt.  It

14      simply is not the case that failure to define a concept, voluntary intoxication, which detracts from

15      the element of specific intent, is failure to require proof of guilt beyond a reasonable doubt.

16      Rather, petitioner must meet the ordinary habeas jury instruction standard if he is to obtain relief.

17      A challenge to jury instructions does not generally state a federal constitutional claim.  See

18      Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d

19      1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the interpretation or

20      application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also

21      Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

22      (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

23      a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

24      Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in the state trial

25      proceedings to reach the level of a due process violation, the error had to be one involving

26      "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined the

1  category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct. at

2  482.

3          Where, as in the present case, what is at issue is the failure to give an instruction,

4  petitioner's burden is "especially heavy" because it has been held that "[a]n omission or an

5  incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson

6  v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 1737 (1977).

7          Petitioner does not demonstrate that the state supreme court patently,

8  unreasonably erred in its result or reasoning regarding the lack of further definition of "voluntary

9  intoxication" such that petitioner's trial was "fundamentally flawed."  The state supreme court is

10  simply correct in its analysis.

11          With respect to CALJIC 4.22, the undersigned adds also that the primary reason

12  the definition appears as a written instruction is to differentiate voluntary intoxication from

13  involuntary intoxication (which appears as CALJIC 4.23).  CALJIC 4.22 provides, "Intoxication

14  of a person is voluntary if it results from the willing use...knowing that it is capable of an

15  intoxicating effect...."  Unless the "voluntary" part of voluntary intoxication is disputed on

16  peculiar facts, the further definition so ardently sought here is one that would be assumed and

17  common sense to most laypersons.  Moreover, petitioner never contested the fact that he had

18  voluntarily intoxicated himself, or that he had any doubt that the use of methamphetamine and

19  alcohol could result in an intoxicating effect.  Petitioner's argument here is simply that because

20  the instruction was not given, it was error – there is no analysis behind the claim.

21          Neither counsel nor the trial court would have thought that this further definition

22  was necessary under the facts of the case which did not dispute at all the voluntariness of

23  petitioner's intoxication.  Both Claims 62 and 66 should be denied.[24]

24  _____

25     [24]  Petitioner was indeed fortunate that the further definition of the quality of intoxication,

26  see CALJIC 8.47, necessary to reduce a murder to manslaughter was not modified and given to
   the jury.  This instruction defines the level of intoxication necessary to relieve a specific intent,

1    *Claim 63 (Reasonable Doubt Instruction is Defective Because it Improperly*

2    *Defines Presumption of Innocence); Claim 64 (The Reasonable Doubt Instruction*

3    *Is Defective Because it Uses the Terms "Moral Evidence" and "Moral*

4    *Certainty")*

5    These claims have no possibility of success in an AEDPA world.  Again, the

6  analysis of the state supreme court cannot be improved upon, and is simply repeated:

> While conferring with the trial court and the prosecutor on jury
> instructions, defense counsel suggested a modification to CALJIC
> No. 2.90, the standard instruction on presumption of innocence and
> reasonable doubt.  The pattern instruction in use during defendant's
> trial began, "A defendant in a criminal action is presumed to be
> innocent until the contrary is proved."  Defense counsel requested
> that the word "until" be replaced by the word "unless" because, he
> argued, "'until' is a word that presupposes that an event will
> happen and you are simply waiting for that eventuality to occur,
> where the word 'unless' more correctly defines the law."  The trial
> court declined to adopt the requested modification, opting instead
> to follow **420 the exact wording of CALJIC No. 2.90. [FN8]
> FN8.  The jury was instructed:  "A defendant in a criminal action is
> presumed to be innocent until the contrary is proved.  And in case
> of a reasonable doubt whether his guilt is satisfactorily shown, he
> is entitled to a verdict of not guilty.  This presumption places upon
> the People the burden of proving him guilty beyond a reasonable
> doubt. [¶] Reasonable doubt is defined as follows.  It is not a mere
> possible doubt because everything relating to human affairs and
> depending on moral evidence is open to some possible or
> imaginary doubt.  It is that state of the case which, after the entire
> comparison and consideration of all the evidence, leaves the minds
> of the jurors in that condition that they cannot say they feel an
> abiding conviction to a moral certainty of the truth of the charge."
>
> Defendant renews the argument of his trial counsel by asserting
> that the standard instruction read in his case impermissibly shifted
> the burden of proof in violation of due process by suggesting to the
> jury that it will find him guilty and that he is only presumed
> innocent until that time.  Relying on dictionary definitions, he
> contends that the term "unless" more accurately reflects the law
> and should replace the word "until" in CALJIC No. 2.90.

---

i.e. "unconsciousness."  As the jury instructions were given to the jury without this qualitative modifier, petitioner reaped a windfall in that the jury could  have ascribed any level of drunkenness/drug use as sufficient intoxication.  For petitioner's trial, the potential of sub rosa "diminished capacity" was alive and well.

The challenged portion of the instruction derives from section 1096, which embodies "a cardinal rule of Anglo-American jurisprudence"--the presumption of innocence and its corresponding burden of proving a defendant guilty beyond a reasonable doubt. (People v. Morris (1968) 260 Cal.App.2d 848, 849-850, 67 Cal.Rptr. 566.) That provision states in pertinent part, "A defendant in a criminal action is presumed to be innocent *until* the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt." (§ 1096, italics added.)

Although other language in the standard reasonable doubt instruction used at defendant's trial has been strongly criticized by justices of both this court and the United States Supreme Court (see People v. Freeman, supra, 8 Cal.4th at pp. 525-526, 34 Cal.Rptr.2d 558, 882 P.2d 249 (conc. opn. of Mosk, J.); id. at pp. 526-531, 34 Cal.Rptr.2d 558, 882 P.2d 249 (conc. opn. of George, J.); Victor v. Nebraska (1994) 511 U.S. 1, 23, 114 S.Ct. 1239, 127 L.Ed.2d 583 (conc. opn. of Kennedy, J.); id. at pp. 23-28, 114 S.Ct. 1239 (conc. opn. of Ginsburg, J.)), we find no infirmity in the portion of CALJIC No. 2.90 defendant challenges here. Viewing that language in context and with reference to the entire charge (People v. Wilson (1992) 3 Cal.4th 926, 943, 13 Cal.Rptr.2d 259, 838 P.2d 1212), we conclude that there is no reasonable likelihood that the jury in defendant's case would understand the instruction to mean that to convict defendant, the state could sustain its burden without proving his guilt beyond a reasonable doubt. Here, the instruction first informed the jury that "a defendant in a criminal action is presumed to be innocent until the contrary is proved" and that if there is a reasonable doubt as to his guilt, he must be acquitted. The next sentence stated that the just-described presumption of innocence "places upon the People the burden of proving him guilty beyond a reasonable doubt." The jury was then provided a definition of reasonable doubt. Contrary to defendant's argument, there is no reasonable likelihood that the jury understood the disputed language to mean it should view defendant's guilt as a foregone conclusion.

Defendant further argues that the part of CALJIC No. 2.90 defining the term "reasonable doubt" must have confused the jurors because the references to "moral evidence" and "moral certainty" invited them to convict him based on vague notions of "morality" in violation of his rights to due process, fair trial, fundamental fairness, and freedom from cruel and unusual punishment. He acknowledges the definition of reasonable doubt used in his case survived a similar constitutional attack in Victor v. Nebraska, supra, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583. Echoing the view of Justice Mosk in his concurring opinion in People v. Freeman, supra, 8 Cal.4th 450, 526- 528, 34 Cal.Rptr.2d 558, 882

67

1         P.2d 249, defendant asserts, however, that the time has come for a
judicial rewriting of the reasonable doubt instruction, since the
2         Legislature has failed to act.

3         In <u>Victor</u>, the United States Supreme Court expressed the view that
although the terms "moral evidence" and "moral certainty" do not
4         render the standard instruction unconstitutional, they did not add
anything of value.  (<u>Victor v. Nebraska</u>, <u>supra</u>, 511 U.S. at p. 14,
5         114 S.Ct. 1239.)  Aware of the high court's concerns, we strongly
recommended in Freeman that trial courts modify CALJIC No.
6         2.90 by omitting the references to moral evidence and moral
certainty.  (<u>People v. Freeman</u>, <u>supra</u>, 8 Cal.4th at p. 504, fn. 9, 34
7         Cal.Rptr.2d 558, 882 P.2d 249.)  Thereafter, the Legislature
amended section 1096 by adopting the wording suggested in
8         <u>Freeman</u> (Stats.1995, ch. 46, § 1, p. 95), and CALJIC No. 2.90 was
revised accordingly.  Thus, the terms of which defendant here
9         complains do not appear in the standard instruction now in use.

10   <u>Lewis</u> , 25 Cal. 4th at 651-653, 106 Cal. Rptr. 2d at 662-663.

11         The state supreme court cited the pertinent U.S. Supreme Court authority which

12   applied to petitioner's trial and final conviction.  No more need be said.  Claims 63 and 64

13   should be denied.

14         *Claim 67 (Ineffective Assistance of Counsel in Failing to Request CALJIC 8.83.1*

15         *– Sufficiency of Circumstantial Evidence to Prove Specific Intent); Claim 84*

16         *(Trial Court's Failure to Sua Sponte Give CALJIC 8.83.1)*

17         Petitioner's claims here are a reprise of the same claims made to the state supreme

18   court.  CALJIC 8.83.1 tells the jurors that they may use circumstantial evidence to find specific

19   intent, but that the surrounding circumstances must be (1) consistent with the theory that the

20   defendant had the required specific intent, and (2) cannot be reconciled with any other rational

21   explanation.  The instruction goes on to repeat that if the circumstances are consistent with two

22   *reasonable* theories, one pointing to the existence of the specific intent, and one not, the one

23   pointing away from establishment of the specific intent must be chosen.  The state supreme court

24   found that, although the requested instruction was appropriate, it had been essentially duplicated

25   by the giving of CALJIC 8.83, 3.31, 2.01 and 2.02.  The state supreme court was correct.

