1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MILTON OTIS LEWIS,

11            Petitioner,                    No. CIV S-02-0013 FCD GGH DP

12        vs.                               **DEATH PENALTY CASE**

13   ROBERT AYERS, Warden

14            Respondent.             FINDINGS & RECOMMENDATIONS

15   _____/

16   _Introduction and Summary_

17            With increasing frequency, at least from the undersigned's anecdotal experience,

18   capital habeas petitioners seek to halt federal habeas proceedings they instituted, presumably

19   when competent, on account of present incompetency.  However, the right to do so is now well

20   established in the Ninth Circuit.  The parties' counsel have presented two starkly different reports

21   of petitioner's competency from their experts.  Petitioner's expert delivers a report which would

22   undoubtedly give rise to a conclusion of incompetence; respondent's expert paints a picture of a

23   person who could undoubtedly assist his counsel sufficiently such that there is no question these

24   proceedings should continue.  Petitioner's counsel, at the invitation of the undersigned, testified

25   to his sometimes problems with petitioner.

26   ////

1

1    The above evidence, for the most part, are snapshot pictures of petitioner on

2    particular days at particular times.  There exists no documented medical history at San Quentin,

3    presented to the court, which would in any way suggest that petitioner suffers from a mental

4    illness, of such present significance, that he cannot understand his habeas proceedings, or more

5    importantly, assist his counsel in investigating issues in this case, as counsel could possibly be

6    assisted in now investigating decades old events.  Moreover, the undersigned would have been

7    aided by reports whose examinations were videotaped in order that the eye could assist in this

8    competency determination as well as the ear.  Neither side presented such evidence.[1]  Petitioner's

9    counsel also chose not to present his client for any type of in-court testimony, or even videotaped

10   deposition testimony.

11         In sum, although the undersigned accepts petitioner's counsel presentation that

12   there are times in the recent past that petitioner was not able to rationally assist counsel due to his

13   mental problems, insufficient evidence has been presented that these periods are sufficient in

14   duration to have precluded counsel from acquiring the basic assistance that any sufficiently

15   rational petitioner would be able to give about his now long-ago trial proceedings or life events.

16   Insufficient evidence has been presented that petitioner was, at the time of the evidentiary

17   competency hearing, incompetent.  Without assigning a burden to either party, the undersigned

18   finds that petitioner is not presently incompetent, and recommends that the case not be stayed.[2]

19

---

20         [1]  The parties set forth procedures for the taking of evidence in a "joint submission"
     which included an agreement not to videotape the medical examinations except for "medical
21   necessity."  In hindsight, petitioner may have sought the non-videotaping agreement from
     respondent because all of petitioner's examinations had been completed at that time, and had not
22   been videotaped.  When the undersigned questioned why the examinations were not videotaped,
     the response back was that may be a "good idea."  RT 152.
23
          [2]  Nothing in the law is as asymmetric as magistrate judge jurisdiction.  While in criminal
24   proceedings, the undersigned has always, without objection, handled competency matters on an
     order basis, in civil proceedings, where the result of the proceeding may be a stay of the
25   litigation, Ninth Circuit precedent demands that the proceeding be adjudicated on a findings and
     recommendation basis.  Reynaga v. Cammisa, 914 F.2d 414 (9th Cir. 1992).   In an abundance of
26   caution, this matter will be decided on an F & R basis.

1    *The Governing Law*

2        There is no doubt in the Ninth Circuit that habeas proceedings must be stayed if

3 the petitioner is determined to be incompetent to proceed. <u>Rohan ex rel Gates v. Woodford</u>, 334