26   \\\\\

1           CALJIC 8.83 tells the jury that it may not find a special circumstance in the case

2   true unless the two requirements set forth in the text for 8.83.1 are met.  Of course, the existence

3   of the special circumstances in this case depended on the finding of the specific intent for robbery

4   and burglary.  CALJIC 2.01 repeats the terminology of the sought 8.83.1, but is directed to a

5   "finding of guilt."  CALJIC 2.02 refers generally, in the same language utilized by 8.83.1, to the

6   sufficiency of circumstantial evidence to demonstrate specific intent.  It is clear that giving 8.83.1

7   would simply have been a duplication of a duplication.

8            There is no way that the rules of <u>Henderson</u> and <u>Estelle</u>, <u>supra</u>, were unreasonably

9   applied by the state supreme court.  Claims 67 and 84 should be denied.

10         <u>Claim 82 – Failure to Instruct the Jury That It Must Unanimously Agree on the</u>

11         <u>Theory of  Felony Murder Adopted, i.e., Robbery or Burglary</u>

12            Petitioner does not oppose respondent's motion for summary judgment on this

13   claim.  Nor could petitioner legitimately do so.  The Supreme Court has not determined that such

14   unanimity is required.

15            Under Arizona law, first-degree murder is a unitary crime, and a
               defendant can be convicted even though the jurors are not

16            unanimous on the theory, i.e., premeditated murder or felony
               murder.  <u>State v. Schad</u>, 163 Ariz. 411, 788 P.2d 1162, 1168

17            (1989).  Submitting a multi-theory crime to the jury without
               requiring unanimity on any one predicate theory is not a

18            constitutional violation.  <u>Schad v. Arizona</u>, 501 U.S. 624, 644-45,
               111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

19

20   <u>Evanchyk v. Stewart</u>, 340 F.3d 933, 937 (9th Cir. 2003).  <u>See also</u> <u>Solis v. Garcia</u>, 219 F.3d 922,

21   928 (9th Cir. 2000).

22            Claim 82 should be denied.

23   \\\\\

24   \\\\\

25   \\\\\

26   \\\\\

Claim 71 – The Verdicts Were Inconsistent; Claim 72 – Inconsistencies in the Special Verdict; Claim 73 – Inconsistencies "Prove" That the Jury Did Not Understand How to Apply the Facts to the Law; Claim 74 – Failure to Object to the Inconsistent Verdicts Did Not Waive the Claim

First, Claim 74 is not a claim cognizable in federal habeas corpus – it is an argument against the imposition of a procedural bar, which itself is a defense to a claim.  Because respondent does not argue the affirmative defense, "Claim" 74 is entirely inoperative as even a relevant argument, much less a claim, and should be dismissed.  Similarly, Claim 73 (the jury did not understand the law) is not a claim recognized by the Constitution.  Again, it is an argument, or a non-cognizable conclusion, from the asserted fact of an inconsistent verdict.  It cannot stand alone.  Claim 73 should be dismissed.

Turning to the other claims, the verdicts at issue were set forth in the Lewis opinion:

The jury returned these verdicts:

Count one:  Guilty of first degree murder of James Rumsey with findings that the murder was committed during the commission or attempted commission of a robbery and a burglary and that defendant had personally used a knife. (§§ 187, 190.2, former subd. (a)(17)(i), (vii), 12022, subd. (b).)

Count two:  Guilty of first degree robbery of James Rumsey with a finding that defendant personally used a knife. (§§ 211, 12022, subd. (b).)

Count three:  First degree burglary with a finding that defendant intentionally inflicted great bodily injury on Helen Rumsey. (§§ 459, 12022.7.)

Count four:  First degree robbery of Helen Rumsey, with findings that defendant personally used a firearm but did not inflict great bodily injury. (§§ 211, 12022.5, 12022.7.)

Count five:  Attempted murder of Helen Rumsey, with findings that defendant personally used a knife, personally used a firearm, and intentionally inflicted great bodily injury. (§§ 664/187, 12022, subd. (b), 12022.5, 12022.7.)

Lewis, 25 Cal. 4th at 655 (n.9), 106 Cal. Rptr. 2d at 665.

Petitioner argues:

The third, fourth and fifth verdicts are necessarily and logically inconsistent. [footnote omitted]  In the fifth verdict, the jury found true the allegation that petitioner inflicted great bodily injury while attempting to murder Helen and in the third verdict it found petitioner guilty of burglary with intent to inflict great bodily injury on Helen.  However, in the fourth verdict, the jury determined petitioner was not guilty of intent to inflict great bodily injury upon Helen in the course of a robbery.

It is inconceivable that the jury could find true the allegation that petitioner was guilty of robbery and use of a knife relating to James Rumsey in verdict form two, but find untrue petitioner's intent to inflict great bodily injury upon Helen in connection with robbery in verdict form four even though she was stabbed in the same manner as Jim Rumsey.  Accordingly, the jury's verdicts were necessarily logically inconsistent and petitioner's due process rights were violated.

\*\*\*

If petitioner did not have the intent to rob at the time he stabbed Helen, he also could not have had the intent necessary to commit a burglary...because the so-called burglary (i.e., entry of the dwelling) occurred before the stabbing.

Opposition at 65-66.

Before discussing the fatal flaws in petitioner's reasoning, the undersigned finds, as did the California Supreme Court, that even if petitioner's thought process is correct, and inconsistent verdicts were obtained, petitioner has not stated an AEDPA survivable claim.

The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal.  See United States v. Powell, 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932).  The underlying rationale of these cases is that the acquittal on one count may be explained as an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence.  See Dunn, 284 U.S. at 393, 52 S.Ct. 189.  In adhering to this rule in Powell, however, the Court noted: Nothing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other. Powell, 469 U.S. at 69 n. 8, 105 S.Ct. 471.

Ferrizz v. Giurbino, 432 F.3d 990, 992-993 (9th Cir. 2005)

71

1    Petitioner argues that the total guilty verdict for James is inconsistent with the

2  partial "acquittal ("not true") found for Helen.  Even if true, no claim is stated.

3    But, in the alternative, such is not true.  First, taking the burglary comment,

4  petitioner assumes that unless petitioner had an intent to steal physically *from everyone* in the

5  Rumsey apartment when he entered that apartment, he could not be found guilty of burglary

6  except as to the one from whom he personally took the money.  Burglary, unlike robbery, is not

7  person specific in the sense that the perpetrator must have desired to take property from every

8  person residing within the dwelling.[25]  As long as petitioner had the intent to steal *from anyone*

9  when he entered the apartment, he has committed a burglary as to all in-dwelling residents – at

10  least all who owned the taken property.  The property at issue here ("gobs" of money) which

11  happened to be located on the person of James also belonged to Helen, i.e., except as specifically

12  provided by statute, assets acquired by a spouse during marriage are community property, Cal.

13  Civil Code 760.  Petitioner does not, and did not, contest that fact, nor does he allege any

14  exceptions to the characterization.  Therefore, when petitioner entered the apartment with the

15  intent to steal that co-owned money from James, he had the same intent at that instant vis-a-vis

16  Helen, and was guilty of burglary at the time vis-a vis Helen .[26]  *During the course of the*

17  *burglary*, petitioner did intentionally cause great bodily harm to Helen.  There is no requirement

18  that the intent to cause great bodily injury must have coincided with the intent to burgle in the

19  first instance.  Moreover, the attempted murder of Helen, which also occurred during the course

20  of the burglary, and the verdict of great bodily harm caused by that attempted murder (the

21

22    [25]  As instructed: "Every person who enters a inhabited apartment with the specific intent
to steal, take and carry away the personal property of *another*...and with the further specific intent
23  to deprive the owner permanently of such [property] is guilty of the crime of first degree
burglary.  RT 3735.  The instruction does not require that the property be in the actual physical
24  possession of any particular person.

25    [26]  The result here would be no different if the money had been on the counter, in no one's
physical possession, when petitioner rushed in to take it.  It would be ludicrous to assert that the
26  burglary could only have taken place against the man.

1   stabbing aspect of Count 5) is consistent.  The verdict for Count 3 was perfectly acceptable.[27]

2      Furthermore, as found by the California Supreme Court, <u>Lewis</u>, 25 Cal. 4th at

3   655, 106 Cal. Rptr. 2d at 666, the robbery verdicts, insofar as the specific intent to rob was

4   concerned,  were not inconsistent.  Petitioner assumes that the timing of the intent to rob from

5   persons whose property was actually taken must have occurred all at the same time or from the

6   same actions.  While such often happens, it is not legally required.  As found by the California

7   Supreme Court it is just as logical to find that the intent to rob *from Helen* (who petitioner had

8   not initially seen from the ajar door and had only seen when she confronted him) occurred at the

9   time he threatened to shoot her as opposed to the time he stabbed her.  Indeed, such is more

10  logical in that he stabbed Helen upon confrontation without saying anything, but only demanded

11  money *from Helen* after her stabbing, while she was struggling to her feet and at the time he

12  pointed James Rumsey's gun at her.  If the robbery occurred with the pointing of the gun, the

13  great bodily injury having occurred earlier with the stabbing, the verdicts are neither inconsistent

14  nor irrational.  Counts 3, 4 and 5 are consistent.