4 F.3d 803 (9th Cir. 2003). The standards utilized are essentially the same as utilized for trials.

> At trial, competence is defined as the ability to understand the proceedings and to
> assist counsel in preparing a defense. *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th
> Cir.1997). A competent defendant possesses "sufficient present ability to consult
> with his lawyer with a reasonable degree of rational understanding and a rational
> as well as factual understanding of the proceedings against him." Rohan, 334 F.3d
> at 808 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134
> L.Ed.2d 498 (1996)); see also *Indiana v. Edwards*, --- U.S. ----, 128 S.Ct. 2379,
> 2383, 171 L.Ed.2d 345 (2008) (noting distinction between defendants competent
> to be tried and defendants competent to defend themselves). As *Rohan*, *Holmes*
> and the above discussion make clear, competency to pursue federal habeas relief
> in a death penalty case requires that the petitioner possess essentially the same
> mental capacity that renders him competent to stand trial: the ability to understand
> and communicate rationally with counsel when necessary. See Rohan, 334 F.3d at
> 813; see also *Holmes*, 506 F.3d at 579; Mae C. Quinn, *Reconceptualizing
> Competence: An Appeal*, 66 Wash. & Lee L.Rev. 259, 301-02 (2009) (discussing
> *Rohan* and *Holmes's* approach to competence in post-conviction proceedings).
> With these fundamental principles in mind, we turn briefly to the evidence we
> have deemed sufficient to warrant a competency determination in similar contexts.

15 <u>Nash v. Ryan</u>, 581 F.3d 1048, 1057 (9th Cir. 2009) (competency on appeal case).[3]

16 Petitioner need not prove prejudice if he is incompetent; proceeding when the petitioner is

17 incompetent is structural error.

> Conducting an entire habeas proceeding while a petitioner is incompetent is no
> different. If this error would be structural and thus fatal even if the government
> could prove absence of prejudice post hoc, it follows a fortiori that the *petitioner*
> need not prove prejudice ex ante.

21 <u>Rohan</u>, 334 F.3d at 818 (emphasis in original).

22 \\\\\\

23

---

24     [3] Not surprisingly, all petitioners in non-capital habeas proceedings are "competent" to
proceed in habeas, even when a basis for their petitions involve incompetency at trial. Because
25 the posture of capital and non-capital petitioners is different, i.e., a capital petitioner may often
benefit by delay while a non-capital petitioner will almost always have nothing to gain by delay,
26 no non-capital petitioner ever claims that he is incompetent to proceed on appeal or in habeas.

1    The problem encountered by the undersigned in this capital habeas proceeding

2    (and probably many other proceedings) is that petitioner's competency is not static.  Unlike death

3    penalty trials, whose proceedings are relatively rapid compared to post-trial attack, state appellate

4    and state/federal capital habeas proceedings are unable to be consummated for decades in

5    California.  There may well be periods of time when assistance with counsel is not possible; but

6    there also may well be times when such assistance is available.  One might presume that counsel

7    can get all the assistance counsel requires during the "good times," and that after some period,

8    there is simply no more assistance needed (or wanted).  The undersigned is unaware of any

9    answer to this question, and must presume that the Ninth Circuit requires a present ability to

10   assist, whether or not assistance after so many years in the process seems practically necessary.

11   *Procedural Facts*

12   This case has encountered numerous motions and rulings on the merits of claims

13   which need not be recounted here.  The genesis of petitioner's motion to stay proceedings

14   commenced with the motion for evidentiary hearing on certain remaining claims, which was

15   heard by the undersigned on June 14, 2007.  During that hearing the undersigned commented

16   upon the lack of evidentiary support which would warrant an evidentiary hearing on mental

17   health and other problems, and gave petitioner two weeks to file same.  After an extension of

18   time was granted, the first Declaration of Dr. Pablo Stewart was filed on August 9, 2007.  On or

19   about November 25, 2008, while working on adjudicating hearing issues, the undersigned

20   noticed for the first time that the Stewart Declaration contained opinions of petitioner's present

21   incompetency.[4]  Petitioner was thereupon ordered to file a motion to stay the proceedings, or file

22

23        [4]  The undersigned observed this on a review of the docket in this case in November
     2008.  After the submission of the first Stewart declaration, the undersigned commenced work on
24   the evidentiary hearing issues and became further enmeshed in resolving his share of the now
     well known crush of prisoner cases and petitions in the Eastern District of California.
25   Unfortunately, this work superseded extensive work on this particular petition.  Moreover, the
     parties were relatively quiescent during this period as well.  Petitioner's counsel never initiated a
26   motion to stay based on incompetency.