15     For the given reasons, Claims 71-74 should be denied.

16    <u>Claim 75 (Penalty Phase) Use of Preliminary Transcript to Prove the Use of a Gun</u>

17    <u>in the Horiuchi Robbery (Double Jeopardy)</u>

18     If one has a sense of *deja vu* for this claim, such would be correct.  Earlier in this

19  case, petitioner brought a motion for summary judgment on use of the Horiuchi evidence at the

20  penalty phase. (Claims 1, 2, 3 and 7).  By Findings and Recommendations, and then by final

21  Order, these claims were decided adversely to petitioner.  Inexplicably, Claim 75 was not

22  included within that initial motion.  However, the belated aspect of presentation of Claim 75 does

23

---

24    [27]  In other words, the course of the burglary took place over the entire time petitioner was
in the Rumsey dwelling, and included that time in which the other specified acts, e.g., attempted

25  murder, took place.  Petitioner labors under the misimpression that the burglary was already over
when petitioner first attempted to kill Mrs. Rumsey with a knife inflicting great bodily injury

26  upon her, and when he later attempted to rob and kill her with the gun.

not change the inevitable result which stems from the prior Horiuchi rulings – the claim is simply a related theory that has no merit.

In the initial motion, petitioner complained:

a.  use of Horiuchi's preliminary hearing testimony violated the Confrontation Clause (Claim 1);

b.  use of Horiuchi's testimony violated due process (trial court errors in making factual findings (Claim 2a));

c.  use of Horiuchi's testimony constituted a knowing use of false testimony by the prosecutor (Claim 2b);

d.  the prosecutor failed to disclose exculpatory evidence in connection with the Horiuchi testimony (Claim 3); and

e.  he received ineffective assistance of counsel because counsel failed to completely review the Horiuchi evidence (Claim 7).

In Claim 75, petitioner again complains that use of the preliminary hearing testimony was improper because the finding of the trial court *during plea bargaining proceedings* in 1980 that petitioner had not used a gun (the facts showed that he had simulated use of a gun) was binding upon petitioner's capital case proceedings, and hence violated double jeopardy protections as well as protections in numerous other Amendments.

In adjudicating the earlier motion, the undersigned found that the Confrontation Clause had not been violated by use of the preliminary hearing transcript.  Moreover, although petitioner's capital case trial judge may have made a slight factual error concerning the use of a gun record, that error was entirely harmless in that the jury would have been given the Horiuchi evidence in any event.  The undersigned also found no Brady violations.

Respondent is essentially correct in asserting that Claim 75 is a reprise of the earlier claims, although there is a slight Double Jeopardy twist.  In this claim, petitioner contends that the capital case trial judge was bound by the Double Jeopardy Clause, i.e, criminal collateral

74

estoppel, in respect to whether petitioner used a gun in the Horiuchi robbery.  As set forth in the

earlier Findings and Recommendations, the undersigned quoted from Lewis:

> The prosecutor [in petitioner's capital case] had intended to also call as a witness the victim of the robbery, Kiro Horiuchi, but Horiuchi died before the penalty phase began.  The prosecutor therefore sought to admit Horiuchi's 1980 preliminary hearing testimony under Evidence Code section 1291.  After finding the witness unavailable, the trial court considered defense hearsay and relevancy objections to the evidence.  With respect to relevancy, defense counsel pointed out that the transcript makes repeated references to defendant's use of a gun, contrary to a specific "not true" finding by the trial court on a firearm use allegation charged.  Referring to the docket sheet in the prior matter, counsel observed that the case apparently involved a court trial at which the prosecution presented no evidence of gun use, and counsel noted that the trial court made an express "not true" finding on the sentencing allegation.  He argued that because there was a "not true" finding on the gun use, the issue was not relevant and the prosecutor should not be permitted to relitigate it.
>
> The prosecutor challenged defense counsel's characterization of the prior proceeding.  Quoting from the minute order that reflected the trial court's "not true" finding, the prosecutor pointed out that defendant's 1980 robbery conviction, including the absence of evidence in support of the gun use allegation, was the result of a plea bargain.  As he noted, the minute order included the notation "DA will not offer proof on [section] 12022.5, settlement is mid-term three years or less with probation open up to five years."  He argued further that the jury was entitled to know the facts surrounding the prior violent incident, whether or not a conviction was obtained.
>
> The trial court agreed with the prosecutor and found that the 1980 robbery conviction was the result of a plea bargain that included dropping the firearm-use allegation.  It further agreed that the details of an alleged crime of violence, whether or not a conviction occurred, could be considered by the jury and that robbery, by definition, is such a crime.  The trial court then considered defense counsel's objections to specific portions of the offered transcript and ordered one of the witness's statements redacted to omit reference to a hearsay statement by the witness's wife.

People v. Lewis, 25 Cal. 4th at 657-658, 106 Cal. Rptr. 2d at 667, 668.

Moreover, again, while the state supreme court was deciding issues other than

what petitioner specifically brings here, its commentary concerning the record in deciding the

propriety of admitting the Horiuchi evidence under California law is very relevant:

>Here, we will assume, without deciding, that the trial court's "not true" finding on the gun use was a "'judicial determination with respect to the truth or falsity of the charge'" (People v. Bacigalupo, supra, 1 Cal. 4th at 131, 2 Cal. Rptr. 2d 335, 820 P.2d 559), barring its use at the penalty phase [because facts underlying "acquittals" cannot be presented at the penalty phase]. Nonetheless, there was no error in admitting the prior preliminary hearing testimony to show the details and circumstances underlying the offense of which defendant was convicted, namely, the robbery itself. Significantly, the victim did not testify that he ever saw defendant holding a gun. Rather, the victim said defendant told him he had a gun and did not want to shoot. Defendant's threat to use a possibly nonexistent gun was thus a relevant circumstance underlying the robbery, which involves the felonious taking of the victim's personal property from his person and against his will by force or fear.

>***

>Nor did its admission result in any unfairness. [citation omitted]. As noted, the evidence was limited to the facts supporting the prior conviction and did not indicate that defendant had in fact used a gun in the commission of that offense. [citation omitted]. Moreover, the jury was informed of the "not true" finding on the gun-use enhancement and heard testimony by the investigating officer in the 1980 robbery case about his notation in the police report that defendant's modus operandi appeared to be a "simulated gun."

People v. Lewis, 25 Cal. 4th at 659, 106 Cal. Rptr. 2d at 668-669.

Petitioner's double jeopardy claim fails for two reasons. Of course, petitioner does not, and could not, contest the use *per se* of priors to enhance a sentence. The Supreme Court has consistently determined that recidivist statutes do not violate double jeopardy because "the enhanced punishment imposed for the later offense 'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes,' but instead as 'a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.'" Witte v. United States, 515 U.S. 389, 399, 115 S. Ct. 2199, 2206 (1995) (quoting Gryger v. Burke, 334 U.S. 728, 732, 68 S. Ct. 1256 (1948)). Nevertheless, in Ashe v. Swenson, 397 U.S. 436, 445-46, 90 S. Ct. 1189 (1970), the Supreme Court held that the Double Jeopardy Clause includes the doctrine of collateral estoppel. Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between

1  the same parties in any future lawsuit." Id. at 443, 90 S. Ct. at 1194.

2          Even assuming that the Horiuchi trial judge's acceptance of the plea bargain in

3  which the allegation of use of a gun was dropped was a "factual finding" for purposes of collateral

4  estoppel, more than that must be established before the Constitutional impact of double jeopardy

5  may be found.

6          In Pettaway v. Plummer, 943 F.2d 1041, 1046 (9th Cir.1991) we explained:

7          Constitutional collateral estoppel exists where 'a fact necessarily
           determined in the defendant's favor by his earlier acquittal [makes]
8          his conviction on the challenged second trial ... impossible unless
           the fact could be relitigated and determined adversely to the
9          defendant.'  On the other hand, 'double jeopardy guarantees are not
           engaged by collateral estoppel which, if applied, would merely
10         restrict proof but not make conviction impossible.'

11         Id. at 1046 (quoting United States v. Head, 697 F.2d 1200, 1205
           (4th Cir.1982)) (citation omitted).
12

13  United States v. James, 109 F.3d 597, 601 (9th Cir. 1997) (quoting Pettaway v. Plummer, 943

14  F.2d 1041, 1046 (9th Cir.1991), overruled on other grounds by Santamaria v. Horsley, 133 F.3d

15  1242, 1245-47 (9th Cir.1998) (en banc)).

16         Clearly, even accepting the Horiuchi plea bargain dropping of the use of a gun

17  allegation as an "acquittal" on that point, such "acquittal" did not prevent the use of the Horiuchi

18  evidence as a whole.  At best, the finding of collateral estoppel would not prevent use of the

19  evidence establishing the robbery (a crime of violence by definition), it would only prohibit

20  evidence that an actual gun had been used.  This would be quintessential "evidentiary" collateral

21  estoppel because the actual use of a gun did not preclude a robbery finding, and thus, not

22  collateral estoppel in the Constitutional sense.  Again, assuming that the jury was presented with

23  evidence that as a whole indicated actual use of a gun, and the trial judge permitted such,

24  petitioner has raised no Constitutional issue because the capital case trial judge committed simple

25  evidentiary error.

26  \\\\\

1        Moreover, as found by the California Supreme Court, and as characterized in the

2   July 12, 2005 Findings and Recommendations, the capital case trial judge did not instruct the jury

3   that petitioner had used a gun, nor did the prosecutor argue such.  Rather, the facts from the

4   Horiuchi preliminary examination transcript (which would have generally been permitted in any

5   event), and other evidence presented in connection with the Horiuchi enhancement at the capital

6   case trial, clearly indicated that petitioner had simulated the use of a gun – not actually used one.