1  a statement providing that petitioner was not challenging his competency to proceed.

2      Petitioner filed his motion to stay on January 30, 2009.  After a number of granted

3  extensions of time, respondent opposed the motion on the merits; an evidentiary hearing was

4  held on October 21, 2009 in which Drs. Stewart and Ponath (for respondent) testified (out of

5  order) as well as petitioner's counsel.  By agreement at hearing, the parties desired their experts

6  to confer after hearing to determine if the testimony given had changed either or both of the

7  experts' opinions.  After conferring, a statement was filed on October 30, 2009, which indicated

8  no change whatsoever had taken place.

9  _Substantive Facts_

10     The initial Stewart declaration, which commenced the competency inquiry,

11  provided that in the course of "ordinary" habeas investigation, petitioner was first evaluated by

12  Dr. Stewart on March 11 and March 13, 2003.  Dr. Stewart recounted that petitioner

13  "demonstrated paranoid delusions, ideas of reference, loose associations, pressured speech,

14  clanging associations, and inappropriate affect." Stewart Declaration (First)  at 5.  For example,

15  petitioner "frequently used nonsensical clang associations such as 'Between 6 to 9, 9 to 6, 96, 69

16  I don't remember anything.  I rolled up my six year old memories and I sit down and lose my

17  memorization.'"  Id.  Further quotes certainly illustrated a disturbed individual who was in need

18  of much assistance, and could give little, if any in return: "[Petitioner's] responses to my

19  questions during the March 2003 evaluations reflected markedly grandiose and paranoid

20  delusions.  When I asked how he was doing, he responded in a conspiratorial and knowing

21  manner, 'A guy came and asked me if I have coffee.  A couple of days later he comes by and asks

22  if I need coffee.  So why is he doing that?  Why is he asking?  He's trying to get at me.  He's

23  trying to tell me I need to join or they're going to get me.  Worse, me and mine, which isn't good

24  for Meeny and Moe.'".... Declaration (First) at 6.   "[Petitioner] was preoccupied with religious

25  references that he explained in illogical terms, such as frequently discussing Eve and 'her

26  ovulation, evolution.  She is not ready for motherhood so there is no ovulation... She's not ready.

1  It's a mind thing.  If I focus, somehow it infects Cain....'" <u>Id</u>.

2          No motion or other reference to the 2003 evaluations was made to the court at this

3  time, 2004, 2005, or 2006.  Dr. Stewart again evaluated petitioner on July 19, 2007: "On this

4  occasion, [petitioner] exhibited signs of psychotic thought process while presenting as much

5  improved from previous examinations.  He appeared neat and well-groomed, his affect was less

6  grandiose and he was not overtly preoccupied with frankly paranoid delusions as on the earlier

7  occasions."  Declaration (First) at 7.  Dr. Stewart thought that petitioner was "guarding against

8  appearing mentally ill, but marked by evident indications of psychotic ideation."

9          Dr.Stewart also gave petitioner MacCAT, a test to determine competence.

10  Petitioner did poorly in 2003, but by 2007, "[petitioner's] score on the Understanding

11  section...measured in the range of minimal to no impairment."  The test also included a

12  "Reasoning" section; petitioner's improvement from 2003 was again noted: "During later testing

13  in July of this year, [petitioner] improved measurably, to a score of 10, on the Reasoning section,

14  but was still in the mild impairment range."  Despite these improvements, Dr.Stewart opined that

15  petitioner "still lacks the ability rationally to assist his counsel."  Declaration (First) at 12-13.

16  Petitioner was declared by his expert as "not competent to stand trial."  Declaration (First) at 14.

17          In preparation for counsel's required statement of position to the court in respect

18  to petitioner's competency, Dr. Stewart penned another declaration on January 27, 2009

19  (Declaration (Second).  This declaration spoke of a visit to petitioner in May, 2008 and January

20  22, 2009.  Dr. Stewart noted his impression that "[petitioner's] overall presentation in both May

21  2008 and January of this year was very consistent with the clinical presentations noted during the

22  previous assessments of his mental functioning," but he did not relate whether "previous"

23  referenced 2003 or the improved 2007.  Dr. Stewart focused on petitioner's inability to "self-

24  direct" giving examples of petitioner's getting off track and stuck there when asked a question,

25  and his inability to intelligently respond to questions.  An example of his obsessiveness involved

26  his belief that the former Surgeon General, C. Everett Koop, held the keys to a successful defense

in this case. Stewart again opined that petitioner was incompetent at that time.