7   No one at the capital trial would have been reasonably concluded that petitioner actually used a

8   (real) gun for the Horiuchi robbery.

9        Use of the actual Horiuchi evidence was neither (1) a violation of the Double

10  Jeopardy Clause nor (2) unfair in the general due process sense (as expressly found in the July 12,

11  2005 Findings etc.).

12       Hearsay (Prior Conviction) Was Admitted During the Penalty Phase (Claim 77);

13       Admission of Prior Convictions Violates Due Process (Claim 78)

14       Petitioner complains of the admission of documents evidencing a prior conviction

15  on hearsay grounds (Claim 77) as well as being violative of due process (Claim 78).  During the

16  penalty phase, paperwork demonstrating that petitioner had suffered a prior drug conviction was

17  admitted for purposes of aggravation.  Because of an incompleteness/ambiguity in the Judgment

18  and Sentencing order, that particular document was withdrawn[28], and the information along with a

19  minute order showing a plea of guilty was admitted.  See People v. Lewis, 25 Cal. 4th at 663-664,

20  106 Cal. Rptr. 2d at 672.  There was no doubt that petitioner was convicted of this offense as he

21  had admitted such during his guilt phase testimony.  RT 3393-94; 3436-37.  Moreover, outside the

22  presence of the jury, the robbery was admitted.  RT 3980.

23       As previously set forth, petitioner must show that the state law evidentiary error

24  caused a fundamental unfairness.  Estelle supra.  Petitioner argues from both a relevance and

25

26       [28]  The document entitled Judgment and Sentencing only referenced the fact that
petitioner had not appeared for his judgment and sentencing.

1    barred hearsay basis that the documents do not actually show a conviction.  However, it is clear

2    that admission of such was not fundamentally unfair because petitioner's own admission in the

3    previous phase shows that he was in fact convicted.  No unfairness, much less a fundamental

4    unfairness, has been demonstrated here.  Petitioner simply argues plain evidentiary [and

5    completely harmless] error.

6           The case petitioner does cite, Harris by & through Ramseyer v. Blodgett, 853 F.

7    Supp. 1239 (W.D. Wash. 1994) is not only pre-AEDPA, but relies on Johnson v. Mississippi, 486

8    U.S. 578, 108 S. Ct. 1981 (1988), which was somewhat appropriate given the ambiguous nature

9    of petitioner's conviction in the Washington case.  Johnson involved a materially inaccurate prior

10   conviction being presented to a jury, and the violation of due process which results from use of

11   such inaccurate convictions.  Here, *even petitioner* admitted the correctness of the prior

12   conviction.  Hence a materially inaccurate prior conviction was not utilized in petitioner's penalty

13   phase.  See Petrocelli v. Angelone, 248 F.3d 877, 891, n.17 (9th Cir. 2001).  Claim 77 is

14   mertiless.

15          In Claim 78, petitioner asserts that the penalty phase admission of any nonviolent

16   prior conviction offends notions of fundamental fairness.  However, petitioner does not cite a

17   Supreme Court case for this proposition, nor even an on-point lower court decision.  The

18   California Supreme Court determined to the contrary of petitioner's contention, Lewis, 25 Cal. 4th

19   at 664, and that is where the matter will lie.

20   Admission of Toombs Testimony/Lewis Denial (Claim 79); Ineffective Assistance of

21   Counsel for Failing to Object (Claim 90)

22          The California Supreme Court dispensed with both these claims as follows:

23          Prosecution witness Police Chief Nicholas of the Weed Police
             Department testified he had investigated an incident on September
24           26, 1986, in which George Toombs reported that defendant had shot
             a hole in the tire of Toombs's truck.  When asked whether
25           defendant had offered an explanation, the witness responded, "As I
             recall, he made a statement that he didn't have a firearm, he hadn't
26           shot a gun or something of that nature, that it was a firecracker."

79

When the witness answered "yes" to the prosecutor's next question asking whether defendant had also said something about Toombs, defense counsel objected on relevancy grounds.  After an unreported sidebar conference, the trial court sustained defense counsel's objection. The prosecutor asked no further questions of the witness.

A short time later, and outside the jury's presence, defense counsel clarified for the record that at the bench he had objected to the testimony about defendant's statements on the ground there was no evidence defendant had been advised of his rights before speaking with the officer, as required by Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.  Counsel also noted for the record the trial court had rejected his motion to exclude on that ground.  When the court reminded defense counsel it had sustained his objection to a portion of the questioning about what the witness had heard defendant say about Toombs and that the prosecutor had ceased his questioning altogether, defense counsel indicated he had objected to the entire line of questioning and noted that some statements did come in.

***

In any event, we find no error.  For purposes of section 190.3, "relevant evidence" is evidence relevant to the specific factors set forth in that provision.  (People v. Boyd (1985) 38 Cal.3d 762, 773-774, 215 Cal.Rptr. 1, 700 P.2d 782.) Section 190.3, factor (b) permits the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence...."  The factor of violent criminal activity encompasses not only the existence of such activity but all the pertinent circumstances surrounding it (People v. Ashmus, supra, 54 Cal.3d at p. 985, 2 Cal.Rptr.2d 112, 820 P.2d 214), and these circumstances may be shown through testimonial evidence.  (People v. Garceau, supra, 6 Cal.4th at pp. 201-202, 24 Cal.Rptr.2d 664, 862 P.2d 664.)

Here, the prosecution presented evidence that in 1986 defendant approached his former father-in-law George Toombs as he sat in his parked truck, shot the front tire, and then threatened Toombs with a handgun through the driver's side window.  Toombs testified about the incident and, as previously noted, Police Chief Nicholas testified about his investigation.  Although defendant's statement to the police denying his use of a gun is only marginally relevant to establishing that the crime actually occurred beyond a reasonable doubt, it arguably pertains to the broader circumstances surrounding the incident and was therefore admissible.  Even if the statement should have been excluded as irrelevant to any statutory factor in aggravation, however, the prosecutor did not mention it again during summation and the testimony constituted such a minor portion of the case-in-aggravation as to render its admission harmless. (See People v. Medina, supra, 11 Cal.4th at pp. 765-766,

80

1      47 Cal.Rptr.2d 165, 906 P.2d 2; <u>People v. Brown</u> (1988) 46 Cal.3d

2      432, 447, 250 Cal.Rptr. 604, 758 P.2d 1135.)  For the same reason, we reject defendant's claim that defense counsel was incompetent

3      for not promptly objecting when the prosecutor first inquired about defendant's statement. (<u>People v. Medina</u>, <u>supra</u>, at p. 770, 47

4      Cal.Rptr.2d 165, 906 P.2d 2.)

5  <u>Lewis</u>, 25 Cal. 4th at 661-663, 106 Cal. Rptr. 2d at 671-672.

6         "A petitioner is entitled to federal habeas relief if evidence introduced at either the

7  guilt or the penalty phase rendered his trial fundamentally unfair. <u>See</u> <u>Estelle v. McGuire</u>, 502

8  U.S. 62, 75, 112 S. Ct. 475, 483, 116 L. Ed. 2d 385 (1991); <u>Payne</u>, 501 U.S. at 825, 111 S. Ct. at

9  2608." <u>Odle v. Calderon</u>, 884 F. Supp. 1404, 1430 (N.D.Cal. 1995).  The opinion of the state

10  supreme court on this subject has been set out at length as it clearly demonstrates that the

11  California Supreme Court did not unreasonably dispose of these issues as the term "unreasonable"

12  has been defined by AEDPA.

13         Since it was not harmful error to admit the evidence, counsel could not have been

14  ineffective for not objecting.

15         Claims 79 and 90 should be denied.

16  <u>Miscellaneous Penalty Phase Asserted Instructional Errors:</u>

17  <u>Claim 80 – Failure to Instruct that the 1980 Horiuchi Robbery Must Be Found True</u>

18  <u>Beyond a Reasonable Doubt;</u>

19  <u>Claim 81 – Failure to Instruct that the Greene Incident Must be proved Beyond a</u>

20  <u>Reasonable Doubt;</u>

21  <u>Claim 85 – Failure to Instruct as to the Elements of Unadjudicated Criminal</u>

22  <u>Activity;</u>

23  <u>Claim 86 – Petitioner Did not Waive his Right to Have the Jury Instructed as to</u>

24  <u>Unadjudicated Criminal Activity;</u>

25  <u>Claim 88 – Use of the Terms "Circumstances," "Special Circumstances," "Aggravating</u>

26  <u>Circumstances," and "Mitigating Circumstances" Are Confusing;</u>

1     <u>Claim 89 – Failure of Counsel to Request that the Jury Be Instructed as to the Elements of</u>

2     <u>Unadjudicated Criminal Activity Constituted Ineffectiveness;</u>

3     <u>Claim 95 – Ineffective Assistance of Counsel in Failing to Request Burden of Proof</u>

4     <u>Instructions About the Greene Incident</u>

5         Petitioner raises a potpourri of penalty phase instructional error, perhaps out of a

6 desire to ensure that nothing is waived.  However, and again, no alleged error is actionable unless

7 it violates fundamental fairness.  <u>Estelle</u>, <u>supra</u>.  None of these errors rise to such a level either by

8 themselves or collectively.