Respondent's expert, who himself practiced psychiatry full time at San Quentin, Roderick Ponath, gave a strikingly different picture of petitioner as of April 2009. Although he diagnosed petitioner with a mental disease of psychotic disorder, not otherwise specified, petitioner was characterized as a person with "residual aspects of a thought disorder which are currently manifested by mostly mild to occasionally moderate impairments with odd and eccentric ideations and a tendency to circumstantiality in his thought process associations, such that he does not become frankly disorganized, but does at times wander off the point, while responding to containment and redirection back." Ponath Report, Exhibit 1at 1.

Of most significance to the undersigned was the striking contrast in petitioner's ability to respond to specific questions about his habeas case without engaging in nonsensical syllogisms, an ability quite apparent from the trial transcript as well.

> Mr. Lewis related his understanding of his position in the appeal process by referring to his original attorney at his trial, Russel Schwartz, then his first appeal attorney, Mark Stoleman, and his current attorney, Dave Senior. He identified each by name and role in his case. He added that there were also paralegals involved headed by Scarlet Nerad in an office in San Francisco, one of whom was Laura. (He gave me the office telephone number, permission to contact her, and the call rang directly to the intended party, whom I later learned was with Capital Appellate Project).
>
> He said that he understood the appeal process took him from the state court to the state appeal court and to the state supreme court, with the need to exhaust appeal at each level, before it was turned over to the federal court. When asked to identify issues in his case which were being appealed, he listed three: 'I just went through them last night: Ineffective assistance of counsel by my original attorney at trial and then my first appeal attorney...Prosecutorial misconduct: they did not submit information to me that they should have for my defense...and Jury misconduct: they didn't answer truthfully in the voir dire...some were laid off that shouldn't have been and some were put on that shouldn't...rules were presented to the jury then the jury didn't follow them.'"

Ponath Declaration, Exhibit 1 at 2 (ellipses in the report).

Ponath did give examples of the "current idiosyncratic quality of [petitioner's] thought process." For example, petitioner recalled a time when he was in a coma from a 1977 assault (written 1997 in the report) for which the after effects included a difficult time

7

remembering.  Petitioner then went into a discussion of a weight lifting incident on the yard in San Quentin wherein petitioner's "power left [him]" when he was lifting over 200 pounds.  This incident, for some unknown reason, "made him realize the damage that had been done previously."  This realization caused him to change his lifestyle at San Quentin; he stopped going to the exercise yard and withdrew from his peers.  "He said that this type of confusion only cleared over recent years."  Ponath, Exhibit 1at 4.

Petitioner did exhibit some paranoia, but he coupled this paranoia with the realization that he could be wrong.

> Of further note was an instance in our first interview in which [petitioner] spontaneously told that a couple of weeks previously, the telephone company which operated the pay phones Death Row inmates use at their cell fronts had abruptly cut off service.  It bothered him and he speculated that there might have been some malicious intent directed specifically at himself.  However, he went on directly to say, 'sometime's it's deliberate, sometimes it's accidental, coincidental.'"

Ponath, Exhibit 1at 5.

Despite these "idiosyncracies" Dr. Ponath believed that petitioner's problems were "not so severe that he has lost the [capacity] to appreciate his position in his current death penalty appeal, to make rational choices with respect to proceedings in the Court, and to communicate rationally with counsel regarding the proceedings....I do think that his ability significantly outweighs his impairment."  Ponath Exhibit 1 at 5-6.

The Ponath report contains further examples and explanations by petitioner countering things he previously related to the Dr. Stewart; however, the above sufficiently characterizes the reports.