9         In discussing the jury instructions, the trial court indicated that it would give

10 CALJIC 8.87, the instruction regarding finding prior criminal acts of force or violence beyond a

11 reasonable doubt.  The trial judge determined to specify the violent conduct at issue for the jury

12 pertinent to 8.87.  However, the judge was concerned that the <u>Horiuchi</u> robbery might be double

13 counted in the penalty phase as both prior violent conduct and a prior conviction.  *Defense*

14 *counsel* agreed with the trial judge that the robbery should only be characterized in the

15 instructions once – and that it should be as a prior conviction.  RT 3982.  Petitioner argues now

16 that the jury should have been instructed, nevertheless, with 8.87 in connection with the <u>Horiuchi</u>

17 robbery ostensibly on the chance that the jury might consider the robbery as prior violent conduct.

18         Obviously, there was no fundamental error, and just as clearly, petitioner probably

19 received a benefit from what happened as opposed to some fundamentally unfair disadvantage.

20 That is, the jury was instructed in connection with the other violent conduct aggravating factor –

21 "A juror may not consider any evidence of any other criminal activity as an aggravating

22 circumstance."  <u>Lewis</u>, 25 Cal. 4th at 665 (n. 14), 106 Cal. Rptr. 2d at 674.  Since the violent

23 conduct for the jury's consideration was expressly characterized within the 8.87 instruction, it was

24 just as likely that the jury would not consider the <u>Horiuchi</u> conduct in connection with 8.87

25 because it was not specified, and it might not have considered it at all having been instructed that

26 no other evidence of criminal activity could be considered.  In the scheme of things, this omission

1 of the Horiuchi invited "error" could not possibly constitute a fundamental unfairness. Estelle

2 supra.[29]

3        Claim 81 is a reprise of Claim 80, except that the November 28, 1986 Greene

4 incident is at issue. The Greene incident involved a confrontation in a bar that petitioner had with

5 Andrew Greene and John Rogers. This time, petitioner got into an argument with Greene and

6 shouted that he would kill him. When petitioner reached into his coat, Rogers pulled the coat off

7 of petitioner's shoulders, perhaps making it more difficult for petitioner to reach his weapon,

8 which became fully exposed. Rogers removed the weapon, and the police were called. It so

9 happened that this violent, criminal incident was left off the initial list of aggravating factors (the

10 "violence and force" list), but this incident had appeared on a supplemental, filed list. The fact

11 that the Greene incident had not been initially listed apparently caused the omission of this

12 incident from the specific list of violent acts given to the jury in connection with instruction 8.87.

13 Neither counsel brought the oversight to the judge's attention.

14        Again, the state supreme court observed that leaving an incident off the list was to

15 petitioner's advantage as the jury would probably not consider it. Lewis , 25 Cal. 4th at 666-667,

16 106 Cal. Rptr. 2d at 675. If the jury did consider it, there existed no reason why the jury would

17 not apply the same standard given to the other violent, criminal acts. Petitioner's counterintuitive

18 speculation that the jury would apply some unannounced standard falls far short of demonstrating

19 a fundamental unfairness. For this same reason, petitioner was not prejudiced in any meaningful

20 fashion by his counsel's failure to bring the omission to the attention of the trial judge (Claim

21 95).[30]

22        Petitioner cites no established Supreme Court authority for the proposition that

23 before a penalty phase jury may consider prior violent conduct, it must be instructed in all the

24

25     [29] The undersigned need not consider respondent's procedural default argument, i.e., assuming that there was an error it was invited error.

26     [30] Again, respondent made a procedural default argument which need not be addressed.

elements of the underlying criminal conduct (Claim 85).  No such authority exists.  Moreover, petitioner misconstrues the function of the jury in analyzing prior criminal *activity*.  In order to be utilized as an aggravating circumstance, the jury must find the activity beyond a reasonable doubt. It is not the function of the jury to "convict" petitioner as the activity is defined for the jury as potentially "criminal" *if* it exists.  See 8.87.  Such was the case here.  Finally, a jury might well become confused if a welter of instructions on underlying criminal activity were given along with other penalty phase instructions.  As the California Supreme Court held in <u>Lewis</u> in refusing to overturn its rule that the jury need not be instructed on the elements of the underlying violent crime:  "Instructions to the jury on the elements of unadjudicated crimes are not required by logic or by the constitutional guarantees of due process, fundamental fairness, right to a fair trial, equal protection, or reliability of penalty."  <u>Lewis</u>, 25 Cal. 4th at 668, 106 Cal. Rptr. 2d at 676.  This remains the rule in California to this day.  <u>People v.Cook</u>, 39 Cal. 4th 566, 611, 47 Cal. Rptr. 3d 22, 61 (2006).  Since no error occurred under California law, counsel cannot be ineffective in the <u>Strickland</u> sense for failing to press for instructions defining the criminal elements of the violent activity.  (Claim 89).[31]  Finally, petitioner cites no established Supreme Court authority for the proposition that a defendant must personally waive his counsel's decision not to ask for element instructions of the underlying criminal activity, and hence, no actionable claim is stated.  (Claim 86).  Respondent's cited cases to the contrary in analogous situations are persuasive.  See <u>United States v. Plitman</u>, 194 F.3d 59, 64 (2nd Cir. 1999); <u>United States v. Durham</u>, 139 F.3d 1325, 1333 (10th Cir. 1998).

Finally, petitioner asserts with respect to Claim 88 that overuse of the word "circumstances," both alone and in connection with legal terms such as "special circumstances," "aggravating circumstances, " and "mitigating circumstances," is confusing.  The undersigned is

---

[31]  Petitioner's counsel argues with respect to Claim 89 that counsel was ineffective for not finding "something" to mitigate the previous unadjudicated criminal activity.  However, that has nothing to do with the stated claim that counsel should have asked for instructions on the elements of the prior, violent criminal activity.

unsure of the federal claim petitioner is attempting to raise, as he simply argues a truism that

sufficiently confusing jury instructions may violate due process.  However, petitioner points to no

particular jury instruction.  Nor does petitioner take issue with the definitions of aggravating and

mitigating circumstances which were given to the jury [in this claim].  And, the word

"circumstances" alone meaning "fact[s] or event[s] accompanying another,"[32] is commonly

known and used.  The California Supreme Court held:

> Defendant contends the various uses of the term "circumstances" in the standard jury instructions at the penalty phase misled and confused the jury, in violation of the due process clause and other federal constitutional guarantees.  He asserts that a jury could confuse the special circumstances found true during the guilt phase with the aggravating circumstances necessary for imposition of the death penalty, particularly in a case such as his, in which the same evidence was used to prove both special circumstances and aggravating circumstances.
>
> Defendant's complaint appears to be with CALJIC No. 8.85, which directs the penalty jury to take into consideration "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." (See also § 190.3, factor (a).)  If defendant's argument is that the standard instructions at the penalty phase invite the jury to artificially inflate the aggravating weight of the underlying offense by considering the same evidence under more than one statutory factor in aggravation, we have in prior decisions held that the standard instructions do not inherently encourage such double-counting under section 190.3 [citations omitted].
>
> Nor does defendant point to anything in the record suggesting any possible confusion by the jury in his case.  Here, the prosecutor's closing argument suggested how each piece of evidence fit under the specified statutory factors.  He also told the jury, in language similar to CALJIC No. 8.88, also given to the jury, that it should not engage in a "mere mechanical counting of factors on each side of an imaginary scale" and that, in determining which penalty is justified, it should consider the totality of the aggravating circumstances with the totality of the mitigating circumstances.  In light of the prosecutor's remarks and the standard instructions about the weighing of aggravating and mitigating circumstances given in this case, we find no reasonable likelihood the jurors were misled or confused in the manner defendant suggests [citation omitted].

---

[32] Webster's *New World Dictionary*, Third College Edition at p.255.

1   Lewis, 25 Cal. 4th at 669, 106 Cal. Rptr. 2d at 677.

2          Nothing in the above quote is AEDPA unreasonable.  Claim 88 should be denied.

3          Prosecutorial Misconduct in the Penalty Phase: Claim 91– Arguing that Petitioner

4          Failed to Present Mitigating Evidence; Claim 92 – Arguing Fact Which Did Not

5          Relate to Statutory Aggravating Factors; Claim 93 – Arguing that Petitioner

6          Lacked Remorse

7          It is difficult to conceive of what a prosecutor could argue in a penalty phase in

8   which petitioner presented *no* evidence, if the above arguments were not permitted.  Reading

9   between the lines, the arguments here are not so much about prosecutorial misconduct as they are

10  about the lack of activity of petitioner's counsel in the penalty phase.

11         Petitioner attacks that part of the prosecutor's argument as follows:

12              I suggest to you that there is no evidence of that [sympathetic]
                nature.  I mean, you can grope as you might, but you haven't heard
13              it because it – it just does not – does not exist.... You have abundant
                evidence of aggravating factors, including the crime itself and the
14              evidence you heard during the penalty phase.  I suggest to you, you
                have no evidence that would mitigate the enormity or the gravity of
15              this particular crime....I suggest to you that there are no mitigating
                circumstances.

16

17  RT 4001-4003, as quoted at page 291 of the Amended Petition.

18         Defense counsel made no objections to this argument.  In Claim 91, petitioner

19  assigns Griffin error to this statement (commenting on petitioner's silence) and state law

20  Davenport error (arguing that the absence of mitigating factors is an aggravating factor).  The

21  prosecutor's argument violated neither case.  First, with respect to Davenport error, the California

22  Supreme Court is in the best position to determine whether its case law was violated.  The state

23  supreme court found that such was not the case, and that is the end of the matter.  Lewis, 25 Cal.

24  4th at 671, 106 Cal. Rptr. 2d at 679.  See High v. Ignacio, 408 F.3d 585, 590 (9th Cir. 2005) ("this

25  court accepts a state court ruling on questions of state law").