At evidentiary hearing the declarations/reports were admitted into evidence.  The experts added little by way of testimony in a substantive sense, but explanations given in testimony about their declarations are instructive.  Dr. Ponath was called out of order.  He confirmed his declaration and added the following.  His opinions were expressed to a "reasonable medical probability," but he equated this to what he believed to be a synonymous term – a

1   reasonable medical certainty, i.e. to a 95%-98% probability.  RT 32-34,  35.  Petitioner had not

2   received mental health treatment at San Quentin, RT 67, and Dr. Ponath did not believe that

3   petitioner needed such treatment at the time he saw petitioner.  RT 27.  This was so despite his

4   diagnosis of petitioner having some mental illness because petitioner's symptoms were relatively

5   minimal.  RT 41.  Dr. Ponath respected petitioner's expert, Dr. Stewart, and would not take issue

6   with Dr. Stewart's observations, RT 58, especially those of 2003, but he expressed surprise that

7   petitioner was in as good a shape as he was when he examined petitioner.  Dr. Ponath was

8   surprised as he had reviewed Dr. Stewart's reports earlier.  See Rt 45, 97.

9           Dr. Ponath did disagree with Dr. Stewart's diagnosis, RT 55-56, because he would

10   have expected petitioner to be worse off, as a person with schizoaffective disorder usually

11   degenerated over time – and that is not how Dr. Ponath found petitioner.  Dr. Ponath ruled out

12   the possibility that petitioner could put on a competency facade for him, but in reality would

13   actually be incompetent to proceed in this habeas action.  RT 64-65.  No explanation could be

14   found why, if petitioner was suffering from the symptoms seen by Dr. Stewart in 2003, no

15   official recordation whatsoever was made of such florid symptoms.  RT 81-82.

16           Dr. Stewart adopted his declarations as his testimony.  RT 161.  Petitioner's

17   expert strongly asserted that petitioner was incompetent at all pertinent times, even at his "best."

18   RT 163.   He believed petitioner to have been worse off at the time of trial.  RT 204.  It appeared

19   initially from his testimony that Dr. Stewart believed petitioner's "psychotic" designation itself

20   made him incompetent.  RT 163.  But see RT 210, 217 where he emphasized that this was not

21   the case.  Even petitioner's competency testing at a "mild impairment" level demonstrated

22   incompetence according to this witness.  RT 175.

23           At his worst, petitioner qualified for forcible treatment, RT 176; but Dr. Stewart

24   was unsure whether petitioner currently required such treatment.  Id.  He was unsure whether

25   instituting a drug regime could bring petitioner to competency.  RT 170, but thought it possible.

26   RT 214-215.

When questioned how petitioner could function at San Quentin day-to-day, and why no recordation appeared anywhere in petitioner's records about florid symptoms, Dr. Stewart believed that petitioner coped by "keeping to himself," RT 167-168; petitioner's affable manner could fool a lot of persons, even trained medical personnel.  RT 171.  Dr. Stewart also believed the mental health treatment at San Quentin to be so bad that a very sick person would essentially go unnoticed.  RT 169.  However, Dr. Stewart believed petitioner to have been "much improved" when he saw petitioner in 2007, as opposed to 2003.  RT 206.

Dr. Stewart also believed that Dr. Ponath had re-directed petitioner with his questioning, when petitioner started to go off track, and therefore, Ponath did not see the real petitioner.  RT 167.

At no time did Dr. Stewart refer his findings to San Quentin staff.  RT 211.  He did not remember whether he ever discussed with counsel making such a referral.  RT 212.  Counsel did not refer his client for mental health treatment.  RT 232,233.

At the court's invitation, petitioner's counsel (Mr. Senior) testified to his interactions with petitioner.  Counsel became increasingly concerned over the years about not being able to "get anywhere" when seeking petitioner's assistance.  RT 222-223.  Mr. Senior gave the very recent example of petitioner's showing him a Bible, petitioner relating the Bible to C. Everett Koop, and how this would influence petitioner's case – but petitioner could never rationally explain this.  RT 223-224.  Petitioner would always inflict long, irrelevant monologues on his counsel.