26  \\\\\

86

1    The alleged Griffin error is equally lacking in merit.  Clearly, a prosecutor is

2  permitted to call to the jury's attention that the defense has not presented evidence on a certain

3  subject, or at all.  And that is so even if the evidence could have been presented by the defendant

4  himself.  Commentary on the defense, as opposed to the defendant, does not qualify as a Griffin

5  violation.  See United States v. Mares, 940 F.2d at 461.  See also United States v. Mayans, 17

6  F.3d 1174, 1185-86 (9th Cir. 1994).  The Lewis court could not have been AEDPA unreasonable

7  in finding no Griffin error.[33]  Claim 91should be denied.

8    In Claim 92, petitioner complains that the prosecutor argued that petitioner was

9  "con-wise" and "tried to manipulate the system," and "that [petitioner] became abrasive when

10  questioned by the police after the murder."  Amended Petition at 292.  Again, there was no

11  objection.  Petitioner does not (and could not) argue that the comments are unduly inflammatory,

12  or that the evidence did not support the characterizations.  Rather, petitioner argues that the

13  characterizations went beyond the aggravating factors set forth in state law.  Lewis at 25 Cal. 4th

14  671-672, 106 Cal. Rptr. 2d at 679, held that the characterizations in argument were different from

15  presentation of evidence outside of statutory factors, and denied the claim.  This issue of state law

16  is foreclosed from federal review.  Claim 92 should be denied.

17    Finally, in Claim 93, petitioner asserts that the prosecutor committed Griffin error

18  by arguing:  "You may take into account the absence of remorse on the part of the defendant.

19  Nowhere in this trial did you see evidence of any remorse on his behalf."  Amended Petition at

20  293 quoting RT 3986.  Petitioner does not argue that the lack of remorse is off limits per se for

21  prosecutorial argument, but only that the argument implicated petitioner's right to remain silent.

22    The case which best illustrates why petitioner's argument must fail, even in

23  addition to the fact that no objection was made, is Beardslee v. Woodford, 358 F.3d at 586.  In

24  Beardslee, the prosecutor made comments somewhat similar to those by the prosecutor in this

25

26    [33]  As has been the case on numerous occasions, there is no need to examine the
procedural default issue as the claim so clearly fails on the merits.

1   case, but in a wholly different context.  The <u>Beardslee</u> prosecutor:

2           called attention to the absence of any demonstration of emotion by
            Beardslee, arguing that he was incapable of showing emotion
3           because he had no remorse.  The prosecutor then continued:  "Since
            you only heard the defendant through the tape recorder and his
4           previous testimony, you were not able to observe his demeanor and
            sincerity at the time he testified so you, too, could judge if there was
5           any feeling in the man."  The court overruled a defense objection,
            and the prosecutor continued: "Wouldn't you expect a man on trial
6           for his life would, through his statements, cry out for forgiveness,
            cry out for pity?  He did not.  Never heard any in the statements."

7

8   <u>Beardslee</u>, 358 F.3d at 586.

9   Because the statements referenced by the prosecutor appeared in the case proceedings at which

10  Beardslee testified either by way of prior statement or in person, and which would not have been

11  the appropriate time to "beg for mercy," the clear implication (argued by the <u>Beardslee</u> petitioner)

12  was that one should have seen Beardslee "beg for mercy" at the penalty phase – the appropriate

13  time to do so.  The Ninth Circuit found <u>Griffin</u> error, but ultimately that the error was harmless

14  because it was not emphasized.

15          In petitioner Lewis' case, there was not any reference to times at which petitioner

16  made statements in court proceedings; there was a simple reference to the fact that the *defense* had

17  never produced evidence at any part of the trial which established remorse.  And, it is not the case

18  that the only time remorse could have been shown was at the trial by the defendant.  Remorse

19  often comes into play by way of statements or letters made to friends or relatives, completely apart

20  from any trial proceedings.  Remorse could be shown by actions, e.g., great depression, etc.  This

21  evidence coming into trial does not depend on a defendant testifying to such facts (as opposed to a

22  personal begging for mercy before the factfinder).  Indeed, it is often more persuasive, and less

23  self-serving, if such facts establishing remorse are introduced by others.  Thus, the prosecutor's

24  comments in petitioner's case were completely appropriate.  Our legal system is not so perverse

25  that the complete lack of defense evidence from any source on an important penalty phase factor

26  must remain unmentioned by the prosecutor.  Claim 93 should be denied.

1   Ineffective Assistance of Counsel for Failure to Object to Officer Smith's

2   Testimony – Claim 94

3          The Horiuchi robbery, as used in the Lewis penalty phase, has been the subject of

4   numerous claims, and its facts will not be repeated.  However, one fact in that scenario involved

5   the testimony of an officer involved with petitioner in that robbery commenting on a statement

6   made by petitioner, to wit, petitioner's statement:  "I didn't have a knife and I didn't have a

7   gun...I'll be out of here in [seventy-two] hours."  Petitioner asserts that his counsel was ineffective

8   for not objecting to this statement in that the statement did not relate to any aggravating factor.

9   The California Supreme Court disagreed:

10          We have long recognized that counsel's decision whether or not to
            object to inadmissible evidence is a matter of trial tactics. (People v.
11          Hayes, supra, 52 Cal.3d at p. 621.)  Because we accord great
            deference to trial counsel's tactical decisions, counsel's failure to
12          object rarely provides a basis for finding incompetence of counsel.
            (People v. Riel (2000) 22 Cal.4th 1153, 1185 [96 Cal.Rptr.2d 1, 998
13          P.2d 969]; People v. Williams (1997) 16 Cal.4th 153, 215 [66
            Cal.Rptr.2d 123, 940 P.2d 710].)  Here, nothing in the record
14          suggests defense counsel lacked a rational tactical reason for not
            objecting to Officer Smith's testimony.  (See People v. Pope (1979)
15          23 Cal.3d 412, 426, fn. 16 [152 Cal.Rptr. 732, 590 P.2d 859, 2
            A.L.R.4th 1].)  For example, counsel could reasonably have viewed
16          the officer's testimony as further support for the defense position
            that defendant did not actually use a weapon during the robbery.
17          We find no incompetence on this record.

18   People v. Lewis,  25 Cal. 4th at 661, 106 Cal. Rptr. 2d at 670-671.

19          The California Supreme Court implicitly (or perhaps explicitly) found that the

20   evidence was inadmissible.  Whether counsel had a valid reason for not objecting would require

21   an evidentiary hearing.  However, no evidentiary hearing need be held in that no matter what the

22   reason, or lack thereof, petitioner's statement is so minor in the scheme of things that no prejudice

23   in the Strickland sense, i.e., undermining of confidence in the penalty phase verdict, could be

24   found.  As stated earlier in these Findings, any person paying attention to the evidence knew that

25   petitioner was simulating the use of a gun during the robbery, and no knife was ever mentioned by

26   the 1980 plea agreement or other court records as a tool used in the robbery.  And, in any event,

89

1   petitioner was denying the use of such weapons.  The only part of the statement with any

2   prejudicial effect would have been petitioner's cocky statement that he would be out of jail in

3   seventy-two-hours or less.  The excessive amount of violence exhibited by petitioner in previous

4   crimes, along with the violence of the one at issue, would have been the focus of any reasonable

5   jury.  That petitioner was cocky as well added nothing of significance to the aggravating

6   circumstances.

7           The Checklist Claims

8           Every capital habeas corpus petition contains a core of common claims either not

9   specific to the case under review, or raise general claims based on the overall results in this case.

10  These claims have never found favor in the California courts or the federal courts.  These claims

11  fare no better here.  To the extent that petitioner has made such claims for their preservation, they

12  are therefore preserved.

13          *Claims 25 and 101 – The Death Sentence was Disproportionate in*

14          *Violation of the Eighth Amendment Because No Inter-Case Comparison is*

15          *Required*

16          Petitioner cites no Supreme Court case which requires that a capital defendant

17  involved in a murder case have his case compared with those of murder defendants against whom

18  the death penalty was not sought in order that some type of proportionality under the Eighth

19  Amendment be established – be that comparison within a particular state (Claim 25) or with other

20  states (Claim 101).  While some type of such review might be in order for capital cases not

21  involving the death of another person, this case, of course, involves such a death, and such review

22  is not required.  Pulley v. Harris, 465 U.S. 37, 42-51, 104 S. Ct. 871, 875-878 (1984).

23          *Claim 29 – The Prosecutor Has Unbounded Discretion in Deciding to*

24          *Bring a Death Penalty Case*

25          Petitioner, of course, does not mean that the prosecutor is not bound by the state

26  statutes which describe those situations in which prosecution of a capital case is permitted, but

1   that within those statutory parameters, the prosecutor has "unbounded" discretion to seek the

2   death penalty.  Petitioner goes on to state the wholly speculative and baseless conclusion that race

3   played a part in the prosecutor's decision simply because petitioner is African-American and the

4   victim was Caucasian.