*Discussion*

There is no doubt that if petitioner presented today, as he presented to Dr. Stewart in 2003, petitioner would be incompetent to proceed with this petition.  However, petitioner does not presently present as he did in 2003.  How he presents more or less at the current time is a "tale of two experts" – he is in the worst of shape; he is, while not in the best of shape, completely competent.  It is difficult for the undersigned to square the opinions of both experts,

10

1    both of whom presented their opinions in a credible fashion.[5]

2              Of particular significance to the undersigned, weighing in favor of a lack of

3    competency, is the testimony of petitioner's counsel.  Oftentimes, the observations of counsel are

4    primary in the analysis. Mr. Senior is well known to the undersigned over the course of two

5    capital habeas proceedings, and he has always been candid, forthright and credible with the

6    undersigned in all his dealings.  Mr. Senior's observation that petitioner cannot assist him to any

7    satisfactory degree is entitled to weight.

8              Nevertheless, the undersigned finds petitioner currently competent enough to

9    proceed in his habeas action for the following reasons.[6]

10             First, no party really contests petitioner's capacity to understand the present

11   proceedings.  The 2007 MacCAT test administered by Dr. Stewart demonstrated "little to no

12   impairment" in understanding the nature of these proceedings.  Petitioner's responses to Dr.

13   Ponath clearly show his appreciation of these proceedings and the issues therein.  Moreover, even

14   Dr. Stewart discounted this area as one which really troubled him.  RT 188.

15             The main point of concern presented by petitioner's counsel is petitioner's ability

16   to assist counsel – here, to directly respond to questions put to him  by counsel such that counsel

17

18        [5] Counsel for petitioner intimated by his questioning that Dr. Stewart had the benefit of
     seeing petitioner over six years, RT 71, 164, 175, suggesting that this continuous process gave
19   Dr. Stewart an advantage over Dr. Ponath who surprisingly had no occasion to treat petitioner at
     San Quentin, but who first met petitioner in connection with the competency issue.  Petitioner
20   argues this point in his post-hearing brief as well.  However, Dr. Stewart's contact with petitioner
     was not all that continuous; Dr. Stewart testified that there was a four year gap in his seeing
21   petitioner from 2003 to 2007, RT 196, and then again, apparently, a one year gap until 2008.
     Moreover, Dr. Stewart's contemporaneous notes were destroyed, at least for some of the
22   examinations, and he prepared the declarations from memory.

23        [6] It does not violate due process to assign the burden to the person asserting
     incompetency.  Medina v. California, 505 U.S. 450, 112 S.Ct. 2572 (1992).  In federal criminal
24   proceedings, the burden of proof is placed upon the party asserting the defendant's incompetence
     by a preponderance of the evidence.  18 U.S.C. § 4241 (d).  However, in federal habeas
25   proceedings, as opposed to criminal proceedings, the burden is on the court to find competency,
     or not, by a preponderance of the evidence, i.e. the burden is on the court to get it correct.  Mason
26   by and through Marson v. Vasquez, 5 F.3d 1220, 1225 (9th Cir. 1993).

1  can be put on the right path regarding issue investigation, or fact confirmation, germane to these

2  proceedings.  There does not appear to be any acts of irrational obstruction, i.e., acts performed

3  by petitioner demonstrating a refusal to work with counsel, nor does it appear that petitioner has

4  any non-rational  "put me to death" or other agenda which colors everything he does.

5  Petitioner's counsel himself testified that it is not petitioner's willingness to assist in this case

6  which concerned him, but petitioner's inability to do so.  RT 222-224.

7           In this vein, however, the court cannot reconcile petitioner's directly responsive

8  answers to Dr. Ponath's questions with Dr. Stewart's opinion, and counsel's observations, that

9  petitioner is incapable of doing so.  Dr. Ponath asked petitioner direct questions about his case,

10  and petitioner responded to the thrust of the question in a logical manner.  In addition to the

11  given example above,  petitioner was asked: "if he was satisfied with his present attorney, Mr.