5          No Supreme Court case has held unconstitutional a selection process in which the

6   District Attorney makes a decision to seek the death penalty within the bounds of state law.

7   Under AEDPA that is the end of the analysis.  General notions of due process or general

8   statements that the finder of fact in a death penalty prosecution should not have unfettered

9   discretion to find in favor of the death penalty in a particular case do not play a role in this

10  argument.  And indeed, the direct authority that exists is adverse to petitioner.  Silagy v. Peters,

11  905 F.2d 986, 993 (7th Cir. 1990), discussing Gregg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909

12  (1976).  See also, Lambright v. Lewis, 932 F. Supp. 1547, 1582 (D.Ariz. 1996).[34]

13         Nor is petitioner entitled to an evidentiary hearing on his race based conclusion.

14  Habeas corpus is not a notice pleading exercise, but petitioner is expected to state claims with

15  factual specificity.  The petitioner has the burden to specifically allege and demonstrate error of

16  constitutional proportion, McKenzie v. McCormick, 27 F.3d 1415, 1418 (9th Cir. 1994), although

17  the court has the ultimate "burden" to determine for itself whether the error was harmless, or

18  whether it has grave doubt that such error was harmless.  Importantly, petitioner may not speculate

19  or hypothesize about alleged error – petitioner must possess a colorable, factual basis for claimed

20  constitutional error before the claimed error may stand as a basis for evidentiary hearing and the

21  possible overturning of a state conviction, Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir.

22  1995); the petitioner must allege facts that point to the "real possibility" of constitutional error.

23  Blackledge v. Allison, 431 U.S. 63, 75, n.7, 97 S. Ct. 1621, 1630 (1977); Wacht v. Cardwell, 604

24

25         [34]  This case has a lengthy subsequent history unrelated to the point in issue.  Suffice it to
    say here, without a string of citations, that the district court case remains pending appeal in the
26  Ninth Circuit at this time.

1    F.2d 1245, 1246 (9th Cir. 1979); there must be some evidentiary "spelling out" of the

2    constitutional claim, Gentile v. Mancusi, 426 F.2d 238, 239 (2d Cir. 1970), i.e., the pleader must

3    lay a foundation for proper factual averments and competent evidence must support the

4    averments.  Davis v. Bomar, 344 F.2d 84, 86 (6th Cir. 1965).  Nor is petitioner entitled to

5    speculate about a claim in the first instance, and then request investigative monies and discovery

6    to determine whether there is any factual basis for the speculated claim.  The court's point has

7    been best put by Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970), adopted by Calderon v.

8    U.S.D.C. (Nicolaus), 96 F.3d 1102, 1106 (9th Cir. 1996):  "Habeas corpus is not a general form of

9    relief for those who seek to explore their case in search of its existence."  The bare race animus

10   conclusion based on a mere difference in races between the aggressor and the victim fall far short

11   of that standard.

12              *Claim 76 – Use of Unadjudicated Violent Act Offenses in the Penalty Phase*

13              Again, no Supreme Court case has prohibited the admission of unadjudicated

14   violent acts offenses to be placed before the jury.  Nor is there any authority with sufficient

15   specificity to make an "unreasonable application" finding.  The authority is to the contrary of

16   petitioner's contention:

17              Petitioner next alleges that the state court violated his right to due
             process when it heard evidence of unadjudicated crimes in imposing
18           his third death sentence.  In Williams v. New York, 337 U.S. 241,
             69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the trial judge considered
19           evidence that the defendant had committed several burglaries for
             which he had not been convicted.  Id. at 244, 69 S.Ct. at 1081-82.
20           The trial judge had cited this evidence in sentencing the defendant
             to death despite the jury's recommendation that he receive life in
21           prison.  Id.  In reviewing the conviction, the Supreme Court noted
             that "[t]he belief no longer prevails that every offense in a like legal
22           category calls for an identical punishment without regard to the past
             life and habits of a particular offender." Id. at 247, 69 S.Ct. at 1083.
23           The Court therefore held that it was constitutionally permissible for
             a sentencing judge to seek information from out-of-court sources
24           indicating that the defendant had participated in unadjudicated
             offenses.  Id. at 251-52, 69 S.Ct. at 1085-86.

25
             The Court has since discredited some of the logic that undergirded
26           its decision in Williams.  Most notably, in Gardner v. Florida, 430

U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (opinion of Stevens, J.), the Court repudiated Williams' assumption that a death penalty is constitutionally indistinguishable from other forms of punishment. Id. at 357, 97 S.Ct. at 1204 (noting that a majority of the Court had "recognized that death is a different kind of punishment from any other which may be imposed in this country."). The Court has not, however, called into question the essence of Williams' holding--that a judge's consideration of evidence of unadjudicated crimes in imposing the death sentence does not violate a petitioner's due process rights. See Nichols v. United States, 511 U.S. 738, ----, 114 S.Ct. 1921, 1928, 128 L.Ed.2d 745 (1994) (citing Williams and stating that "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior."). Indeed, the Supreme Court has consistently ruled that "relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party." Barefoot, 463 U.S. at 898, 103 S.Ct. at 3397. We therefore follow Williams and join three other Circuit Courts in holding that the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process. [FN12] See Devier v. Zant, 3 F.3d 1445, 1464-65 (11th Cir.1993) ("[I]t is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well."), cert. denied, 513 U.S. 1161, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995); Coleman v. Risley, 839 F.2d 434, 459 (9th Cir.1988) ("We have long held that the due process clause does not preclude the sentencing judge from considering evidence of prior criminal conduct not resulting in a conviction."), rev'd on other grounds sub nom. Coleman v. McCormick, 874 F.2d 1280 (9th Cir.) (en banc), cert. denied, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989); Williams v. Lynaugh, 814 F.2d 205, 208 (5th Cir.) ("[T]he admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments."), cert. 6 denied, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987).

Hatch v. State of Oklahoma, 58 F.3d 1447, 1465 (10th Cir. 1995) (a capital case).[35]

The California Supreme Court, therefore, did not act unreasonably in denying petitioner's claim. Claim 76 should be denied.

\\\\\

---

[35] Hatch has been recognized as being partially overruled on grounds that have nothing to do with the principle at issue. The undersigned will not therefore list those citations.

1         *Claim 83 – Failure to Instruct the Jury That it Must Find the Penalty Beyond a*

2         *Reasonable Doubt*

3         Again, petitioner cites to no authority that the jury must be instructed that it make

4 its penalty phase determination beyond a reasonable doubt.  Indeed, the court cannot find that

5 petitioner has even opposed summary judgment on this issue in his opposition.  But, in any event,

6 the older authority which exists is contrary to petitioner's claim.

7              The joint opinion issued the same day in <u>Jurek v. Texas</u>, 428 U.S.
              262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), makes clear that

8              specific standards for balancing aggravating and mitigating
              circumstances are not constitutionally required.

9

10 <u>Zant v. Stephens</u>, 462 U.S. 862, 875 (n.13), 2733, 2742 (1983).

11         Petitioner might have argued that <u>Apprendi</u> changed everything.  <u>Apprendi</u>

12 required that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a

13 crime beyond the prescribed statutory maximum must be submitted to a jury, *and proved beyond*

14 *a reasonable doubt.*"  <u>Apprendi</u>, 530 U.S. at 490, 120 S. Ct. at 2348 (emphasis added).  In <u>Ring v.</u>

15 <u>Arizona</u>, 536 U.S. 585, 122 S. Ct. 2428 (2002), the Supreme Court held that <u>Apprendi</u> applied to

16 penalty phase determinations in capital cases.  However, <u>Ring</u> involved only the judge vs. jury

17 aspect of <u>Apprendi</u> because Arizona law already required the proof of aggravating factors beyond

18 a reasonable doubt no matter who made the decision.  Finally, the Supreme Court held in <u>Schriro</u>

19 <u>v. Summerlin</u>, 524 U.S. 348, 124 S. Ct. 2519 (2004), that <u>Ring</u> would not be applied retroactively

20 because the judge vs. jury aspect of <u>Apprendi</u> was not a watershed rule of procedure.  Again,

21 <u>Schriro</u> involved only the judge vs. jury aspect because in determining whether <u>Ring</u> was

22 retroactive, the reasonable doubt standard was necessarily not at issue.

23         It is an interesting and open question whether the reasonable doubt aspect of the

24 <u>Apprendi</u> ruling would constitute a watershed rule in the penalty phase context.  Unlike the judge

25 versus jury aspect, the reliability of the death finding may well be enhanced by a requirement that

26 the jury must find that the aggravating factors outweigh the mitigating factors beyond a reasonable

1   doubt as opposed to the undelineated present standard.  However, even assuming that Ring would

2   be retroactively applied to petitioner's case, insofar as Apprendi's  reasonable doubt requirement

3   is concerned, and that the jury should have been charged to make its ultimate determination

4   beyond a reasonable doubt, any such failure to charge is harmless error.

5           "In light of the Supreme Court's ruling in Washington v. Recuenco, __U.S.__, 126

6   S. Ct. 2546 (2006), we hold that Apprendi errors are reviewed for harmlessness using the

7   framework of Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)."

8   United States v. Zepeda-Martinez, 470 F.3d 909 (9th Cir. 2006).  Under that standard, "an error is

9   harmless if the court finds beyond a reasonable doubt that the result would have been the same

10  absent the error.'" Id.  In this case, application of the harmless error standard is easy.  Aside from

11  the predatory aspects of the murder and attempted murder of the Rumseys, the prosecution

12  submitted numerous episodes from petitioner's violent and predatory past.  On its side of the

13  balancing ledger, petitioner's trial counsel presented *nothing*.  Whether application of the

14  reasonable doubt standard could be likened to mathematically doubling, or tripling or quadrupling

15  the prosecution burden, two, three or four times zero remains zero.  The jury had nothing to

16  balance in petitioner's favor.  While petitioner's drug usage was known to the jury regardless of

17  the defense presenting no evidence on the subject during the penalty phase, it is just as likely that

18  jurors would consider this an aggravating factor than one mitigating the violent death of Mr.

19  Rusmey and the near death of his wife.  Many death penalty cases have involved evidence of drug

20  usage, and many juries have returned the death penalty as their penalty phase verdict nonetheless.