12  Senior."  He straightforwardly said that he was.  He stated, 'I've been leaving my work to may

13  (sic) attorney.  I trust him."  Ponath Report, Exhibit 1 at 2.  Such an opened ended question

14  would have been a prime opportunity for petitioner to go off on a tangent if he were so inclined

15  (or compelled by some mental disease), but he did not.  He answered the call of the question in

16  an intelligent manner.

17           Dr. Stewart criticized Dr. Ponath for "redirecting" petitioner during the Ponath

18  interviews when petitioner started to go off track, and that this "redirection" hid petitioner's true

19  propensity to commence an illogical blather.  However, Dr. Stewart has missed the point.  If

20  petitioner *can be redirected* so that he can again focus on what was asked, and then answer the

21  question satisfactorily, then petitioner's ability to assist counsel is not so degraded that nothing of

22  value can be obtained from a structured question-answer-redirection-answer session.

23          Moreover, petitioner's ability to pull it together for Dr. Ponath is not the first

24  example of his being able to answer questions in a logical manner.  At the time of trial, a time at

25  which Dr. Stewart opined petitioner would be having *more* difficulty with his inability to assist

26  counsel, RT 203-204, the transcript reveals a person who was quite able to understand a question

1  asked of him, and respond to that question in a satisfactory fashion.  The trial transcript in this

2  case reveals no instance brought to the attention of the undersigned where petitioner engaged in

3  irrelevant monologues.  Rather, his testimony at trial revealed the opposite:

4        [by petitioner's trial counsel]

5        Q. And did this apartment [Amy and Marie's apartment] have any type of regular
      sleep schedule.

6        A. No.  There was times– I remember, Marie I think amid the experience, there
      was a time she fell out during the day and would sleep.  And when she woke up ,

7        it was activity until that occurred again.  Same thing with Amy, she'd go until
      they–they would– there was a couple of times where I went to the bathroom and

8        they had used and I'm not sure about times now.  But I know that after they came
      out of the bathroom, they'd go for periods of eight or nine to twelve hours of

9        constant activity and then they would just be this shutdown, they'd start breaking
      down and you'd find them asleep.

10       Q. Now, Mr. Lewis, you've used methamphetamine, correct.?
      A. Yeah.

11       Q. The symptoms that you're talking about that you observed with Marie and
      Amy, is that something that happens with the use of methamphetamine?

12       A. Yeah.
      Q. And you're familiar with the term. "A run"?

13       A. Yeah.
      Q. What is that?

14       A. That's the period I just spoke of, like the twelve hours.  Whenever there's a
      beginning usage, they put up into this driven state and you just begin to operate

15       until that, I guess the drug wears down or lets you go.

16 RT 3398-3399.

17 Perhaps petitioner did not use the King's English in his responses, nor were all of them smoothly

18 flowing, but one definitely acquires the impression that petitioner was thinking about the

19 question, and more importantly responding to it with intelligent information.

20         And, when petitioner was given an open ended question where he could go off on

21 a tangent if unable to contain himself, he did not:

22 [with respect to petitioner's being introduced by June to Amy and Marie]

23       Q. And June, did she introduce you to Marie at that time?
      A. Yes.

24       Q. How long did you talk to Marie Baker or Amy Hadix on that occasion?
      A. The first time?

25       Q. First time.
      A. Few minutes.

26       Q. Okay, when was the next time you met them?

1    A. Was the– three days before the incident.
     Q. Okay.  And explain what happened on that occasion.  How did you come to
2    meet them then?
     A. I had somehow come down to staying with this guy across town by the
3    downtown medical center.  They live behind there or something.  And he put me
     up for about a week.  Well, originally started with a girlfriend, me and Pam broke
4    up and I had left her home and the first people I run into that I knew was this
     particular guy and he wanted to purchase some drugs.  So, I didn't know of
5    anybody and June was one of the persons I knew offhand that I could find and
     then find through her other sources.  And actually, I came over there for that
6    purpose.
     Q. Okay.  And did June then introduce you to Marie?
7    A. Well, she just– I'd already been introduced, she just took me up there again to
     see if this guy could sell them some drugs.
8

9    RT 3395-3396.

10   Petitioner went on to discuss how he came to work on Amy's van, and generally how he came to

11   "hang around" the apartment complex where the capital offenses took place.  Surely petitioner

12   did not have an economy of words at all times, and may have been somewhat confusing in

13   communication, but any counsel seeking assistance in terms of the background events to the

14   crime would have understood that June introduced petitioner to the two women and he was

15   involved in drug deals involving them just prior to the "incident."  Petitioner made sense then,

16   and he made sense to Dr. Ponath in 2009.