21  See e.g., People v. Hayes, 52 Cal. 3d 577, 276 Cal. Rptr. 874 (1990).  Certainly, in the absence of

22  any medical presentation regarding drug usage it cannot be said that unexplained drug usage is

23  necessarily mitigating.

24          The failure to instruct that the jury had to find that the aggravating factors

25  outweighed the mitigating factors beyond a reasonable doubt, assuming retroactive Ring

26  application, had no effect on the penalty phase verdict – and the undersigned can say that beyond a

1   reasonable doubt.

2       *Claim 87– Triple Counting of Evidence Regarding Petitioner's Intent to Steal*

3       *Improperly Resulted in the Death Penalty*

4       Petitioner complains that the jury "triple counted" petitioner's intent to steal to find

5   felony murder in the guilt phase, as a special circumstance (guilt phase), and at the penalty phase

6   (where jury could consider the facts and circumstances of the murder as a factor).  Petitioner cites

7   no pertinent established Supreme Court authority, much less any on-point authority, precluding

8   such triple counting.  Petitioner does cite Allen v. Woodford, 366 F.3d 823 (9th Cir. 2004), a

9   preAEDPA case, which stands for the proposition that multiple counting of aggravating factors *in*

10  *the penalty phase* may constitute a violation of due process.  Not only is Allen a pre-AEDPA case,

11  and reasonably applicable established Supreme Court authority is required for petitioner to

12  prevail, the Allen case is completely inapposite to the claim made by petitioner here.  Nothing in

13  Allen (or in common sense) precludes a jury from considering intent to steal in the guilt phase,

14  and then again in the penalty phase as a fact and circumstance of the crime.  See Lewis, 25 Cal.

15  4th at 676, 106 Cal. Rptr. 2d at 683.  Petitioner cannot prevail on this claim.

16      *Claim 96 – Ineffective Assistance in Failing to Object to the Constitutionality of*

17      *California's Death Penalty Statute*

18      The amended petition vaguely claims that trial counsel was ineffective because he

19  *"*failed to object to the 'triple-charging' and other constitutional deficiencies in California's 1978

20  death penalty statute."  Amended Petition at 297.  No further explanation is given.  The

21  undersigned has already found no merit in the triple charging allegations in terms of a federal

22  claim.  Petitioner does not suggest how the California Supreme Court's denial of such a claim

23  could constitute ineffective assistance from a state law perspective.  See Lewis, 25 Cal. 4th at 678,

24  106 Cal. Rptr. 2d at 684, ruling adversely to petitioner on the triple charging, and on the allegation

25  of ineffective assistance.  Moreover, no other claim about counsel's ineffectiveness vis-a-vis the

26  constitutionality of the 1978 statute would be exhausted as such level of generality fails to state a

1   claim in federal habeas.

2           *Claim 97 – The Death Sentence Fails Intra-Case Proportionality*

3           Petitioner asserts:  "The California Constitution requires intra-case proportionality

4   review (determination of whether sentence is proportional to the individual culpability of

5   petitioner).  The trial court's failure to conduct such a review violates petitioner's Fourth, Fifth,

6   Sixth, Eighth, and Fourteenth Amendment rights."  Amended Petition at 298.  In making this non-

7   sequitur, i.e., except for the creation of liberty interests, a violation of state law cannot itself give

8   rise to a violation of the federal Constitution, petitioner in essence requests that this court overrule

9   the state supreme court's decision that petitioner was sufficiently culpable.  Lewis, 25 Cal. 4th at

10  678, 106 Cal. Rptr. 2d at 684.  This court may not override the state court's determination under

11  state law.  Bonin v. California, 59 F.3d 815, 841 (9th Cir. 1995).  Nor does petitioner cite to a

12  Supreme Court case which is sufficiently applicable to the principle which he would like to

13  establish.

14          *Claim 98 – Failure to Require Written Findings By the Jury*

15          Neither state law nor the federal Constitution requires written findings by a jury.

16  Petitioner cites no case which requires such.  The claim is meritless.

17          *Claim 99 – California Death Penalty Statute Fails to Narrow the Population of*

18          *Death Penalty Eligible Defendants, Especially Felony Murder Defendants*

19          In footnote 11 of Karis v. Calderon, 283 F.3d 1117, 1141 (9th Cir. 2002), the court

20  held:

21        Because our decision entitles Karis to a new sentencing hearing, we
    do not address his other claims of error at the penalty phase with the
22        exception of his constitutional challenge of California's sentencing
    scheme.  With regard to this claim, we reject Karis' argument that
23        the scheme does not adequately narrow the class of persons eligible
    for the death penalty.  The California statute satisfies the narrowing
24        requirement set forth in Zant v. Stephens, 462 U.S. 862, 103 S.Ct.
    2733, 77 L.Ed.2d 235 (1983).  The special circumstances in
25        California apply to a subclass of defendants convicted of murder
    and are not unconstitutionally vague.  See id. at 972, 103 S.Ct.
26        2733.  The selection requirement is also satisfied by an

1   individualized determination on the basis of the character of the
2   individual and the circumstances of the crime.  See id.  California
   has identified a subclass of defendants deserving of death and by
3   doing so, it has "narrowed in a meaningful way the category of
   defendants upon whom capital punishment may be imposed." Arave
4   v. Creech, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188
   (1993).

5 Petitioner claims that the above quote is dicta.  It is not.  The Ninth Circuit specifically addressed

6 a claim made in the case and ruled adversely to it.  Petitioner cites no Supreme Court case at odds

7 with Karis.  That is the end of the matter.

8     *Claim 100 – California Death Penalty Statute is Unconstitutional Because it is*

9     *Vague and Uses Otherwise Improper Aggravating Circumstances*

10    Again, Karis held that California special circumstances are not unconstitutionally

11 vague.  To the extent that petitioner attacks the aggravating circumstances as being vague, the

12 undersigned does not understand the argument.   Petitioner argues in his Opposition at page 97

13 that *as applied to him* the *aggravating* factors were vague.  In the same paragraph, petitioner then

14 faults his trial counsel for not producing evidence during the penalty phase regarding *mitigation*,

15 and that therefore, no "individualized determination on the basis of the character of the

16 individual" was possible.  The argument does not follow a logical path with respect to vagueness

17 of aggravating factors, and the undersigned will not construct a traditional vagueness analysis of

18 all the factors sua sponte.

19     *Claim 101– California's Death Penalty Statute is Unconstitutional Because it*

20     *Fails to Require Inter-Case Review*

21    Petitioner cites no reasonably pertinent Supreme Court case for the proposition that

22 inter-case or comparative review among other capital defendants is required in order for a death

23 sentence to be valid.  The undersigned is not aware of any such authority.  The case cited by

24 petitioner, Pulley v. Harris, 465 U.S. 37, 104 S. Ct. 871 (1984) stands for the precise opposite

25 proposition as proffered by petitioner – that is, no comparative analysis is required.  The claim is

26 meritless under AEDPA.

1  *Conclusion*

2       IT IS HEREBY RECOMMENDED that all claims identified as raised in these

3  motions, <u>see</u> *Introduction*, do not warrant the grant of a habeas corpus petition; summary

4  judgment should be awarded to respondent on all claims at issue herein.

5       IT IS HEREBY ORDERED that unless otherwise provided below, the claims

6  identified in the *Introduction* as remaining to be adjudicated will be adjudicated after evidentiary

7  hearing.  After consultation with the undersigned's clerk, petitioner and respondent shall choose a

8  date in June 2007 for the commencement of the evidentiary hearing.  No later than February 8

9  2007, petitioner and respondent shall agree on those claims for which discovery shall be

10 permitted, and shall submit a stipulation and order by that date to this effect.  In the event that

11 petitioner and respondent cannot agree on discovery, said disagreements shall be the subject of a

12 court hearing on February 22, 2007.  On February 15, 2007, the parties shall file a joint statement

13 of disputed discovery and issues pertinent thereto.  All discovery, including expert discovery, shall

14 close on May 1, 2007.  That is all responses and depositions shall have been scheduled prior to

15 this date.  All discovery motions shall have been filed prior to this date, and noticed as near as

16 possible to May 1, 2007.

17      Experts shall be disclosed by petitioner on February 28, 2007; respondent shall

18 disclose experts by April 1, 2007.  Each party's disclosures shall be accompanied with the

19 information required by Fed. R. Civ. P. 26(a)(2).  Should a party desire to take depositions of

20 adverse experts, such discovery is authorized by this Order.

21      Each party shall serve an exhibit list, as well as copies of all exhibits, on the

22 adverse party no less than two weeks prior to evidentiary hearing.  All objections to exhibits shall

23 be heard at evidentiary hearing.  Also two weeks prior to hearing, each party shall file a witness

24 list identifying those persons, by name address and telephone number, who will testify at

25 evidentiary hearing.  Failure to include an exhibit or witness on a list shall preclude that exhibit

26 from admission or that witness from testifying.

1    Respondent may file a motion, no later than March 16, 2007, if respondent believes

2  that a claim or claims scheduled for evidentiary hearing would be precluded by 28 U.S.C. 2254.

3  The hearing shall be noticed for hearing date as soon as possible, but in no event later than May

4  10, 2007.

5    These findings and recommendations are submitted to the United States District

6  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

7  days after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10  shall be served and filed within ten days after service of the objections.  The parties are advised

11  that failure to file objections within the specified time may waive the right to appeal the District

12  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED: 1/22/07

                                 /s/ Gregory G. Hollows
14                               _____

15                               GREGORY G. HOLLOWS
    GGH:gh:035                   UNITED STATES MAGISTRATE JUDGE
16  lewi0013.sj

17

18

19

20

21

22

23

24

25

26