17          Despite attempts to explain away petitioner's lack of any prison mental health

18   record, the lack of records or observations of bizarre behavior on the part of petitioner such as he

19   exhibited to Dr. Stewart in 2003, is irreconcilable with an opinion of near continuous

20   incompetence.  Persons babbling nonsense over lengthy periods of time would certainly have

21   required some type of record annotation by prison staff as a person this incompetent could not

22   long care for himself in the prison environment.  As part of the basis for his opinion, Dr. Ponath

23   queried a correctional officer about petitioner's activities, and no out of the ordinary behavior

24   was mentioned.  Moreover, neither petitioner's counsel nor petitioner's expert reported

25   petitioner's bizarre behavior to prison officials despite the now stated opinion that in 2003,

26   petitioner would have been a candidate for forced mental health treatment/medication.  While the

14

1  undersigned has no doubt that petitioner may well have, on occasion, acted in the manner

2  described by Dr. Stewart and petitioner's counsel, the lack of any recordation of severe bizarre

3  symptoms *over a two decade period* belies a present finding of present and long-term

4  incompetency.

5         Further, Dr. Stewart was not the only medical, mental health professional to have

6  examined petitioner over the course of these proceedings.  Yet *nothing* was presented to the

7  undersigned by way of evidence that these professionals could not examine and interact with

8  plaintiff because he was unable to communicate or assist in these mental health examination

9  endeavors.

10        Of special note as well is the fact that in 2007, when petitioner was last

11  administered the MacCat competency test, petitioner scored very well on understanding the legal

12  process and was only "in the mild impairment range" for reasoning/assistance capabilities.

13  While the undersigned has no doubt that petitioner's underlying mental illness was in existence

14  during this testing as testified to by Dr. Stewart, the attempts to explain away the easily

15  understood phrase, " in the mild impairment range," were unpersuasive.  Petitioner's symptoms,

16  as opposed to the mere presence of his disease, simply were not active enough to render him

17  incompetent at all times, or even a good percentage of the time.[7]

18        Finally, petitioner was not presented to the court, either by way of in-person

19  testimony, or videotaped deposition, to demonstrate his inability to assist counsel.  (See footnote

20  1 above).  While the undersigned professes no expertise in diagnosing or treating mental

21  illnesses, the undersigned has certainly over the years been able to identify situations which

22  required the suspension of proceedings because of possible incompetence.  The undersigned

23  knows when a person is not answering questions asked, is running hopelessly off subject in

24  conversation, or is otherwise unable to communicate rationally – such happens from time to time

25

26        [7] The testing results were not presented in court.

15

1 in court proceedings.  An inference has to be drawn that the apparent reluctance to present

2 petitioner for questioning in court stems from the fact that he would be more as Dr. Ponath saw

3 petitioner in 2009 than as Dr. Stewart observed in 2003.

4 *Conclusion*

5    For all of the above reasons, the undersigned cannot find that petitioner presently

6 manifests such incompetence that the instant proceedings cannot continue.  The court

7 recommends that petitioner's (counsels') motion (docket #128), in response to the court's

8 inquiry, to have himself declared incompetent and to have these proceedings stayed be denied.

9    These findings and recommendations are submitted to the United States District

10 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

11 days after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14 shall be served and filed within fourteen days after service of the objections.  The parties are

15  advised that failure to file objections within the specified time may waive the right to appeal the

16 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17 Dated: January 26, 2010     /s/ Gregory G. Hollows

18           UNITED STATES MAGISTRATE JUDGE

19 GGH:gh:035
lewi0013.f&r

16